IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
MACON DIVISION

ADAM SINDELL,                )
            Plaintiff,       )
                             )CIVIL ACTION
        vs.                  )FILE NO.5:22-cv-00365
                             )
LATONYA COACH, et al.,       )
            Defendants.      )
--------------------------/


    Zoom Videotaped and Video-Conferenced Deposition of

ADAM HARLAN SINDELL, taken on behalf of the Defendants,

for the purposes of cross-examination, discovery and for

any and all other purposes provided by the Federal Rules

of Civil Procedure, pursuant to Notice and by agreement

of the parties, all formalities waived, before Gaye D.

Traynor, Certified Court Reporter, at Macon-Bibb County

Detention Center; 668 Oglethorpe Street; Macon, Georgia,

commencing at 1:19 p.m. on Friday, March 24, 2023.

BULL & ASSOCIATES, INC.
COURT AND DEPOSITION REPORTERS
315 W. Ponce de Leon Avenue, Suite 650
Decatur, Georgia 30030
(404) 256-2886

APPEARANCES OF COUNSEL:

On behalf of the Plaintiff:
        JESSICA SWORDS BURTON, Esquire
        BERNARD & JOHNSON, LLC
        5 Dunwoody Park
        Suite 100
        Atlanta, Georgia 30338
        PH:    404.477.4755
        EMAIL:  jessica@justice.law

On behalf of the Defendants:
        JASON C. WAYMIRE, Esquire
        WILLIAMS & WAYMIRE, LLC
        4330 South Lee Street
        Building 300, Suite A
        Buford, Georgia 30518
        PH:    678.541.0790
        FAX:   678.541.0789
        EMAIL:  jason@wmwlaw.com

Also Present:
Lt. Grant, Macon-Bibb County Jail

### INDEX TO PROCEEDINGS
### EXAMINATION INDEX

**WITNESS:**
**ADAM HARLAN SINDELL**


**EXAMINATIONS:**                               **PAGE**

**Examination by Mr. Waymire**                    5

**Examination by Ms. Burton**                     46

**Further Examination by Mr. Waymire**            46

**Further Examination by Ms. Burton**            187

_____

### INDEX TO EXHIBITS

**DEFENDANTS' EXHIBITS MARKED:**                **PAGE**

**1 Incarceration Details**                     179

**2 Screenshot**                                135

          (In the following transcript, dashes [--] are
used to indicate an intentional or purposeful
interruption of a sentence, and ellipsis [...] is used
to indicate halting speech or an unfinished sentence in
dialogue, written material.)

(Reporter's disclosure presented and
attached hereto.)

MR. WAYMIRE:  Begin video 1:19 p.m.

Let me just say a few things, and then
we'll swear you in, Mr. Sindell --

THE WITNESS:  Yes, sir.

MR. WAYMIRE:  -- and start asking you
some questions.

This will be the deposition of Mr. Adam
Sindell taken in the case of Sindell V Coach and
other folks by the defendants pursuant to
agreement of counsel and Notice.

We're going to reserve all objections
except -- except as to form of the question and
responsiveness of the answer.

Is that agreeable?

MS. BURTON:  Agreeable.

MR. WAYMIRE:  And do you have a
preference as to reading and signing?

Do you want to decide now or later?

MS. BURTON:  We'll reserve for now.

MR. WAYMIRE:  All right.  Fair enough.

This young lady is going to swear you,
Mr. Sindell, and I'm going to start asking you
some questions.

```
                              * * *


                     ADAM HARLAN SINDELL

being first duly sworn, was examined and testified as

follows:

                       EXAMINATION

BY MR. WAYMIRE:

        Q    All right, sir.  Could you start by

telling us your full name?

        A    My full name is Adam Harlan Sindell.

        Q    And what year were you born?

        A    1975.

        Q    We're here in the Bibb County Jail.  You

agree with that?

        A    Yes, sir.

        Q    And we're here 'cause you're here.  This

is where you're staying right now; right?

        A    Yes, sir.

        Q    Where do you normally live when you're

not here?

        A    I live normally in middle Georgia area:

Macon, Georgia.

        Q    Is there a particular address?

        A    Yes, sir.

        Q    What is that?
```

```
 1        A      198 Highway 57; Macon, Georgia 31217.

 2               Let me just say that that's not where I

 3        live anymore.  I'm selling that property so...

 4        Q      Yeah.  Who do you live there with?  Or

 5   who did you live there with until you came here?

 6        A      My fiancee.

 7        Q      And who is that?

 8        A      Kayla Roberts.  My two children.  Sorry.

 9        Q      I take it they're under the age of 18?

10        A      Yes, sir.

11        Q      And how long have you lived with Kayla?

12        A      Not at that address.  I've lived with

13   Kayla about three years.

14        Q      Over those three years has anybody

15   else -- any other adults lived with you?

16        A      No, sir.

17        Q      Tell me, what kind of -- well, let's --

18   let's talk about school first.

19               You grew up where?  Florida?  South

20   Florida?

21        A      Yes, Hollywood, Florida.

22        Q      Hollywood, Florida.  You graduated high

23   school?

24        A      Yes, sir.  I have a -- I went to a

25   vocational school afterward for a year.
```

**Q**   What kind of vocational school?

**A**   Business and customer service technology.

**Q**   And did you get any kind of certificates or IDs or something?

**A**   Yes, sir.

**Q**   What's that?

**A**   Just a vocational short period.  I got it from Middle Georgia Tech. actually so but it's just a vocational -- just a certificate type of course, you know.  I'm not sure exactly what they call it, but it's -- it was a -- took me a year to get it, and it was about windows basically, learning how to do windows and do business -- business-type course.

**Q**   And then so what kind of work have you done?

**A**   I've done this -- I've had the same job my entire life.  I worked for my father's construction company.  I progressed from, you know, a menial laborer all the way up to project manager.

**Q**   Is that commercial?  Residential?  Both?

**A**   Commercial, sir.  Build mausoleums in the cemeteries.

**Q**   And where about?

**A**   The company is based in middle Georgia in Warner Robins, Georgia.  But all the work was out of

state, mostly Miami and New Jersey.

Q    So I take it that before you came here,
you're -- you were still working for that company?

A    He shut the company down about a year and
a half ago maybe due to health concerns.

Q    And so when the company shut down, what
did you do for work?

A    I moved over to doing work residential.
I started doing remodeling, privacy fences, decks,
patios, stuff like that.

Q    Just working for yourself?

A    Yes, sir.

Q    So it a company?  Or is it word-of-mouth
sort of thing?

A    I had a business license under the name
Concreation.  I had a business license under the name
Concreation, C-O-N creation.  I only had that for one
year.

And then after that I did a sole
proprietorship that was just my own.  But it -- I'm
not sure if it's listed in the -- in the books or
not, but I was working for myself so...

Q    I understand that you have sued about an
incident that happened at the Houston County Jail and
that you are claiming personal injuries from that?

A     Right now?

          Q     Well, you claim, I think, that in

connection with the incident at the Houston County

Jail you were injured?

          A     Yes, sir.

          Q     Your body was injured?

          A     Yes, sir.

          Q     All right.  So my question while we're

talking about work is, did you miss any work or were

you unable to do some kind of work due to some kind

of injury that you claim you sustained in this

incident?

          A     Yes, sir, absolutely.  That's really the

main cause of me bringing this lawsuit forward is

because I can barely do anything that I used to do as

far as my back starts hurting real early in the day.

                I used to work 12-, 15-hour days.  And

now I get two hours into a workday, and -- and I

can't even continue on.  So that's what led me to

bring this lawsuit forward is that I realized that my

back's really messed up so...

          Q     So what part of your back is hurt?

          A     I guess you would say lower back.

          Q     And so the symptoms are still ongoing?

          A     They're hurting right now, sir, as we

speak.

        Q    Have you ever gotten any kind of medical
treatment for that?

        A    I've had medical treatment in Houston
County Jail.  They sent me to specialists.  I went
there.  They gave me medication.

             When I got out, I was in the process of
trying to find a doctor that would -- I didn't have
the money basically for a doctor so I was trying to
find someone that would, you know, work with me or
whatever.  And it was kind of difficult to find
proper treatment because of that, that I didn't have
the cash.  I didn't have the cash because I'd just
been released from incarceration and hadn't been, you
know, working then.

             Then I wasn't able to do the same jobs I
was because my back was hurting so bad.  So I
couldn't make as much money, and I really couldn't
afford proper medical care, you know.

        Q    So what I'm hearing -- you correct me if
I'm wrong.  What I'm hearing, though, is that you
received some medical treatment for your back while
you were incarcerated in Houston County Jail.  But
then after you were released, no medical treatment
for your back; is that right?

A     Yes, sir.

          Q     So while you were in the jail, let's just
talk about your -- the treatment that you got for
your back.  Explain that for me.

          A     They gave me -- they sent me to a
specialist, and he said that there's definitely a
problem.  And he prescribed different medications.  I
took them.  They were -- they worked somewhat, you
know.  He said that I'd be able to get more, you
know, in-depth with my treatment once I got out.

          Let me just say that when I got out, I
mean, there really wasn't a lot of time, you know,
for me to -- I got -- it wasn't -- they gave me
medication to take home with me.  And then, you know,
it wasn't a long time, you know, from the time that I
got out and that medication ran out until the time
that I was -- you know, had some more legal issues
and was, you know, incarcerated again so...

          Q     So you talked about medication.  What
medication were you prescribed?

          A     I don't know, sir.  Houston County Jail
could give you the record of that.  But I'm not sure
of the type.  I just took it so...

          Q     Was it -- I know you might not know the
name of it.  But was it in the nature of pain

medication or something else?

      **A**    It was definitely pain.  They gave me one

for pain medication and one for muscle relaxer type

and one for a -- like a sedative-type thing so I

could sleep.  And they gave me an extra mattress and

extra blanket and, you know, different things to

accommodate my -- my back.

      **Q**    Who was the specialist that you talked

about?

      **A**    They -- they would have to tell you, sir.

I can't remember.  It's been a couple years ago.

      **Q**    Did the actual jail medical staff give

you any treatment or evaluate you?

      **A**    Not really, sir.  It was during the COVID

thing, and they -- they diagnosed me over a laptop

computer, you know, on a video chat.  And I -- and I

complained about that, wrote grievances:  Hey, how

can I properly be diagnosed over a laptop?

           The doctor originally told me to hold my

elbow up to the -- to the camera on the laptop.  And

I really didn't even have a problem with my elbow,

you know.  So it was kind of -- I wrote a grievance

and saying:  Hey, you know, this is not right.  And

when I did, then they sent me to the hospital.

           And then the doctor at the hospital

referred me to other people and kind of forced them

to -- or I don't know, told them that they needed to

give me better treatment than what I was getting.

      Q   Did you ever have any kind of diagnostic

imaging, like an MRI or something of that nature?

      A   Yes, sir, I did.  It was nine days after

the incident.  The doctor said that I was supposed to

have had a CAT scan immediately because I was knocked

unconscious.  And but they didn't take me to the

hospital for nine days after the incident happened.

      Q   So when you went to the hospital, was it

an MRI that happened?

      A   They -- I think it was a CAT scan maybe.

      Q   To your head?

      A   Yes, sir.  I was slammed on my head as

well as my back.  My head hit the concrete first so

there was blood everywhere, and that's what they --

you know, they were the most concerned about 'cause

they said I could have some type of bleeding in my

head or whatever.

      Q   Was there any kind of imaging on your

back?

      A   I don't remember, but I don't think so.

Yeah, maybe, maybe.  I don't want to say 'cause I'm

not positive.  I think maybe, but I can't remember

for sure.

Q    But the one thing you remember is some kind of imaging to your head?

A    For sure I had that done.  But the doctor said that he felt like it was a little late.  It'd been nine days so -- 'cause I -- that's why I remember that is because he told me that I should have had that done a week ago or whatever so...

Q    Do you remember any kind of diagnosis about your head?

A    No, sir.

Q    Did you ever hear anything from anybody that said there was something wrong with your -- your head or had a brain injury or something like that?

A    No, I didn't.

Q    Do you have any information or is there any suggestion here that, you know, you had some kind of brain injury from that?

A    I mean, I know I had a concussion because I've had a history of concussions.  And so I know that -- that I had another concussion because I've went through it before.  That -- but, you know, that lasted a week, maybe two weeks, but that wasn't the -- that wasn't the -- to me that wasn't the most serious injury.

My back was hurting really bad so I was more concerned with getting that taken care of. I'm kind of the person that doesn't -- doesn't like to -- you know, I'm not hurt. I'm fine. I'm -- I'm superman, you know.

But after a while I realized: Hey, you know, you're really hurt. You need to get something done about this, you know, so...

Q    So kind of what I'm hearing about your head at least is that you believe you had a concussion; is that right?

A    Yes, sir.

Q    A doctor didn't tell you that; is that true?

A    That's true.

Q    And you believe you had -- had a concussion --

A    Yes, sir.

Q    -- because you had a history of -- of concussions, and this acted the same way; is that right?

A    Yes, sir. But let me reiterate that you said that the doctor didn't tell me. I don't know that the doctor didn't tell me. I just don't remember him telling me that.

Q   Fair enough.  Fair enough.  I appreciate you adding that.

So you say you have a history of concussions?

A   Yes, sir.

Q   From what?  Playing football?

A   Martial arts, sir.  I had to stop taking them because of it so...

Q   So before this incident, which I think I believe happened in 2020; is that right?  Yeah. Yeah, 2020 -- you'd had how many concussions?  Just estimate for me.

A   I mean, on record?  Or are you asking me what I think or...

Q   Let's go with what you think first.

A   Actually, I've never actually been formally diagnosed with having a concussion.  But, I mean, I've watched football, and it kind of gave me the same impression.

But, I mean, never have I been to the hospital and they say:  Hey, you've had a concussion, that kind of thing.  Because I'm not the type to go to hospitals or to, you know, complain about having any medical problems.  I mean, this is -- this is new to me so...

Q   So in terms of what you believe is a concussion, why don't you define that for us.

A   Well, just headache not going away for several days after a head trauma, something like that.

Q   Anything else?

A   This -- this particular one lasted almost -- I mean, my head was ringing for maybe three weeks so...

Q   Is there any other symptom that you define as a concussion symptom?

A   I couldn't -- my eyes, it was -- seemed super bright in the room.  I complained to the medical staff that I -- the lights were too bright in my room that -- you know, that when I opened my eyes, it was, you know, giving me worse of a headache.

I was nauseous for three or four days, and I had a headache that didn't go away for maybe three weeks.

Q   Yeah, so those -- that set of symptoms, is that what you associate with having a concussion?

A   Yes, sir.  Yes, sir.

Q   And so using that as a definition -- a working definition for what a concussion is, how many other concussions did you have before this incident?

A    Well, none because there was nothing
anywhere close to that.  I mean, I -- I've had a
headache for a day or two.  We could say that, and
I'd call that a concussion.  But until this happened,
I never had anything comparable to this happening
before so...

          Q    So you had lesser --

          A    Much less.

          Q    -- head trauma?

          A    I'm sorry.

          Q    Lesser head trauma but head trauma before
this?

          A    Yes, sir.

          Q    And so -- and that was from martial arts?

          A    Yes, sir.

          Q    And would that be like getting thrown and
smacking your head on a -- on the floor or getting
punched in the head or what?

          A    Just, you know -- just, you know, it's a
physical sport.  And, you know, I never had any
specific incident that caused me to, you know, bam,
though, he's knocked out or whatever.

               But just -- just the roughness of the
sport, you know, and have a headache a little --
little -- little later, you know.  Next day or

something you got a little headache or something.  I
called that a concussion up until this point, you
know, but this was different.  You know, it was much
more so...

        Q      Before this incident in 2020 in the
Houston County Jail, had you ever had some kind of
head trauma that caused you to lose consciousness?

        A      No, sir.

        Q      And what kind of martial arts did you
practice or do?

        A      Shotakan.

        Q      What's it called?

        A      It's a Japanese style named Shotakan.

        Q      Shotakan.  Okay.

               COURT REPORTER:  Spell it for me?

               THE WITNESS:  S-H-O-T-A-K-A-N.

BY MR. WAYMIRE:

        Q      And was that a grappling art?  Was that a
striking art?  Was it some of -- some of both?

        A      It's more of a -- it's more of a -- of a
grappling type thing.  Very few strikes actually.

        Q      All right.  We started talking about your
work.  And the kind of work that you do is
construction work.  I take it, it's significantly --
there's some level of manual labor involved; correct?

1    A    Quite a bit, yes, sir.

2    Q    And so that's what makes it tough for you

3    to do if you have a back -- if you have back trouble?

4    A    Yes, sir.

5    Q    So you have lower back pain.  Is there

6    anything that particularly triggers the lower back

7    pain?  Or is it just with you when you get up in the

8    morning, and it just keeps on going?

9    A    Actually I tried to find a specific

10   incident that was making it hurt because I wanted it

11   not to hurt.  Whatever I was doing, I would prefer

12   that that didn't happen, you know.  And I really

13   can't pin it down because it's just basically -- like

14   I say, it's hurting now.

15        So I don't really think that -- I mean, I

16   don't know honestly if there's a specific incident,

17   if that's your question.  It just hurt every day.

18   So, I mean, but it's hurting every day anyway now so

19   I don't know that it was necessarily the work causing

20   it to hurt, you know.

21   Q    Yeah.  Before this incident in the

22   Houston County Jail that you sued about, did you have

23   any back pain before that?

24   A    None, sir.  Never.

25   Q    Did you ever have back pain?

A     Never in my life.

         Q     Did you have any other health problems?

         A     No, sir.

         Q     And this incident involved an officer --
two officers, some physical incident; right?  You'd
agree with that?

         A     Three officers.

         Q     Well, I know.  But one didn't touch you
at all.

         A     Right.

         Q     You agree with that?

         A     Yes, sir.

         Q     Coach didn't touch you at all; right?

         A     Coach did -- did something, too, yes.
This was maybe two days prior.  I don't know if
that's involved or...

         Q     Well, let's -- let's just talk about the
time where two male officers approached you.

         A     Okay.

         Q     And then I think you're going to tell me
that -- that your head hit the floor.  I think you
already have.

               Okay, that's the one that I'm talking
about.

         A     Okay.  At that point Ms. Coach had not

physically assaulted me on that particular day, no.

Q   I understand.  And that's -- that's what I'm getting at.

So to go with my -- my line of questioning here then, after that incident, did you go unconscious?

A   Yes, sir.

Q   And then where were you when you woke up?

A   In the hallway outside of my dormitory.

Q   Was your back hurting then?

A   They were dragging me by my feet down the hallway.  I really -- I was in shock.  I really don't know exactly what was going on at that point.

Q   You weren't noticing your back?

A   No, I was being drug by the officers by my feet.

Q   All right.  When was the first time that you noticed anything hurting with your back after that incident?

A   About maybe -- I mean, let me ask you this or let me -- let me get you to clarify the question.

When you mean like -- okay, well, let me just answer in two parts.  I was hurting -- my back was hurting at the time based on being roughed up a

little bit, you know, like banging or whatever.

But the -- the pain that I'm having now, the -- the -- the hurt that I'm feeling now and what -- what I -- what's bothering me the most didn't start for about four or five days.

Q    So you woke up after the incident. You're in a hallway.  You're not really noticing your back because other things are going on?

A    My whole body is hurting, sir.

Q    And so the next time that you noticed any significant pain with your back is four or five days later?

A    Yes, sir.

Q    Is that right?

A    Yes, sir.

Q    And so what do you feel?

A    Pain.  Just aching, throbbing pain.  It was really bad at first.

Q    Is this in the lower back?

A    Yes, sir.

Q    And if -- well, I would say the lower back kind of starts at the -- the top of the buttocks.  Is that where we're talking about?

A    From the top of my buttocks to about a little less than midway down my back, an area of,

say, 10 inches, you know, I guess.

Q    Yeah.  And is it focused on the middle, like the spinal area?

A    Yes, sir.

Q    Does it -- is it to the sides at all?

A    No, sir.

Q    So it just seems to be focused on the spinal area?

A    Yes, sir.

Q    And so describe what you -- what you felt.  Is it a -- okay, some people will say:  I've got burning pain.  Sometimes they'll say:  I've got dull pain.  I've got stiffness.  I've -- you know, all sorts of, you know, variations that pain can be.  Explain it to me in your own words.

A    I don't know, sir.  It hurt really bad. I don't know what exact kind of pain it was.  It was -- it's hurting right now so right now I feel, I guess, a dull aching-type pain.

I can't remember exactly the type of pain that -- that was there four days later, but I know that it was excruciating and it caused me to -- it's what -- I mean, originally I didn't want to seek any legal action or anything like that.  I was just going to take it in stride.

But my back was hurting so bad I felt like something needed to be said, something needed to be done with my back.  You know, I needed to go to Medical.  So I filled out the forms, and that's what happens.

Q    Yeah.  All right.  So you told me that your -- as we sit here today, you have pain in your back?

A    Yes, sir.

Q    And it's -- you're not screaming or jumping up and down?

A    No.

Q    So it's bearable.  You agree with that?

A    It's bearable, yes, sir.

Q    Are you under the influence of any kind of pain medication?

A    No, sir.

Q    Do you have any kind of medication going on today?

A    Yes, I do have some medication, but I don't know exactly what it is.  I was given it for a head -- this, my -- I've been assaulted in here so I don't know exactly.  They never even told me what it was so, but I've been taking it for like three days now.

Q    Whatever that medication is, do you think it affects your memory or your capacity to talk to me?

A    No, sir.  Not at all.

Q    Or understanding what I'm saying?

A    I don't think so, no.

Q    Okay.  All right.  So, at any rate, back to the pain you're feeling right now because that's what you know, you certainly know about that.  So would you say it's sharp?

A    No, sir.

Q    So kind of dull?

A    Aching, dull pain.

Q    Got it.

A    That's how it felt.

Q    Is it stiff?  Does it -- does it reduce your flexibility at all?

A    Well, I would say that it reduces my flexibility because it hurts.  So if I go to bend down, the pain increases so that would reduce my flexibility.

I'm -- I'm not -- I wouldn't say necessarily that it -- that it's inhibiting my movement, but it does inhibit my movement based on the fact that when I go to bend or anything, it

hurts.  So I have to not -- so I naturally don't try to do that as much or -- I hope that you understand now.

Q   I understand.  So you know what you're feeling today.  Going back in time, has it changed at all?  In other words, is it different today from when it was in the past?

A   Basically it -- it -- it's -- it's a very, very light pain until I do anything.  And then if I start doing something, like per se if I try to do some push-ups or -- which is something that I've done in the past while incarcerated, I try to do some push-ups.  I can't do push-ups like I used to.

And then after trying for the rest of the day, my back's in a lot more pain than it would have been had I not tried the push-ups, you know.  I hope that answers your question now.

Q   Yes.  So -- so physical activity, significant physical activity makes it hurt more?

A   Definitely.

Q   Is that the idea?

A   Yes, sir.

Q   And I know you haven't done a lot of physical activity today 'cause you're sitting here.

A   No, sir.

Q    Right?  Other than that variation, has it
changed over time?

        A    I mean, sir, honestly, I mean, I would
say it's gotten worse.  I mean, you know, I wanted it
to go away.  I wanted this not to hurt at all.  I'm
not the type to try to nurse an injury and stuff like
that.  I'm the type that tries to ignore one, you
know.  And it -- it really -- it seems to have gotten
worse honestly, I mean, to answer your question.

        Q    And so how -- how so?

        A    It just -- it just seems like -- I don't
know.  It seemed like a few weeks after the incident
maybe it wasn't -- it didn't affect me as much as it
is.  I mean, it's like -- I don't know, maybe I'm
just -- maybe it hasn't gotten worse.  It just hasn't
gone away, and that's basically what I -- what I mean
by that.

        I would have expected it -- I expected it
to have gone away by now, but it has not.  It doesn't
seem to be showing any signs of going away so...

        Q    Is this an everyday thing?

        A    Yes, sir.

        Q    Every day all day?  Or does it kind of
come and go?

        A    I'm sorry.  Yes, sir, it's a -- it's an

everyday, very miniscule pain until I do some physical activity and then it becomes bad.

And I keep hoping that one day I'm going to do the physical activity and it doesn't hurt quite as bad but it hasn't shown any signs of -- you know, basically every time I do anything strenuous or bend over real deep or whatever, it starts hurting again so...

Q    Yeah.  So an ordinary day working, tell me how that usually goes.

A    Normally I'm the hardest worker on my crew.  I'm the boss so I'm the hardest worker there. And I put in -- I do more manual labor than the guys that I pay to do the manual labor.  I try to lead by example.  I try to, you know, run my crew by:  This is how I work so this is how you guys should work.

And I -- normally I work the young guys half my age, and I -- and I do that from 4:00 in the morning until dark, you know, and that's how I was raised.  And now I can work, you know, an hour or two hours into it, I'm having to take a break.  I'm having to stop and let my guys do all the work.

And people have noticed.  People are saying:  Hey, what happened to you?  You know, stuff like that so...

Q    So you take a break.  Does that make
things better?

        A    No, sir.  It just -- I just have no
choice really.

        Q    So is your testimony you're able to put
in roughly two hours of -- of significant manual
work, and then you have to quit for the day?

        A    I'm not going to say that I can do
exactly two hours.  It just -- you know, I'm just
giving you an estimate.  But basically once I get
started working, if it -- you know, it just starts
hurting.  So I can -- however much of that I can take
is how long I work.

             I'm not going to say it's two hours of
work.  I just work and, I mean, I do as much as I
can.  That's what I'm going to do.  I'm not trying to
-- I don't want it to hurt.  I don't want to stop
working, but I have no choice so...

        Q    When you got out of the Houston County
Jail, you went to work -- back to work for your
father?

        A    No, he had -- he had recently closed the
company down.  I did small amounts of work for him
still.  But mostly, no, I was working for myself.

        Q    All right.  Did you lose income because

of, you know, your back hurting?

     A    Absolutely.  I lost income based on a couple of reasons.  One is because I had to hire an extra guy to make up for the work I wasn't doing.  So that cost me.

     And then the other reason is because eventually I -- I had to stop working all together.  I mean, I couldn't -- I can't really -- I couldn't afford to pay the people it would take to do the work for me.  I was used to doing the majority of the work myself and having a helper.

     But after this incident I had to have all people working and me just doing the business side of it, and I couldn't -- I couldn't -- I don't make enough money to -- to justify, you know, hiring two guys anymore.  So the work that I wasn't able to do cost me basically my -- my career.  I mean, honestly.

     Q    How were you paid when you were working for yourself?

     A    Mostly Cash App, Facebook payment, money payment.  Cash, I guess, you would say, but I have record of it based on...

     Q    Let me ask a better question.

     A    Okay.

     Q    Did you pay yourself by the hour?  Were

```
 1    you paid by the job?

 2         A    By the job, sir.

 3         Q    So suppose I'm a person, and I want a

 4    fence to be put up.  Suppose I'm a -- I'm a

 5    homeowner, and I want a fence to be put up.  And I

 6    call you up and I say:  Hey, can you put up a fence

 7    for me?  You say yes, and we agree on a price.

 8              Then I take it the way you would be paid

 9    would be -- or your profit -- let's call it your

10    profit -- would be the amount -- total amount that

11    you're paid for the job minus how much you have to

12    pay your people and, you know, the materials and gas

13    and other expenses.  Do you agree with that?

14         A    You're asking me if I receive the

15    payment, and my profit would be the payment minus my

16    expenses?

17         Q    Correct.

18         A    Yes, sir.

19         Q    And so your -- your testimony if I'm

20    understanding correctly, is that your back -- the

21    pain to your back caused you to be unable to

22    physically work as much; is that right?

23         A    Say it again?  I'm sorry.  I didn't hear

24    your question.

25         Q    Pain in your back caused you to not be
```

able to physically work as much; is that right?

        A    At first, yes.  But then it became to
where I couldn't -- I couldn't do the work anymore.
I couldn't sign the jobs anymore based on the pain in
my back.

        Q    So you quit taking jobs?

        A    After it got to the point where I
couldn't afford to -- okay, you asked me about the --
the payment thing.

            Well, when it gets to the point where I
have to hire more labor than the profit and I start
losing money, then I had to -- I actually was in the
middle of one job, a very lucrative job for me.  And
I ended up losing the job, you know, getting fired
because of it because I couldn't -- I was -- I
couldn't finish it basically.

        Q    What job was that?  I mean, who was
the -- who was the customer?  I'll ask that.

        A    The customer's name was Ryan Myer, M-Y --
M-Y-E-R.  He lives in Byron, Georgia.

            I did 240 foot of French drain and three
concrete slabs for parking, normally a job that I
would have one helper.  Because of my back injury, I
had to have two and a temporary third.  And I ended
up not being able to complete the job.  I -- I did

the majority of it, but I couldn't complete it

because it involved a lot of digging and I just

couldn't dig anymore so...

Q    Did -- I think you used the word fired

from the job.  Maybe -- maybe I made that up.

A    No, I might have said fired, but let me

reiterate.  It was -- no, actually I wasn't fired

fired.  I just stopped going.

I still -- as it stands right now, the

guy's still expecting me to come back and finish, but

it's been a, you know, a while now.  So I was hoping

to give him some of his money back because I felt

guilty about not being able to complete his job.

There was some maintenance involved that

I'm supposed to be doing afterwards, some cleaning

the drain and making sure it's still -- I guaranteed

him that I would maintain the drain after I finished

it.  And I haven't been able to do that so I -- I was

kind of wanting to give him something back or, you

know, work out a new deal with him or something so...

Q    When did you stop working on that job?

A    I can't tell you the exact date, sir.  It

was not long after maybe -- I don't want to say, sir.

It'd be speculation.  You could contact him, and he

would definitely tell you.

Q    I have that you were in the Houston
County Jail from May 28th of 2020 to December 30th of
2020.  Do you agree with that?

        A    I agree that that's -- that's very close.
I don't know the exact dates.  I mean, it's been a
couple years so...

        Q    Yeah.  So after that, you got out of jail
and started working; true?

        A    Yes, sir.

        Q    And then roughly how long after you
started working -- let's call it the beginning of
'21 -- did -- did you, you know, take this job on and
then eventually quit working on this job?

        A    I can't say, sir, but it was definitely
in '21 is all I can say.  You're saying that I got
out in the end of 2020?

        Q    That's my understanding, yes, sir.

        A    Okay.  So then in 2021, that was when I
worked for him.  Now this was a long job.  I was
there -- I'm not going to say an exact amount of
time, but it was over six months or around six months
I was at his house so...

        Q    And you stopped working on the job in
2021?

        A    Like I say, you know, I can't remember

the exact dates.  I mean, he would be willing to tell

you.  But it was -- I started working on the job --

it was supposed to be like a three-month job.

Because of my injuries, it turned into a six-month

job and then I ended up not finishing it.

So that was sometime during that year

that I got out, not long after I got out.  You know,

I'm not sure exactly how -- how long, but it was

after I got out so...

Q    Did you take any other job after that?

A    After his job?  No.

Q    So from sometime in 2021 until your

recent incarceration, you didn't do any kind of work;

is that true?

A    Very little.  Odd jobs.  You know,

nothing like what I normally do.  I normally run my

own business and I'm a -- you know, I do whatever

needs to be done.  I do house fences, garage,

concrete, whatever.

After that job is when I realized:  Hey,

you really can't do this anymore, you know.  So I

took much smaller jobs:  Cutting lawn, painting,

whatever I could, you know, make a little money off

of.

But I have a -- I have all records of

every job that I've done.  So I can -- I could

furnish the information exactly.  But as of right

now, I can't remember exactly what I did.  I mean, it

was -- you know, it's -- I know that I did odd jobs

here and there, but I couldn't give you dates or

times or -- but I could produce that later because my

wife keeps detailed records -- or my fiancee' keeps

detailed records of everything that we did so...

     Q    Did your business have -- accountants

call them books?  You know, like income and debits

and that kind of business?

     A    Yes, sir.

     Q    So there is a book of that sort?

     A    I'm not going to say a book, but there's

a record of every transaction.  Not so much the

materials, although I did -- I think I did claim some

on taxes.

     But I know that -- let me -- let me just

say, the majority of all the payments that I received

are online -- were online in some form or another.

So there's a physical record of them.

     A lot of them were Facebook payments.

They have a payment service.  A lot of them were Cash

App payments.  And we -- we -- we -- for an unrelated

reason we went and -- for taxes we went and looked

and researched.  You know, we basically have a -- oh, the IRS asked me to furnish this type of information that you're asking me about.

So we went on online and saw that:  Hey, we do have all the receipts and all the stuff that shows what -- what I did and everything so...

Q    You mentioned taxes.  Did you file a tax return for 2020?

A    I don't want to -- I don't want to say the exact year.  I did file a tax return, and I -- and I did claim a certain amount of money.  I let someone else do my taxes, and I -- and I did claim a certain amount of money.  And I did claim and it does show -- it does -- it would reflect all the jobs that I said, but there was a mistake done.

And when whoever filed my taxes made a mistake on it, the IRS said that I owed them like $35,000 or something, and I didn't.  And maybe six or eight months went by, and I was really distraught about it.

But then when it was all said and done, then I got another letter from the IRS saying that they dismissed the charge and that -- that they realized there was a mistake or whatever.  I didn't get any refund like I was supposed to or anything,

but they took away the "you owe us 35,000 thing"
so...

     Q   Did you file tax returns for the year
2020?

     A   I -- I can't say exactly what year this
was, but it was sometime between the time that this
incident occurred and now.

     Q   How about 2021?  Did you file tax returns
for that year?

     A   I -- I filed taxes one time during --
between this incident and now.  I don't -- I can't
recall which year it was.

     And then when I had that problem about
them saying I owed all this money, so I never refiled
it or did whatever.  I probably could have refiled
and said:  Hey, you know, since I don't owe you all
this money, where is my return?  But I was just so
glad to get the $35,000 bill off me, that I was like:
Hey, just -- I don't need them that bad.

     So I -- and then after that I wasn't
working anymore so I didn't file taxes because, you
know, I was doing, you know -- I mean, I was little
bit of jobs but nothing to really be -- I didn't
think it was enough to be claiming on taxes.  So
small odd jobs and stuff here and there so...

Q    So sometime after you were released from
Houston County Jail you filed tax returns for federal
and state; is that right?

         A    I'm -- I'm pretty sure, yes.  Not
positive the federal.  I don't know a lot about taxes
so I had somebody else do it so -- but I would
assume, yes.

         Q    Did you -- do you have copies of those?

         A    Not -- not on me.

         Q    Well, I know not on you.  But, you know,
at your house wherever you lived, whoever has your
records?

         A    Possibly, possibly.  There's been a lot
going on.  I can't say for sure.  I would assume that
the IRS would have that information, though, 'cause
something was filed so...

         Q    You don't think you would have copies of
what you filed with the IRS?

         A    I don't think so, no.  Oh, I will say
that it was done online so it was done through a tax
service online.  Maybe -- don't quote me but maybe
Turbo Tax or one of those type of tax companies.  So
there -- I'm sure that there is a record that could
be found.  I just don't remember who it was.  And
somebody else filed it for me so I don't really

remember what exactly was done.  So I don't know what
was done exactly.

     Q    So if you had to put a dollar figure on
lost income that you claim as a result of any and all
injuries that you say you received in this incident,
what's a dollar figure?

          MS. BURTON:  I'm going to object as to
     the form of that 'cause that is generally a jury
     question.

          Go ahead and answer if you -- well,
     however you want to answer that question, you can
     answer.

          THE WITNESS:  So you're asking me --
     first, I need a little clarification on the
     question.

          Are you asking me from the time that this
     incident happened until now?  And -- and are you
     asking me only -- I mean, I was -- I was taught
     just for background on why I'm asking this is, I
     was taught that when you do a job, you know,
     you -- you either lose two jobs or you gain, you
     know, by word of mouth.  A lot of my business
     comes from word of mouth.

          So are you asking me to -- to say how
     much I would have made had this -- like, okay,

this one customer Ryan, he was like one of the
better customers I've ever had, and he's wanted a
lot more work done.  He already guaranteed me work
for the next year or two.  Now I'm not getting
that work because I didn't finish his job.

So is that a lost wage as well as, you
know, anything else?  Or just what?  You know,
like could you clarify a little bit what you mean
by how much?  Do I go into depth on -- do I lose
the -- are you asking me about money that I would
have gotten from somebody he referred me to?
Because he -- he referred me to a job or two.

But then when -- at the beginning.  But
then when -- when I didn't complete his job, now
he doesn't refer me at all so...

Q    All right.  I'm going to give you a
hypothetical that will, I think, answer what, you
know, I'm asking.  Pretend like I have a business of
some sort.

MS. BURTON:  Would you mind speaking up
just a little bit?  I'm sorry.

A    (No response.)
BY MR. WAYMIRE:

Q    Pretend like I have a business of some
sort.  I make widgets.  All right.  And I'm injured,

42

and I can't make widgets anymore for two years.  My

business income was $50,000.  And because I wasn't

injured -- or because I was injured, I couldn't make

$50,000 a year for two years.  So my total lost

income from that injury would be $100,000.

A    Not including you're referencing other

jobs or promoting other jobs for me or, you know?

Q    In the widget business...

A    Just that this is specifically the

widgets?

Q    Well, in the hypothetical widget business

that I can't do anymore, I lost $50,000 a year.

Now, I recognize your business model is a

bit different because it depends on other people's

actions and intangible things --

A    Yes, sir.

Q    -- that you're not sure will happen.

They might happen.  Sometimes they do happen.  Often

they happen, but you don't know?

A    Okay.  So how much -- I'm sorry to cut

you off.

Q    Yeah.  So I'm just trying to get it to a

dollar figure of how much you -- money you think you

lost as a result of being injured in this incident in

the Houston County Jail.

A    Okay.  So how long -- how long of a

period?  During how long of a period?

          Q    I'm looking for a dollar figure.

          A    I understand.  But what I'm asking you

is, you're saying you want a dollar figure on how

much I lost.  But during how much time?  What --

what's the time frame of -- I lost during what time

frame?

          Q    Well...

          A    From then until now?

          Q    Your -- the -- the incident, I believe,

was June 30th of 2020?

          A    Which would be approximately three years?

          Q    Well, you were in jail until the end of

that year.

          A    Okay.

          Q    You couldn't have worked in jail?

          A    Right.

          Q    I don't know if you'd been in jail

between then and now for very long.

          A    No.

          Q    But obviously you'd have to -- the time

that you were in jail, you don't get lost income for

that.

          A    Right.

Q    So...

A    No, I mean from the -- from the -- you're asking me -- I just don't know exactly how long it's been so it's hard for me to judge how much to tell you because I don't know.  Give me a time amount, and I'll tell you how much I lost during that time.

Q    Well, you -- I understand that you got out of jail from December 30th, 2020.  So the next day in theory you could start working.  And then you're in jail now.  I don't know exactly when that happened.

A    Less than a month.

Q    So between your release from Houston County Jail and your re-incarceration at Bibb County Jail here.

A    Which is how much time, is what I'm asking.

MS. BURTON:  Do you want me to pull up the calendar?

THE WITNESS:  I just am fuzzy on exactly the dates that I...

BY MR. WAYMIRE:

Q    Well, let's call it...

MS. BURTON:  What was his release date?

MR. WAYMIRE:  I have December 30th of

2020.

MS. BURTON:  Okay.

THE WITNESS:  I'm just trying to answer
your question as honestly without -- you know, I
don't want to leave anything on accident.

MS. BURTON:  Do you mind if I ask him a
question?

MR. WAYMIRE:  Go ahead.

EXAMINATION

BY MS. BURTON:

Q    Do you recall when you were incarcerated,
when you got arrested for here?

A    Three weeks ago.

Q    Three weeks ago.  Okay.  So it would be
one full year plus approximately 2 1/2 months?

A    One year or two years?

Q    No, I'd say...

MR. WAYMIRE:  It'd be two years.

A    (No response.)

Q    I'd say two months.  One year -- sorry,
two years...

A    Two years and two months.

FURTHER EXAMINATION

BY MR. WAYMIRE:

Q    Let's call it two years and two

months for --

    MS. BURTON:  Say two years.

   A (No response.)

BY MR. WAYMIRE:

   Q -- for purposes of the question, give or take.  I know there's some change in there but...

   A About $170,000.

   Q Explain how you got that figure.

   A Well, it's not any -- well, honestly, this is -- it's not a -- it's not a -- it's not a stretch.  By any stretch of the imagination, it's not a stretch for me to make close to 2,000 a week.

    So you said two years, but I subtracted a little because I didn't want to sound, you know, like I was, you know, I don't know.  There's times when it rains, and that would take a little bit off.  There's times when I, you know, I -- I was never in between a job.  I mean, I was doing well and the word of mouth was there and people were constantly signing businesses.

    I was looking to expand.  I was looking to start putting some guys on the jobs and me doing more selling the jobs and doing the business side of it and less physical.  And so I was starting to make more and more money.  On this last job I was on, I

made really over 2,000 a week.

So I just was trying to give you a fair estimate, sir, without, you know -- you know, inflating it any, you know. I really would say 100,000 a year, but you know that's not possible because I'm going to take a little bit of time off. I'm going to -- you know, there's going to be rain days. There's going to be different things like that so...

Q    Yeah. And when you give the $2,000-a-week figure, does that mean 2,000 gross without taking out expenses? Or are we talking about --

A    That's after expenses.

Q    -- that's how much you clear?

A    Yes, sir.

Q    That's how much you clear?

A    Pretty much, yes, sir.

Q    That's profit?

A    Yes, sir. Well, yes, sir. Profit, yeah.

Q    And do you have documentation to back this up?

A    Yes, sir.

Q    Have you given that to your attorney?

A    Not yet. Not yet, no. As far as I know,

I haven't been asked.

MS. BURTON:  If he has it, I will request
it.

BY MR. WAYMIRE:

Q    All right.  You told me about your head
hurt for about six days or so.  Am I getting that
right?

A    I mean, don't nail me down on exactly six
days.  But, yeah, I mean, it was -- I thought it was
a little more than that maybe, but I don't know.  I
mean, it hurt.  It hurt well into the next week for
sure.

Q    I want -- I want to know the parts of
your body that were hurt.  Okay?  So I'm listing your
head as one.  I'm listing your back as another 'cause
that's what you told me so far.

A    Yes, sir.

Q    Was any other part of your body hurt in
this incident with the...

A    In this specific incident?

Q    Yes, sir.

A    It was my foot, my elbow, my neck, my
back and my head.

Q    All right.  So just to be clear about the
incident, this is the incident where the two officers

```
 1   came in.  There was a lockdown dispute, and you were

 2   rendered unconscious; is that right?

 3          A     Yes, sir.

 4          Q     That's the one we're talking about?

 5          A     Yes, sir.

 6          Q     All right.  So foot, elbow, neck, back

 7   and head.  You've told me about your back, and you've

 8   told me about your head; correct?

 9          A     Yes, sir.

10          Q     Actually, let me get a little more detail

11   about your head.  Did you have any kind of visible

12   injury to your head?

13          A     Blood and cut.

14          Q     Tell me where the cut was.

15          A     It's a little hazy, sir, because it was

16   pretty -- you know, I got hit pretty hard.  But I do

17   know that I had -- oh, my mouth was bleeding as well

18   or blood came out of my mouth.  I don't know exactly

19   where it was coming from.  I think that my lip was

20   busted.

21                I had -- definitely had blood, a -- a --

22   a -- what do you -- a laceration on my head, on the

23   back of my head.  The -- that's -- that's what you

24   asked me so...

25          Q     Was that in the hair so that it'd be hard
```

to see if anybody looked at it?

    **A**    I'm pretty sure they took pictures of it and documented it so...

    **Q**    And did you see any of those pictures?

    **A**    No, sir.

    **Q**    If you had to estimate how big that laceration was...

    **A**    It was on the back of my head, sir.  So I know that it was there, and other people could see it.

    **Q**    Did you ever feel it?

    **A**    It felt like, you know, a bunch of crusty blood back there.  I mean, I -- I basically stayed asleep, I mean, for a day or two after this incident happened.

    So, you know, but I could feel it, yeah. There was crusted blood back there.  People told me they could see it, but I really couldn't say how big it is because it's behind me and there's no mirrors there so...

    **Q**    Was there any kind of treatment for that wound?

    **A**    Pills and a -- there was pills.  There was -- I believe, they gave me some type of antibiotic ointment or something.  There -- basically

I think that's it as far as -- oh, they did -- they did come in. They put me on observation for a concussion or whatever.

And like I remember this. Like every four hours for like two or three days they came in there, woke me up and -- and did stuff to me to try to see if I had any type of brain trauma or stuff like that. Shine a light in my eyes, different things of that nature.

Q    Did anybody tell you they thought you had brain trauma?

A    I don't recall, sir. I know they sent me to the hospital nine days later as in reference to that. But the doctor at the hospital said that it had been way too long; that they should already had me there and stuff so...

Q    The cut or laceration on the back of your head, how long did it take for that to heal?

A    I really don't know, sir. I can't really give you an honest time. I mean, it was however long a cut take me. A week or two. I don't -- but I don't want to say for sure exactly because, I mean, I really wasn't -- you know, like I say, it's on the back of my head so I really couldn't pay much of attention to it.

1    Q    The ordinary time frame for cuts and
2    bruises; right?

3         A    Yeah, I would say so, yes, sir.

4         Q    And how about whatever was going on with
5    your -- your mouth or your lip?

6         A    It was an ordinary busted mouth.  I mean,
7    I had blood all over me from it, but it didn't -- if
8    you're asking me did it take longer than a normal
9    mouth cut?  I mean, it was basically a normal hit in
10   the mouth thing, you know.

11        Q    So...

12        A    I don't know for a fact that -- if you
13   don't mind me adding something, I don't know for a
14   fact that all the blood came from the cut in my
15   mouth.  I mean, there was a lot of blood, and the cut
16   didn't seem that bad.  So I don't know that that's
17   where all the blood came from.  I just know that it
18   came out of my mouth.

19        Q    Did you ever look at the cut around your
20   mouth?

21        A    It was in my mouth.  You know, I could
22   feel it with my tongue, but I couldn't see it.

23        Q    Was that -- what's your belief about how
24   physically you got that?

25        A    I have no idea.  Oh, what's my belief?

**Q    Yeah, because...**

              MS. BURTON:  I'm going to object to -- as
    to form 'cause it's calling for speculation.  But
    answer the question.

              THE WITNESS:  I don't mind telling him.

              MS. BURTON:  Answer the question.

              THE WITNESS:  The -- I believe that they
    roughed me up further when I was in the hallway.
    I mean...

BY MR. WAYMIRE:

    **Q    So you think that the -- the wound in**
your mouth was from the hallway rather than the
initial incident?

              MS. BURTON:  Same objection.

              THE WITNESS:  Well, from -- same?  Okay.
    From what I understand from gathering information
    from the people that witnessed it because I was
    knocked unconscious so I only know the beginning
    part and the end part, but from what I understand
    from what I gathered from other people that were
    there that witnessed it, I was slammed on my head
    and back.  So I don't understand how my mouth got
    cut, you know.

              So the only thing I could speculate was
    -- and then that coupled with the fact that when I

woke up in the hallway, they were roughing me up. So I'm assuming that that mouth injury came from what they were doing to me in the hallway.

That being said, I -- I -- did -- did they hit me in the mouth or anything in the hallway? Not that I know of, but I woke up during it. So who knows? And if you ask me to speculate, they beat me up in the hallway when I was unconscious, you know, so...

BY MR. WAYMIRE:

Q   Do you have any sense for how large this cut in your mouth was?

A   It wasn't that big, sir. It was maybe a quarter of an inch or less.

Q   And how deep?

A   I could stick my tongue in it. Like I say, I couldn't really see it 'cause it was down low. But I could stick the tip of my tongue in it a little bit, but --

Q   Okay.

A   -- it wasn't -- it wasn't a -- it wasn't a very big cut, no. I mean, it's like I say a quarter inch or less long. I could stick the tip of my tongue in it.

Q   All right. Tell me about your foot.

What was wrong with your foot?

          A     It just felt like I got a twisted ankle.
That I do remember.  They were dragging me by it so
I'm pretty sure that that's what caused that.

          I had a bruise on my -- you know, it
turned a little dark -- darkish color on my ankle
area.

          Q     Which ankle?

          A     My right one.

          Q     And your elbow?  What happened with your
elbow?

          A     My elbow was just banged up.  Now, that
being said, there was a previous incident involving
Coach where she pulled a mattress out from under me
and flipped me over and my elbow hit the -- hit the
metal bunk.  And that was documented.  They took
pictures of it.  I wrote a grievance on it.  And so
they have pictures of it.

          The elbow seemed to be more damaged.  You
know, like it was more bruised, like it had been like
two days or something from the time that Coach did
that to the time that I was in Medical.  But my elbow
was hurting.  Like I could tell that it was more than
just what was already -- had already occurred so...

          Q     So you're saying there was a preexisting

injury, and then it was reinjured?

          A    It was a preexisting injury two days
prior from -- from the same deputy, from one of the
deputies.

          And then when I woke up in Medical the
day -- you know, like the next day, all the bruises
and bangs that I could feel, it was amongst them.
I'm assuming -- you asked for speculation.  I'm
assuming I hit the floor somehow or, you know,
whatever during the incident.  I don't know but my
elbow hurt, you know, so...

          Q    After -- after the incident in the dorm
where you hit your head and so forth, was there a
visible injury to your elbow?  Visible?

          A    I can't remember.  I -- I did -- I was
asked by the doctor to hold my elbow up to the
laptop, and I -- obviously that's because I told them
that my elbow was hurting.  But, I mean, honestly, I
was like:  Hey, you're talking about my elbow.  I
mean, I can't -- I got a headache and my back is
killing me and you're asking me to hold my elbow up
to the camera.

          You know, so I just -- it was the least
of my problems honestly so I just really didn't put a
lot of thought or -- you know, that was just a normal

every -- everyday banged up elbow.  It wasn't
anything, you know, like I'm not going to sit here
and say that was a, you know, dehabilitating [sic]
injury because it was just a bruise and bang, you
know, from -- from the altercation so...

     Q   And tell me about your neck.  What was
wrong with your neck?

     A   It hurt.  Whiplash-type hurting.  I
couldn't turn it.  That was actually pretty bad at
first.  They gave me a neck brace or whatever.  I
couldn't turn it side to side so they put the brace
on me.  And I had to wear that for a while and hurt
pretty bad.  It went away eventually but -- about
four days, I guess.

     Q   So that went away in four days?

     A   Yes, sir.

     Q   And was that -- all right, so I've --
I've woken up, for example, before with a kind of
what I call crick in my neck.  It hurts to, you know,
move it one way or another.  And so I got to hold my
head in -- in one position, and then it doesn't hurt.
Is that kind of the way?  Is that what we're talking
about?

     A   Yes, sir.  Basically I had to -- I mean,
you say that like -- are you asking me if it -- if

it's because I slept on it wrong or...

        Q    No, no, no.  I'm not trying to say that
at all.

        A    Okay.

        Q    I'm just trying to compare it to
something that I understand so that I -- I know what
kind of injury we're talking about, how you felt.

        A    Well, let me -- let me tell you exactly
the problem.  When I would read a book, and I
normally read like this, you know, laying on my back,
it was excruciating pain.  So they gave me a neck
brace.  And if I turned it to the sides, it would
hurt.

        Q    If you didn't move your neck to the side
or...

        A    Kept it straight perfectly normal like I
was walking, it was okay.

        Q    Felt okay?

        A    Yes, sir.

        Q    And then all those problems went away
after about four days?

        A    Yes, sir.

        Q    Okay.  And you described your back and
how that felt and your ongoing problems; correct?

        A    Yes, sir.

Q    Would you add anything to your description?  I mean, is there anything else that you would tell the jury, for example, about how your back is hurting?

A    My back was -- I mean, in my opinion -- now I'm not a doctor or a specialist by no means.  In my opinion, I -- I received an injury from this.  My back's hurt from this.  And, also, a banged up injury.

So, you know, like what I'm trying to say is, I feel like my back was originally hurting because of the slammed on the ground.  You know, that hurts.  An immediate hurting and the next day or two I'm sore because I've been slammed on the ground.

Then, now, I feel like there's some type of injury there longstanding because, like I say, it's been however many years now and I'm -- and I'm sitting here in pain right now so...

Q    Okay.  So your testimony is that before this incident you had zero problems with your back ever?

A    Yes, sir.

Q    After this incident, your back started hurting.  Was there any other incident that caused some kind of harm to your back?

Let me give you an example. My back might already be hurting, but then I get in a car wreck. And now it hurts more or hurts in a different place or something of that nature. Okay? So that's the kind of thing I'm asking you about.

After this incident, was there anything else that caused harm or pain to your back?

A     Absolutely not, sir, no.

Q     Okay.

MS. BURTON:  You've been going for about an hour, maybe a little bit more. Is it time to take a break?

MR. WAYMIRE:  That's okay with me.

MS. BURTON:  Do you need me to get a deputy to take you for a restroom break or anything?

THE WITNESS:  I'm okay.

MR. WAYMIRE:  Off video at 2:20.

(Brief recess.)

MR. WAYMIRE:  Back on video at 2:26 p.m.

BY MR. WAYMIRE:

Q     All right. Mr. Sindell, we took a break. You understand you're still understand oath?

A     Yes, sir.

Q     All right. We were talking about parts

of your body that were injured in this incident.  And
you told me about your foot, your elbow, your neck,
your back and your head.  You told me that your head
hurt for, give or take, six days?

  A  Yes, sir.

  Q  Did it keep hurting after that?

  A  No, sir.

  Q  So everything that was wrong with your
head so far as headache and so forth was gone after
six days?

  A  Give or take, yes, sir, approximately.
Could have been a little more.  I don't know.

  Q  Neck pain went away after about four
days; correct?

  A  Yes, sir.

  Q  Your elbow, I take it, had bruising; is
that right?

  A  Yes, sir.

  Q  And that went way in the normal time
frame that bruises go away?

  A  I would say, yes, sir.

  Q  Your foot, you felt like you had a
twisted ankle and some type of bruising.  How long
did that take to go away, to heal?

  A  Honestly, I really can't give you an

exact time.  I would say that that went away in a

normal amount of time that it takes for that to go

away.  Like I say, I had bigger problems so I didn't

really pay attention to that.

          Q    Okay.  So far as your ankle being

injured, was it that you couldn't walk on it or you

had to limp or something along those lines?  Or was

it just kind of nagging pain?

          A    It was aching, nagging.  I normally sit

in an Indian-style fashion a lot.  And in doing that,

caused it to hurt, you know, when normally it doesn't

hurt when I sit like that so...

          Q    Okay.  After you got out of the Houston

County Jail in December of 2020, did you go to any

kind of medical provider for anything?

          A    After -- after this incident?

          Q    Well, after you got out of jail, which

was December of 2020?

          A    I don't think so, no, sir.

          Q    So zero checkups?

          A    I mean, I had the medication they gave me

so -- and they gave me like two, maybe three months

worth.  I tried to -- I tried to go somewhere.

               I mean, at first I wanted it to go away

and I wanted it to not to be there and I tried to

ignore the -- the issue.  But when it started causing
me problems, then I wanted to get something done
about it, but I can't afford it.

I mean, I tried to find somebody that
would -- that would see me on some type of sliding
scale or something cheaper.  But I really was having
trouble finding anybody that would treat me for free,
you know, so...

Q    All right.  So let's talk about -- well,
first of all, I think you got to the Houston County
Jail in May of 2020?

A    Approximately maybe.  I'm not sure.

Q    End -- end of May we'll call it?

A    You'd have to -- I mean, the -- the
documentation is there, sir.  I can't remember.

Q    Yeah.  So what were you charged with?

A    For -- you're talking about the time that
this incident occurred while I was there?

Q    Why -- why were you in jail, yeah?

A    I was in jail for possession of a firearm
by a convicted felon and possession of some type of
scheduled drug.  I'm not sure exactly which one.

Q    What happened with those charges?

A    I'm on bond for them.  A person that did
the crime that -- that is guilty of the crime

confessed, wrote notarized written statements saying

that they did the crime and that I had no knowledge

of it.  Turned those statements in, and we're waiting

on them to drop the charges as we speak.

  **Q**  So the charges are still pending?

  **A**  Yes, sir.

  **Q**  All right.  Had you been in the Houston

County Jail before this particular incarceration?

  **A**  Yes, sir.

  **Q**  How many times?

  **A**  I can't really say, sir.  A few.  More

than two probably.  I can't really pin it down.  It's

been -- I've been there -- I lived there a long time

so...

  **Q**  If you had to estimate, if you had to put

all of them together so far as jail time in Houston

County Jail before you came this last time, how long

are we talking about?  Months?  Years?

  **A**  You're speaking of how much time I have

served in that jail?

  **Q**  Yeah, before May of 2020.

  **A**  I would say maybe two years.

  **Q**  So is it...

  **A**  All total would be.

  **Q**  I understand.  Putting them all together.

And the -- the procedures were roughly
the same throughout that time?

        A    Yes, sir.

        Q    So it is accurate to say that by May of
2020, you knew the drill so far as how inmates are
supposed to act and how --

        A    Yes, sir.

        Q    -- how this jail is run?

        A    Yes, sir, exactly.

                MS. BURTON:  Make sure that you wait for
    him to --

                THE WITNESS:  I'm sorry.

                MS. BURTON:  -- finish the question
    before you answer.

BY MR. WAYMIRE:

        Q    Before this incident or before you got to
the jail in May of 2020, had you ever met Officer
Coach?

        A    No, sir.

        Q    How about Cleckner, C-L-E-C-K-N-E-R?

        A    Yes, sir.  He was an officer there on a
prior, yeah.

        Q    All right.  And how about Bouerger,
B-O-U-E-R-G-E-R?

        A    I had met him before in jail as his

capacity as an officer and me being incarcerated.

Q    Okay.  So for Cleckner and Bouerger,
you'd met them before.  You knew who they were?

A    Yes, sir.

Q    Had you had any kind of incident with
them that, you know, something went sideways?  There
was a problem?

A    No, actually they were actually kind of
better towards me than -- than I would have expected.
They were like kind of nice to me before.

Q    So no prior conflict?

A    No, sir.

Q    Did either of those fellas have some kind
of reputation that you are aware of?

A    Yes, sir.

Q    Tell me about that.

A    I didn't know that -- that Officer
Cleckner's name was Cleckner.  I was familiar to him
as Officer Brock.  That's what everybody in the jail
calls him, including the staff.

       And they pattern that from Brock.  By
saying Brock, they mean they're comparing him to
Brock Lesnar, which is a professional wrestler.

Q    So -- so his reputation was what?

A    So when they -- when -- I mean, he's got

a reputation of being a -- a -- excuse my language --
bad ass, and he beats up inmates repeatedly.  And
there's rumors of him using steroids and training all
the other guards and giving them steroids.

I mean, that's the speculation in the
jail.  That's not something I've seen with my own
eyes.  But that's the thing when a -- when a staff
member says -- they call his name like in the hallway
or something, they say:  Hey, Brock.  They don't say
Deputy Cleckner.

I didn't realize his name was Cleckler
[sic] -- Cleckner until much, much later after this
incident happened because I knew him as Brock.
That's -- that's his name in the jail.

Q    So if people called me Brock and I had a
reputation as kind of a wrestler type or somebody
who's physically capable, right, that could mean a
number of things.  It could mean I'm just good at
wrestling.  It could mean I'm strong.  It could mean
I'm abusive and anything in between.  So...

MS. BURTON:  I'm going to object as to
form.

MR. WAYMIRE:  I haven't asked a question
yet.

MS. BURTON:  I know.

A     (No response.)

BY MR. WAYMIRE:

           Q     So tell me -- tell me what you think it
meant.

           A     All of those, all of the above.

           Q     Okay.  Are -- did you ever see with your
own eyes any kind of incident where Mr. Cleckner --
Officer Cleckner was involved with some other inmate
in a physical altercation?

           A     Many, many times, sir.

           Q     How many are we talking about?

           A     Well, basically when they have an
altercation -- you know, when they -- when they need
to -- to -- you know, they call for:  Hey, we need
some physical assistance, basically they call -- I
forgot the exact -- I think it's a 10, 1010, 1073,
like a fight or a -- you know, where they know it's
we need some -- some beef, you know, he's the first
one to come flying in.

           You know, I don't know if that's by
choice or that's what they choose, but every time
there's an altercation in the dorm, which in jail
that happens quite often, he's the one that comes
running in, you know, so...

           Q     Yes.  So, for example, two inmates are

fighting.  They need officers to come break them up?

     A    Right.  He somehow makes his way to the front of the pack as far as officers arriving on the scene.  He's the first one every time.  So, in my opinion, it's 'cause he likes it.  I mean, you know.

     Q    Is there any incident where you actually witnessed Officer Cleckner in a physical altercation with an inmate where you believe he used -- he was out of line?  He used too much force for the situation?

     A    About 50/50, honestly.  There's times when force is -- is -- is -- I mean, I'm not going to sit here and say that, you know, the inmate population doesn't deserve anything.  You know, I mean, there's -- there's times when force was necessary, yes.

          Did he overdo it?  Most of the time, yeah, he did.  But and he's known for that.  Like I say, in the jail, was there times when I think the right amount of force was used?  Yes.  I'm not going to sit here and say that he -- every time he came in there overbearing.  No, there was times.

          And there -- and I will even go so far as to say that there were times when he didn't use as much force as maybe he probably could have got away

with using.  But, yes, I have seen times where he was definitely way more aggressive than he needed to be. And I'm sure from what I understand, that that's been well-documented so...

Q    So let's -- let's exclude your incident. I know you have opinions about your incident.

A    Yes, sir.

Q    And I take it that before your incident with Bouerger and Cleckner, there was no prior incident where any force was used on you by anyone?

A    They were -- they were -- okay, Cleckner, you know, he joked around, played around.  He's always physically like push you up against the wall, but he's -- but he's laughing, you know.  And I laugh about it.  No big deal or whatever, you know.

But -- but the other guy Bouerger, I was his -- what they would call trustee or whatever. Like when he worked our dormitory before he was one of the guys that -- that respond to altercations, he worked in the dorm, you know, and he -- and he chose me to be the guy to sweep up and pass the trays out.

So we actually had the opposite.  We actually had a very good relationship as far as inmates and officers go.

Cleckner, he -- he was nice to me, but

there was never any, you know, over -- you know, like

it was -- it was just a normal inmate-officer

relationship.  Like there's nothing that sticks out,

you know, so...

        Q    Okay.  So let's pick out top three

incidents where you believe -- where you actually saw

an incident where Cleckner used some kind of force on

one or more inmates that you believe was unjustified,

more than the amount of force that -- that was

necessary.

        A    I didn't say it was just three, sir.  Oh,

I'm sorry.

             MS. BURTON:  Let him finish the question.

BY MR. WAYMIRE:

        Q    I know.  I'm asking -- you're telling me

there are a number of them?

        A    Yes, sir.

        Q    And I don't know how many there are.  I

mean, you seem to be suggesting dozens.

        A    I'm not suggesting dozens.  But a dozen

wouldn't be an outlandish figure, no.

        Q    A dozen total that you've seen?

        A    That I've seen personally?  No, I'm not

saying that's how many he's been involved in.  But I

would say I've seen him physically interact with the

inmates probably an estimate of 10 times.

Q    Ten times.

And you -- you said earlier in response to a question, you said 50/50, which told me -- you tell me if I'm right -- told me that half the time you feel like it was justified.  You don't see a problem.  Half the time you felt like it was too much.  Is that what you meant?

A    Let me -- let me clarify by saying that there was times when I felt like force was justified.  There was times when I felt like he used force when it shouldn't have been used.

I'm not really qualified to -- to know exactly when force is justified and when it's not.  But, in my opinion, I mean, there was several times that I saw him do stuff he didn't -- that there was no need for.  And then there was other times when I expected him to -- to do stuff.

Honestly, I mean, he -- he's the guy that kind of gets in a little bit of a rage at times, and I kind of think that sometimes for whatever reason he just wasn't that mad and it wasn't a big deal.  But there's definitely times that he overreacted, and that would be very obvious to anybody looking.

And he's -- that being said, talk amongst

the guys and everything, he's been written up,

grievances and been complained on multiple times for

excessive force.  And I'm pretty sure that -- I mean,

the officers told me so I can't say for a fact.  But

I'm pretty sure that he's been disciplined for it

before by the Houston County Jail so...

          Q    All right.  Well, my question is or was,

you said 50/50, which means to me that half the time

that you saw something that Cleckner did using force,

you didn't have a problem.  You didn't think it was

inappropriate.

                On the other hand, half the time you felt

like:  Oh, that's too much?  Excessive?

Unreasonable?  Is that what you meant when you said

50/50?

          A    Not exactly half and half.  But, yes,

sir, I agree with what you're saying.

          Q    Got it.  So you physically saw roughly 10

of these incidents?

          A    Yes, sir.

          Q    So in roughly five of those incidents you

think that something was overdone?  Inappropriate?

          A    Maybe four.  I'll give you -- I'll give

you four maybe.

          Q    Talk to me about those four.

A     Okay.

          Q     Just give me a thumbnail sketch one by
one.

          A     You're talking about describe the
incidents?

          Q     Yes, sir.  Give me the -- give me the
setting?  How many inmates we're talking about?  What
happened?

          A     Well, there was an incident where it was
he asked an inmates -- inmates in the hallway --
sometimes when you're traveling from one part of the
jail to another, a lot of times he's the officer that
escorts you, walks you down the hallway or -- or
whatever.

          Oh, I'm sorry.  And my back is kind of --
so he's an officer a lot of times that escorts you
since he's already in the hallway prepared for a
response, a lot of times when you get called to court
or to see your lawyer or something of that nature,
he's the one that -- that escorts you down the
hallway.

          And a lot of times that when you come out
of your dormitory, they want to do a physical patdown
to ensure that you don't have any weapons or anything
that you're not supposed to be taking out of the

dormitory.

So one time that I'm referring to, I saw him when he went to -- when he was patting the guys down, you know, doing a physical frisk pat search, he -- the guy made a comment about him being homosexual. You know:  Hey, you know, you didn't have -- like, you know, during the course of -- and I didn't see the actual frisk but during 'cause I'm against the wall, too.

But during the course of him patting him down, an inmate made reference to, you know:  What are you?  A homo?  'Cause you just grabbed my, you know, you know what.  And Cleckner shoved him into the wall, you know.  While he had his hands on the wall, he pushed him and made his head hit the -- hit the wall.  That's one of the incidents.

Q    Who was the inmate?

A    I couldn't tell you, sir.  It was a -- it was a black inmate, but it's been a long time ago and I don't -- I never knew him to begin with so...

Q    Was the inmate injured?

A    To my knowledge, no.  I mean, but as far as injured, you mean did he have to go to Medical?  No.  But, I mean, he got his head slammed against the wall.  So I don't know if you consider that injured

or not but...

     **Q**    **Was there some kind of blood any place?**

     **A**    **No, sir.**

     **Q**    **Was there any kind of cut?**

     **A**    **No, sir.**

     **Q**    **Was Cleckner the only officer there?**

     **A**    **Yes, sir.**

     **Q**    **How many inmates were there?**

     **A**    **Five, six approximately.  You know, like a little group.  I can't say exactly the amount but...**

     **Q**  **One shove and it was over; is that right?**

     **A**    **Yeah, he made a little comment.  Cleckner didn't like it.  Bam, you know, against with the wall.  The guy said something and he said:  You know, don't come to jail, something like that.  Or don't call me a fag.  I think that's his exact -- his exact words were:  Don't call me a fag or something.**

     **Q**    **All right.  Incident No. 2.  Tell me about that.**

     **A**    **When you're saying No. 2, you mean just another incident that I recall?**

     **Q**    **Yeah, you told me there were roughly four that you remember where Officer Cleckner used some kind of force that you felt was out of line; right?**

You told me about one of them.

     A    Yes, sir.

     Q    Tell me about the next one.

     A    I really -- I mean, I -- I feel uncomfortable getting into the specifics of these -- of these things because, you know, I didn't pay them much attention at the time. So I didn't really, you know, focus on them.

     I mean, this is like a -- this is an occurrence that's unfortunately not -- not -- not as rare as you -- as I'd like to think in -- in -- in -- in this environment, you know. I mean, people -- people mouth off to the guards, and guards rough them up. I mean, that's something that happens sometimes.

     And kind of tried to not pay attention to it. 'Cause if it's not me, I kind of try to stay out of it. You know, I don't want to be involved. I don't want to be a witness to anything like that because, you know, for obvious reasons.

     Q    Well, you're telling me that you were a witness, and you're telling me that there were these incidents where you think that Cleckner used too much force. I'm not asking you to guess or speculate or make something up. I'm just asking you to tell us what you really remember.

A     Okay.  So...

          Q     If you really don't remember anything,
then tell us that.

          A     All right.  So there was -- it was
another incident where there was two inmates
fighting, and I can't remember the dorm I was in.
But Cleckner came in and grabbed one of the guys
around the neck and -- and then put him in a choke
hold like, and he pulled him back away from the other
guy.

                But he, in my opinion, choked him way,
way longer than -- than what the guy need -- you
know, he pulled him back.  They were separated.  The
other officers had the other inmate.  But, yet, he
kept choking him for a long period of time, way
longer than I would think that you needed to do that.
You know what I mean?  Like it looked way excessive
to me but...

          Q     Do you know the inmate's name?

          A     No, sir.

          Q     Black?  White?

          A     Black.

          Q     Did that inmate lose consciousness?

          A     No, sir.

          Q     If I made a distinction between an airway

choke and a blood choke, do you know what I mean?

        A    No, sir.

        Q    Do you have information about whether the
inmate's air, ability to breathe, was cut off or
restricted?

        A    I don't understand your question, sir.

        Q    All right.  A choke, some kind of
pressure around somebody's neck, may be applied to
the windpipe which might restrict breathing?

        A    Can I just tell you exactly how he choked
him, and then that would...

        Q    Sure, yeah.

        A    He came up behind him and wrapped his arm
around him, you know, in, you know, like a
headlock-type thing and pulled him backwards.  And
the guy -- and kind of bent him, you know, to where
his body was bent backwards like and he was -- had
him around the neck.

             Yes, I would -- if you're asking me did
the guy have trouble breathing?  Absolutely.  I mean,
I mean, he was -- he was black, but he was turning
colors basically so...

        Q    What makes you think that he was having a
hard time breathing --

        A    Because he was turning colors.  He was a

lighter skinned black guy, and he turned really dark
looking.

Q     Was he able to talk?

A     I was on the top floor, and they were
downstairs so it was farther -- farther away than I
could -- and then there was a whole bunch of officers
and a whole bunch of commotion so I just -- and I
remember a lot of inmates saying:  Wow, he choked,
you know, the -- the you know what out of that guy,
you know, and -- and that kind of thing.

Q     How long was this choke applied?

A     Probably realistically, I mean, it seems
longer than, I'd say, 30 seconds.

Q     Was the inmate still struggling?

A     No, not at all.

Q     So after 30 seconds, he's -- the inmate's
turned loose?

A     Yes, sir.

Q     Any other forced used by Cleckner in that
incident?

A     When you say turned loose, I mean, the
choke hold was turned loose.  He wasn't turned loose
completely.  I meant that he let the choke go, and
they cuffed him up and everything.  But he wasn't
like released.  He was just -- the hold was shifted

basically.

     Q    Fair enough.

     A    Okay.

     Q    Did Cleckner use any more force in that incident?

     A   He had him by the cuffs, and he was pulling the cuffs upward.  You know, the guy was cuffed behind his back.  He was lifting the cuffs up real, real high like obviously injuring -- you know, hurting the guy, you know, while he was dragging him out of the dormitory.  Like there's absolutely no -- no need for that.

        That's something that officers -- some officers, let me say, do apparently, you know, to try to -- I don't know why people do stuff like that to people.  But some of the officers are guilty of that, of lifting your handcuffs to where it hurts you really bad so...

     Q   You said dragging out of the dormitory. Was this off -- was this inmate walking with his feet out of the dormitory?

     A    Not really.  Cleckner has a habit of kind of -- he's really, really big.  He's a body builder and he's -- he's huge, you know.  So he's basically -- the guy's feet were -- yes, they were

touching the ground, but I don't know how much of his own walking he was doing.

But Cleckner had him by the cuffs in one hand and squeezing the back of his neck with the other hand and kind of half carrying him, half walking him out of the dormitory, which is what he does on lots of incidents, you know, so...

Q   Okay.  All right.  Incident No. 3?  What do you remember about that?

A   I'm just going to -- I'm just going to -- my mem -- my memory on those incidents is -- is a little hazy so I just want to -- if that's okay, I'd like to stop there because I don't want to give you information that I'm not 100 percent sure about so...

Q   Well, if we were to have a trial and if you were to say:  Oh, I saw Cleckner, you know, abuse somebody else on these other occasions, that's why I'm asking you this question because I want to know how much you know about that and what you're going to say.  If you're going to say, "I don't have any information about that"...

A   Then don't say that I saw it?  Is that what you're saying?

Q   Yeah.

A   Okay.  Well, let me just say like this.

Let me -- let me clarify my answer.

It's not -- with Cleckner, with Deputy Brock as he's called in the jail, it's -- it's not an uncommon occurrence for him to come in and start roughing people up. This is something that's been happening quite a bit. It's happened quite a bit at this jail, you know.

And I've seen it a bunch of times, but I can't really recall the exact incident and the exact what did he do to what inmate. And when you ask me -- when you -- to get real specific, this is something that happens often enough to where they are blurred together, and I'm not -- I can't really recall the exact incident. Doesn't really stand out in my mind.

I know that sounds horrible, but it happens quite a bit so it's not something that, you know: Oh, my God, I saw him choke somebody. Because I see him choke people all the time so, you know.

But do you -- when you want me to get specific about which inmate he choked and which, and how and all this, I don't want to do that because they all blur together basically. I mean, if that helps you any.

Q    You have no real memory of this?  Is that

what you're telling me?

     A    No, I won't say I have no memory of them. I just can't answer you specifically who it was and how it happened.  And I just remember seeing the incident.  I can't -- I don't want to get pinned down on the exact details because I don't want to tell you something that's not true, you know.

     Q    'Cause you don't remember the exact details; is that right?

     A    That's fair, yes.

     Q    So the two that you've told me about are the only ones that you remember specific details?

     A    Definitely remember those, yes, sir.

     Q    All right.  So the incident that I think your lawsuit is about happened on July -- or, excuse me, June 30th of 2020.  It's the -- I'll call it the takedown incident.

     Are you suing for anything -- any incident other than that?

     A    Yes, sir, I am.  For that specific incident?

     Q    I know you're suing about that.

     A    Yes, sir.

     Q    I'm asking if -- is there any other incident that you're suing about?

A     During this proceeding or whatever?

          Q     Yeah.

          A     Yes, sir.

          Q     All right.  Well, let's start for the
first one.

          A     Okay.  You want me to just give you --
tell you what happened?

          Q     Tell me what happened.  Give me the...

          A     Okay.  So -- and this is all pertaining
to the same incident, but it just was -- it happened
over a period of a few days.

               So it started off Mrs. Coach, Deputy
Coach that was working in my dormitory.  She -- she's
very, very -- I'm not going to say like -- she's
very, very strict.  Okay.  So she comes in and then
there's a -- there's a set form of rules in the jail.
But some officers enforce certain ones; some don't.
Some give you a little more leeway than others.

               I'm not trying to get too winded, but I'm
just trying to give you a little background on.
Okay.  So Ms. Coach is the type that enforces every
single rule and with no exception, and she's very,
very strict.  So lots of inmates have a problem with
that.

               And there's -- and there's normally when

she comes in on a normal -- with a normal deputy, you know, there might be one guy who's misbehaving or whatever and he gets locked in his cell and he's not allowed to come out of his cell because he's forfeited by -- by his behavior he's forfeited his right to come out and use the phone or watch TV or whatever.

When Ms. Coach works, there's 30 or 40 inmates that are not allowed to come out of their cell because of some infraction that she's said that they did. Now, is that a true infraction? Probably. I mean, I'm not going to say she's just doing this, making it up. But she enforces rules that other officers don't enforce.

Anyway, the reason I'm telling you this is because she's really strict and, you know, so that's how that goes. So one of the rules that -- that is neglected by some officers but not others is making your bed. Okay.

Every officer but Officer Coach allows you to eat breakfast first. And then after you get done with breakfast you make your bed. And then you have to make your bed in order to come out and interact with all the other inmates.

Ms. Coach says that you have to make your

bed earlier than breakfast.  So most people like to
wake up, get their tray, then eat it, then make their
bed.  That's the common thing that everybody does,
all the other officers.

Is that the rules?  I don't think so.  I
think Ms. Coach enforces the actual rule that you
have to do it at this certain time, but she's the
only officer that enforces that so everybody
complains about it.  A lot of people refuse to do it.
So that enables her to lock them down.  And when I
say lock them down, I mean, withdraw their free time
based on the fact they didn't make their bed at a
certain time.

Q    So let -- let's get a little bit -- let's
zoom out.  The picture is, this is a multiprisoner
dorm; right?

A    Yeah, 80 -- 80 men, yes sir.

Q    Eighty?  How many cells?

A    Forty.

Q    And two people per cell?

A    Yes, sir.

Q    And when you say locked down, tell me
what that means.

A    Your door opens up at -- usually after
breakfast.  They -- when they get done cleaning up

after the meal is served, then you can -- they open

your door up and you stay out in the -- in the

dayroom area where you can watch TV, use the phone.

You can go outside.  There's a recreation

yard.  There's a door you can go out.  You can use

the phone.  You can go -- there's a bathroom.  That's

a big thing.  There's a bathroom in the center of the

dorm that you can use so you don't have to use it in

front of your roommate and stuff like that.

When y'all -- when I say locked down, I'm

sorry, to answer your question, when you're locked

down, that means she's -- you're -- she's saying,

okay for -- I think the policy is for four hours she

can restrict your being able to come out.  So she can

say, okay, you didn't -- basically what I was getting

at is, you didn't make your bed so now you have to

stay in your room for four hours.

Q    So instead of being able to come out in

the dayroom, go to the special bathroom, go outside,

watch TV, whatever, you got to stay in your cell for

four hours?

A    Yes, sir.

Q    That's being locked down?

A    Yes, sir.

Q    That -- all right, continue with -- with

what you...

         A    So -- so in the course of me not making
my bed, which I admit that -- that I didn't make my
bed at the proper time.  I mean, I will admit that.

         She came around and -- and was saying
that, you know, this person, that person, you don't
get to come out, you don't get to come out, going
down the line.  Because there's always -- there's 30
people that don't make their bed, you know, 'cause
they don't normally have to do that.  So they're
like:  Hey, you know, screw you basically, you know.

         So she came around and -- and -- and does
that.  Well, I am the type that, you know, as opposed
to her coming in there and messing with me and this
and this, I'd prefer to stay in my room for four
hours and read a book or something, you know.  You
know, I'm okay being in there like that.  So, you
know, so that's okay with me.

         So, hey, I knew going in that I wasn't
making my bed and I knew that I was going to have to
get a four-hour punishment and I was willing to
accept the four-hour punishment to not have to get up
before breakfast.  You know, so's that's what I did.

         On this -- what -- what -- to answer, you
know, what's going on with this situation, well, she

didn't like the fact that I was okay with the

four-hour lockdown.  That bothered her because she

wanted -- a lot of guys, they:  What do you mean I

got a four-hour lockdown?  They start kicking the

door.  They start freaking out and usually leading to

more problems for their self, but it -- they're

visibly irritated by the fact that they don't get to

come out of their room, that they're on lockdown.

Okay.  But me not -- me liking lockdown,

which is -- honestly I like lockdown because, you

know, basically I -- I don't want to go out there and

watch TV.  And I'd rather sit in there and read my

Bible.  You know what I mean?  That's what I do.

So -- so I -- so her -- in my opinion,

her realizing that it doesn't bother me to be on

lockdown, made her mad.  Because now her punishment

is not having any effect on me.

Q    Okay.  Just to be clear, this is not

something she told you about how she's thinking or

anything like that.  This is your belief?

A    Speculation on my part, yes, sir.

Q    Understand, continue.

A    So because of that, she's mad.  So she

says:  Okay, we're going to do a little something

different.  We're going to take your mattress from

you.  So you're not going to -- well, basically, she

said:  You're not going to lay up in the cell and

blah, blah, blah, and not follow my orders and you

think it's okay and blah, blah, blah.

She came in the cell, opened the door.

She took all my books, including my Bible which was

the main problem I had, and threw my Bible in the

trash can.  She threw it in the trash bag.  And I

said:  Whoa.  Oh, that's one thing she did.

But she also pulled the mattress,

snatched the mattress out from under me.  She grabbed

my mattress, and I was laying on my side.  She

whipped the mattress, you know, real hard, pulled it

out from under me and it caused me to flip over.  And

my elbow hit the metal bed, and it caused a bruise on

my arm.

And -- and I -- and then she -- and then

when she took my -- you know, and I had a comment or

two, you know.  Yeah, I probably said something, you

know, because that's not normal treatment.  That's

not something that -- from what I understand, she's

not allowed to do that.

And she took my Bible and threw it in the

trash can and took my books and threw them all --

they have a policy that has you can only have three

books in your room, and I had four.  But the Bible is something that you can have in any institution anywhere.  They can't take that from you no matter what you do wrong, you know, unless you do a specific crime with your Bible.

Since I didn't do that, she was supposed to take the three books or one book out of the three that I wasn't supposed to have.  But, instead, she took all the books and threw my Bible all in the trash can, which I obviously had a problem with.

So then she didn't let me out at all that day.  That was -- and you're only allowed to get a four-hour lockdown.  Anything more than four hours she has to write on a grievance.  I mean, she has to write a disciplinary report for you.  You have to go to court, and they have to sentence you to anything. She's allowed to give you four hours of lockdown. Anything more than that, she -- they have to go through a different process.

She kept me on lockdown all day.  And then when I came out for the evening shift when a new police deputy came in the dorm and relieved her for -- for the nighttime shift, I went out to the kiosk and wrote a grievance on her for throwing my Bible away and for -- actually, I'm sorry -- I said -- I

said that wrong.  Let me -- let me go back.

It was -- that wasn't this.  That was a different.  I'm sorry, I got that confused.  She did let me out after -- it was more than four hours, but it was about midway through the day she let me out.  I'm sorry.  It was the following day that she kept me in there all day.

The first day when I -- when -- after she flipped me on the mattress and after she threw my Bible away, that day sometime in the afternoon she let me out.  I wrote a grievance, put it on the commuter saying that she threw my Bible away and that she flipped the mattress over and caused me harm on my elbow.

The security staff called me out and said:  We want to talk to you about this officer pulling the mattress out from under -- under you.  And I said -- so I told them the same story that I told you and that I was upset about it visibly.  You know, I was -- I was really upset.  I didn't feel like she should have done that to me, but my main concern was I want my Bible back, you know.

So they took a statement.  The officer -- they called the -- a -- some officer that's in charge of internal -- oh, the IA officer.  The internal

affairs officer came in.  He filmed my statement.  He called the -- the orderlies.  She had -- while she was doing this, she had two inmate orderlies with her that were like gathering the stuff up or whatever.

And then she -- so they called them.  They testified what they saw or whatever.  She admitted that she did that, that she pulled the mattress out from under me?  I received it -- and he told me -- he just asked me a bunch of questions, and then I went back to the dorm.

Then later on when I checked the -- the -- the -- my grievance and it gave me a status or whatever on my grievance, it said that she was reprimanded for -- for putting -- physically snatching my mattress.  She wasn't supposed to do that; that she was reprimanded for that and that I would have my Bible back by the end of the working day.

Okay.  So I didn't get my Bible back.  The next day I complained:  Hey.  I wrote another grievance and said:  Hey, I didn't get my Bible back.  She came in the dormitory early in the morning.  And instead of the 30 inmates that she normally has locked down, she locked down 50 or 60 and actually -- or more.

And she said that there'll be no passing food of any kind.  Now, passing food is a really, really big thing in there.  Everybody doesn't eat everything that's on the tray so there's a big market for:  I'm going to trade my eggs for your grits.  Or we're going to do pancake for toast.  You know, there's all this.

Well, she told the dormitory that nobody is passing anything.  There's no extra trays.  You're going to get your tray.  You're going to eat it in your room, and that's it.  And it's all because you got people that want to write grievances on me, and she pointed at my door.

And -- and then -- and then she said if y'all want -- then she came around and searched the dormitory, which a deputy in Houston County Jail, now they can search as many as they want.  Don't get me wrong.  But it's common everyday policy that they -- that they search three rooms per day.

Now, a deputy comes in, and every officer does the same thing.  They come in.  They search three rooms and then they go about their business and it's a normal day.  She searched every single room.  And when she did, she threw away everything that -- that -- now, true enough, these are items that

normally are -- are considered -- they're not supposed to have, you know. Extra mattress, extra blanket, extra magazines, stuff like that.

But all the other officers don't take these things. You know what I'm saying? They -- the people have had them forever. She comes in, and she takes everything that she could possibly take within the confines of the -- of the rules, I will say. I mean, she's not taking things that you're allowed to have.

But anything extra, anything she could do to try to irritate the inmates that she's taking from, she took all the way around the dorm. And she says, you know: You don't like it, go talk to Room One. He's the reason that this is happening.

And in my opinion and everybody else in the dorm's opinion, she was doing that to try to get inmates to assault me, to be against me. Because, you know, hey, we're talking this because of Room One. We're doing this because of this. You don't get to come out of your cell because this guy wants to write grievances on you.

And she did that loud in front of the whole dorm. She pointed at me, pointed at my cell: Some people want to write grievances, while pointing

at my cell.  You know, so she's basically trying to get everybody to beat me up basically.  All right, which is, you know, I'm not saying that she -- that was her, you know.  But that's what that causes, and she knows that.  And that's, in my opinion, that's what she was doing.

Lucky for me, I grew up in Houston County, and I know all these guys.  I grew up with them, you know, went to school with them and, you know, they're not going to react to that.  They know she's the problem.

Had it been any other officer, they would have probably beat me up.  But they didn't because she does this all the time.  This is her MO and, you know, they -- they know as the person that -- you know, they said they -- you know, and I actually had some people come to my door and, hey, we're going to do this and do that to you.

And then some others guys say, you know: Hey, that's Coach.  That's not him.  You know, she's going to do that no matter what.  Don't -- don't blame him for what she's doing.  But she was trying to in -- in short, she was trying to get them to assault me, you know, and trying to make it hard for me.  Oh, there's not yard call today because of, you

know, some people, you know, pointing at -- pointing
at, you know, my room.

             Well, then, she also left me locked down
all her entire shift for day after day after day.
Okay.  I can't say exactly how many days, but I know
two for a fact.  She kept me in my cell all day long.
She's not allowed to do that.  I'm only supposed to
be able to get four hours, but yet she didn't let me
out.  I'm not letting you out at all.  I don't care
what you say.

        Q    Can I stop you there?

        A    Yes, sir.

        Q    Was there some kind of offense or some
kind of thing that you had that you shouldn't have
had that caused a lockdown for these two days?

        A    The original day, the -- the first day
where she locked me down for, I said when she pulled
my mattress out from under me, I didn't make my bed
before chow, which is a -- is a -- yes, that's an
infraction.  And I had one extra book.

        Q    You told me about that.

        A    Right.

        Q    Now, you're telling me about two other
days?

        A    The next day I had my bed made when she

got there right on schedule standing at attention by my door because I hadn't talked to my fiancee' the day prior, and I know she's a worry -- she worries really bad if I don't call.  So I -- whatever I had to do to make -- to make sure I got out and used the phone, I'm going to do because my -- my family's worrying about me now 'cause I didn't call yesterday and I call generally every day.

And that -- so I didn't do anything wrong the second day.  She just locked me down based on the fact that you wrote a grievance on me, you know.  The -- the -- the -- dang what was I going to say?  The -- that's it, I guess.  What -- what'd you -- oh, you wanted me to continue on?

Q    Well, you were telling -- you were telling me you were locked down.  I know the first day with the mattress incident you had locked down?

A    Right.

Q    Then you told me about another day you were locked down?

A    And then one more following that.

Q    One more following that.  On the third one, was there some kind of infraction or incident or jail rule violation?

A    No.  The second, too, there was no

infraction whatsoever on both of the two days.  She just -- the -- the officers at that jail work three days on and then two days and then, you know, but however.  But she was during a shift that they worked three days in a row, you know.  So all three of her days I stayed locked down because of the grievance, you know, that -- also, I will -- I forgot to mention this.

I was a dorm trustee, which means I serve the food.  I -- you know, and this is a position in the dormitory that's coveted, you know, because you get extra food if there's any.  You get out of your cell early 'cause you have to pass the stuff out.  Everybody else has to remain locked down while you pass trays out and while you clean up and all this.

So you get extra time during the day.  There's several different times during the day when everyone else is locked down and you're out based on the fact that you worked.  I was a trustee up until the time that this happened.  And then she fired me because of this, too.

So I lost my job as a trustee, and she didn't let me out of my cell for three days.  She didn't give me my Bible back.  They instructed her to give me my Bible back.  When I wrote the grievance

saying that I want my Bible back, I mean, this is

something that's a Constitutional right.  I mean, I'm

allowed to have this, and there's no -- I have --

unless you use the Bible as a weapon or something

like that, they have to give you that, you know, by

law.

So I'm saying:  Hey, I want my Bible

back, you know.  Well, they kept telling her to give

me my Bible back.  They're writing responses to my

grievances saying:  Give him his Bible back.  And she

flat-out refused to give it back because she -- for

whatever reason.  I mean, she just was not going to.

In my opinion, it's because she didn't me

to feel like I was winning anything, you know, like

she's going to -- you know, I threw your Bible away,

and you're just going to have to like it.

But my problem was, the main problem that

I had, I finally got my Bible back nine days later.

Okay.  But my problem with that is, my Bible -- I

didn't get my Bible back nine days later.  My Bible

stayed in the trash can.  I got a Bible nine days

later.  They just brought me one and threw it in my

cell and said:  There's your Bible.

But it wasn't my Bible because my problem

with that was that I had phone numbers and legal work

and stuff in it and I lost all of that so.

          Okay.  So to move on, so that's what
happened.

     Q    Can I ask you one thing?

     A    Yes, sir.

     Q    You said you were locked down during
Coach's shift?

     A    Yes, sir.

     Q    How long is a shift?  Eight hours?
Twelve hours?  How long?

     A    Twelve.

     Q    So you're telling me -- your testimony
is, after the mattress incident the next day, you're
locked down for 12 hours when Coach is there?

     A    Two more days.

     Q    I know.  I'm going...

     A    Twelve hours apiece, yes, sir.  From six
in the morning till six at night.  Then the next
shift starts at six at night, and they let me out.

     Q    Okay.

     A    Because I hadn't done anything wrong.

     Q    All right, so continue.

     A    So that went on, and I kept writing
grievances.  They kept saying that they were going to
give me my Bible.  It didn't come back.  I got it

back nine days later.

The -- then the next shift -- and -- and -- and, like I said, this has been a couple years ago so don't quote me exactly on the day and the time. But a following day that she worked, you know, another day that she worked, she did it again. This is -- this all happened in one shift.

But then the following one was the next time she worked. 'Cause they go off for a couple days. Then some other officer comes in, and then she comes back. When she came back, she did it again. And she locked me in my cell again, and she wasn't supposed to do that. And they told me in the grievance she wasn't supposed to do that.

My family didn't understand what was going on; that she -- my fiancee' was worried to death about me. So they -- Officer Coach said: You know, you're locked down again. I said: For what? She says: You know for what, you know. And I took that as because you wrote a grievance on me basically.

So I hadn't done anything wrong because -- and I know I hadn't done anything wrong because I knew Coach was coming to work and I specifically made sure that I didn't have anything in my cell that

could be -- I was tired of being locked down.

So I wanted to make sure that there's no infraction in my cell and that my bed was made. I was basically standing at attention with my bed made when she got there at 6:00 in the morning. She told me I was locked down. She didn't pop my door when everybody else came out after chow. She didn't open my door. I'm like: What's going on? You know, what's going on, you know, blah, blah, blah. There's nothing you can do about it. You can't do anything from inside your cell.

I felt like, you know: Hey, this is, you know, getting carried away. The staff is -- is telling me that she's not supposed to be doing this. In my grievances -- my responses to my grievances, they're saying, you know, we're going to handle this. We're going to handle this, but it's not being handled. I'm still being locked down. I'm still not able to use the phone.

So I asked an inmate to -- I asked her could I have some toilet paper, and she said yes. She popped my door open, and I came out to get the toilet paper. I grabbed the toilet paper and then I turned and I got on the messaging system that they have -- the kiosk is what it's called -- and messaged

my girl real fast:  Hey, she's doing it again.  Call up here, tell them she's got me locked in my cell for no reason.  I love you.  Bye.

I hung up the kiosk, turned around and I was headed back towards my cell and Cleckner and Bouerger came flying in.  When they -- Bouer -- Cleckner was looking like, you know, I was scared.  You know what I mean?  The way he was running, he was running full speed.  He was looking really mad.

And now this is completely just something I heard, but I heard that he had a little thing for Deputy Coach, you know.  So that kind of maybe motivated him to be so aggressive.  I don't know exactly what the problem was, but he was furious looking.

And he -- when he came in, Coach said -- she stopped him at the desk like kind of -- not stopped him, but she walked around the edge of the desk.  He came running in.  She kind of stood.  And she said:  We got one needs his ass kicked.  And he kept running, and the other Officer Bouerger tried to stop Cleckner from -- from doing what he did.

Okay, Cleckner said:  I'm going to tell you one time to go to your cell.  Well, I was already on my way to the cell.  I had made my message, had

sent it and was headed to my cell to go back in my
room and shut the door because I didn't want to get
beat up and I didn't want any problems.  I just
wanted my fiancee' to call up there and tell them
that I'm being mistreated again by Ms. Coach.

So I was headed to my cell.  He comes
running up with Bouerger right next to him.  He said:
I'm going to tell you one time to go to your cell.
And I said:  Yes, sir.  And I threw my hands up in a
don't-shoot motion, both hands palm out like this.  I
don't know how to -- don't shoot, you know.  I said:
Yes, sir.  And I threw my hands up like this.

Okay.  As soon as I said that, Bouerger
reached his hand to try to stop Cleckner from
assaulting me.  Cleckner slapped his arm down,
grabbed me around the waist, picked me up as high as
he could, paused for effect, you know, like wrestlers
do, and then dropped me like this.

And the way I'm -- what I'm explaining
is, he held my legs in my -- around my thigh area so
my legs wouldn't hit.  And he made my head land
"bow," you know.  Honestly, I mean, he could have
killed me.  I mean, that's what I felt like he was
trying to do because that's very -- I mean, we're on
pavement.  And he -- he picked me up like this and

went, "bow," you know, and slammed me on the ground.

That's the last thing I remember until I woke up in the hallway.  They were dragging me by my feet.  Now, from what I've been told in the dormitory, that when -- that -- that I was unconscious.  I was flapping around like I was having a seizure.  There was blood everywhere.

They put me in a wheelchair and pushed me out of the dormitory in a wheelchair.  But, yet, I woke up and there was no wheelchair in sight and they were dragging me by my feet down the hallway.  So I'm like:  How did I get out of the wheelchair?  I was in a wheelchair.  You know, like why am I out of the wheelchair?

Well, they drug me all over all the way to Medical, which is a long way, approximately 100 yards down a hallway and around the corner.  And then right before we go in the side door of Medical, which I found very odd because you have to get -- the way they took me into Medical, you go into a yard area that's -- that's for inmates that are in the medical wing.  They go outside to get fresh air and -- and, you know, get a little outdoor recreation.

I've never seen any inmate get taken through that door and through the yard and all.  It

doesn't make any sense when you can go through the front door of Medical and come straight into Medical where all the nurses and the emergency room and all that's at.

But, no, they didn't take me in that door. They took me in a side door that goes through a yard, a patio and a yard that's not on camera, by the way. And they're going to drag me through that yard into the thing.

Right before they take me in the door, Cleckner jumps on top of me and starts choking me in the hallway right outside the Medical room door. Okay, I scream at the top of my lungs: Get him off me. I'm screaming.

Now, where they're at, there's like four officers all, you know, around me holding me. Cleckner's on my chest, and he's choking me. The booth can't see me, but there's a booth in the hallway. So I scream at the top of my lungs: Get him off me. Ahhh, I'm screaming at the top my lungs. When I do, he let's go of my throat and jumps back and backs away from me.

But, honestly, I mean, I'm not going to say what his intentions were. But if I wouldn't have screamed, I mean, it's obvious that the reason he let

me go out of that choke was because I screamed so loud, you know, and that people knew.  Without him -- without me screaming, he doesn't know -- I mean, no one knows what's going on.

But I screamed at the top of my lungs so the people in the security booth could hear it.  And so he jumped back and let me go.  But, honestly -- and I can't speculate as to what he was going to do.  But it just seemed mighty odd that he had his hands around my throat, and he was choking me like that.

You know, like this is not during the altercation.  I was out unconscious.  I mean, they're dragging me.  I'm limp, you know.  Honestly, I mean, if you had to ask me why, I think he was going to try to kill me.  I think he was going to try to -- he knew he had messed up, and I felt like he was going to kill me.  He was going to choke me to death and say I hung myself.  And that's something that, you know, there's rumored to have happened before at this jail.

So and then they drug me through the patio and the yard area, which I'd never seen an inmate ever go to Medical through the yard.  They always go in the front door.  And Medical is like -- why are you taking me on -- the back way to Medical

1  through a place where there's no camera?  If you had

2  to ask me why, I mean, I think this man was going to

3  try to kill me.

4          The reason that I tell you this story,

5  you asked me was there any other assaults or

6  anything.  Well, yes, the Coach incident happened

7  days prior to this, but it's all tied into the same

8  thing.  So if you ask me why I would be suing for

9  some other incident or whatever than her with the

10  mattress and the Bible thing, that's it.

11      Q    I'm going to ask you some details here.

12      A    Yes, sir.

13      Q    So on this day when the incident with

14  Cleckner happened, you were locked down starting at

15  six in the morning?

16      A    Yes, sir.

17      Q    How long were you locked down before, you

18  know, the toilet paper and Cleckner happened?

19      A    Five and a half hours approximately.

20      Q    Before crawling and asking for toilet

21  paper, had you had any other interaction with Coach?

22      A    Just me asking why.  Now, she's -- I'm

23  talking to her through my glass door.  She's -- can

24  hear me, you know, but she's at her desk and I'm in

25  my room.  But if I yell loud, she can hear me.

I asked her:  Why am I locked down?
What'd I do?  And she says:  You know why.  And I
assume that meant because I wrote a grievance on her.

Q    Now, is there intercom between your --
something in your cell --

A    Yes, sir.

Q    -- and Coach?

A    Yes, sir.

Q    Is that what you're talking on?

A    I -- I pushed the intercom multiple times
to try to ask her why I was locked down, but she
wouldn't answer, which is, you know, if they -- if an
inmate is -- you know, some inmates barr -- you know,
barrage her -- rah, rah, rah over and over and
over -- so they don't answer the intercom.

They -- they answer it once.  If you --
if you got a legitimate complaint or whatever, then,
okay, they'll address it.  But if you:  No, hey, I
want some extra food or whatever, then they just shut
it off and they ignore it.

She ignored mine from the start so I had
to yell, you know, for her to hear what I was -- you
know, she didn't answer me on the intercom.  She just
talked to me out loud.

Q    How far is your cell from where Coach is?

A     Ten yards.

          Q     And Coach, I take it she's at a desk-area
type of thing?

          A     Yes, sir.

          Q     Okay.  So you asked Coach for toilet
paper?

          A     Yes, sir.

          Q     And she says:  Sure, you can have some
toilet paper?

          A     Yes, sir.

          Q     So did she send somebody with toilet
paper?

          A     She sent somebody, and she popped the
door at the same time, which what normally happens in
that situation is, you open it.  Okay, there's a
railing here, and the guy that brought the toilet
paper comes to the railing.  So I have to open my
cell, walk about four feet, and then he hands me the
toilet paper.

          Q     Yeah.  So at that point you got toilet
paper?

          A     Yes, sir.

          Q     And what's your thought process?

          A     I want to send my wife a message telling
her that -- that I'm being locked down for no reason

by the same officer, and they've told her not to do
this to me anymore.  I need you to call up here and
tell them that this is going on again.

     **Q**    Was there any more communication with
Coach?

     **A**    None.

     **Q**    So you went to the kiosk from your cell?

     **A**    Yes, sir.

     **Q**    And you know you're supposed to be locked
down?

     **A**    Yes, sir.  Well, no, I don't know I'm
supposed to be locked down.  I know that she said
that I'm supposed to be locked down.  But --

     **Q**    Put -- put it this way...

     **A**    -- from what I understand, I'm not
supposed to be locked down.

     **Q**    Put it this way.  You disagree with
having been locked down?

     **A**    Yes, sir.

     **Q**    But so far as Coach is concerned, she's
put you on lockdown status?

     **A**    She's never said a word to me.  I asked
her.  You know, she didn't -- I just said:  Why am I
locked down?  She said -- and normally if they --
when they lock you down or do any disciplinary,

they're supposed to inform you of why.

So that's what I was tying to find out was:  Hey, what did I do?  Because I was going to write another grievance, and I wanted to document what -- what she's saying I did wrong 'cause I hadn't done anything wrong.  And she said:  You know why.  And that's that.  So, you know.

Q    Between you getting toilet paper and you seeing Cleckner coming, was there any order to anybody to lock down?

A    She told the entire dormitory to lock down 'cause she was calling -- you know, I assume because she was calling her Cleckner and them to come in and beat me up basically.

Q    How many times did she tell the dormitory to lock down?

A    I mean, when she hollered it, they all kind of ran to their cell, you know, basically.

Q    How many times did she give that order?

A    I don't know.  I didn't even hear her.

Q    More than once?

A    I didn't hear her at all.

Q    How could you not hear her but everybody else did?

A    Because I just went straight to the

kiosk, and I was typing my text in.  She -- I don't know.  I mean, I didn't -- I didn't pay it no attention because all I was trying to do was get my text in.  And so I was paying attention to typing my text.

     As soon as I got the text done, I was headed back to my cell.  I wasn't trying to fight her.  I wasn't trying to stay out of my room.  I wasn't -- I just wanted my family to know that I was being mistreated again and locked down for no reason.

     Q    So it sounds to me like only later, only after this incident did you learn that orders were given to lock down; is that right?

     A    I didn't -- really didn't learn besides the fact that I know that I saw all the inmates go in their room.  So I assumed that there was a -- I don't know that the order was given.  But I saw all the inmates at once go in their cells.  So I could assume that she told them to, but I didn't hear her tell them to at all so...

     Q    So from the other inmates' behavior --

     A    Right.

     Q    -- you assume that orders had been given to lock down?

     A    That's accurate, yes, sir.

116

1    Q    Supposing that orders were given to lock

2    down, is there some reason that you would have

3    believed you were exempt from that order?  That you

4    didn't have to lock down, but everybody else did?

5         A    Supposing?

6         Q    Yeah, I know.  You say you didn't hear an

7    order to lock down?

8         A    Right.

9         Q    I'm saying assume for the purposes of my

10   question that there was such an order, one or more:

11   Lock down, everybody lock down.  Is there some reason

12   that you can give us that you were somehow exempt

13   from that order; that it didn't apply to you, but it

14   applied to all the other inmates?

15        A    Well, I -- I mean, I'm assuming that she

16   was talking to the other inmates.  I mean, I'm

17   assuming that she knew what I was doing; that I was

18   typing on the kiosk and that, you know, that's a way

19   -- like if I was to have gotten on the phone to call

20   my family, she could shut the phones off, but she

21   can't shut the kiosk off.

22             So I'm just speculating now.  I mean, I

23   don't know what's going on in her mind because I

24   don't know why she was doing the things she was

25   doing.  But I'm assuming she was talking to them

because she's trying to get them to lock down because she's calling security in there to rough me up.  So I'm thinking that she was talking to them.  She wasn't even talking to me really, I mean.

I don't think it would have -- I don't think in her mind it would have been, you know, why would she tell me?  It's obvious that I'm, you know, making a decision that I'm going to make this text, you know.  So, I mean, I'm assuming that she wasn't even talking to me to begin with, if what you're saying is true that she ordered everybody to lock down.

All I know is that I saw everyone locked down.  I can't say that that order was given.  I mean, I just saw everybody go in their cell, you know.

Q    Was there any communication between you and Officer Coach about --

A    None.

Q    -- you -- hold on.

A    I'm sorry.

Q    I think you know where I'm going.  Any -- any communication between you and Officer Coach about you going to the kiosk and being allowed to do that?

A    None, no.  It's pretty obvious that, you

know, I -- you know, I pretty much thought that

that's what she had in mind to begin.

I mean, honestly, you know, the officers are not slow. They know exactly what this brings and what this does. She knew when she called Cleckner. I mean, in my opinion -- in my opinion now, I'm speculating, but she called Cleckner to get me beat up.

I mean, you know, like I said, she'd been trying to get the inmates to do it and they wouldn't do it. So then I feel like she called staff to do it, you know.

Q    All right. And so let me make sure. I'm pretty sure we're clear. But you're not telling us that there was some discussion where you asked Coach about: Hey, I want to go send a message or go to the kiosk? There was no discussion like that; true?

A    That's true, yes. Oh, you're -- you're -- hold on. You asked me did I ask her to go to the kiosk or was there any kind of...

Q    Whether you asked permission, whether she gave you permission. Was there any discussion about...

A    No, there was no discussion whatsoever about me going to the kiosk.

Q    So you -- bottom line, you took the
opportunity to get out of your cell.  Now the door is
open.  You're going to take the opportunity to go
send a message as fast as you can?

         A    Yes, sir.

         Q    Got it.  No discussion with any officer?

         A    No, sir.

         Q    True?

         A    That's true, yes, sir.

         Q    So you're typing.  You're focused on the
message.  Did you send the message?

         A    Yes, sir.

         Q    What did the message say?

         A    Help.  She's doing it again.  Call up
here.  They got me locked down for no reason.

         Q    That's done.  Next step is you look up?

         A    I hit -- sorry, sorry, go ahead.

         Q    Go ahead.

         A    I hit send, and then I started walking
back to my cell.

         Q    And?

         A    Before I got to my cell, Cleckner came
running in.  I already told you what happened on
that.  And then he attacked me.  I mean -- I mean, he
was going to do that.  It was obvious to me that

he -- that was his intention all along.

The officer next to him tried to stop him.  He put his hand up and tried to hold him back.  And he -- and Cleckner slapped Bouerger's arm away, slapped it down and then grabbed him.

Q    Was -- did either of those officers tell you to lock down before you were touched?

A    He said:  I'm going to tell you one time, Sindell, to lock down.  I said:  Yes, sir.  Put my hands up like:  Don't shoot.  And as soon as I said, "Sir," he grabbed me and slammed me.

He gave me -- I was headed to my cell.  Had he have not come in the dorm, I would have been in there already.  If -- he got in between me and the room when he said that.  I mean, I was on my way to my room when -- I mean, all I wanted to do was send the message.  I didn't want to fight the police.  I wanted to get my family to call up here and tell them that I was being mistreated.

Q    So one order from Cleckner?  Is that what?

A    I'm going to tell you one time to go to your cell.  But before -- as he said cell, he was grabbing me and slamming me on the ground.  He gave me no -- he didn't give -- yes, he made the order,

but he didn't give me a chance to follow it.

I said, "Yes, sir," and put my hands up, and he slammed me immediately. He had no intention of letting me walk to my cell. He intended on slamming me down to begin with, I mean, in my mind. It was obvious because that's...

Q    That's not something he told you? That's your belief?

A    Well, he didn't give me a chance to really go to my cell. He said: I'm going to tell you one time. And then he slammed me, you know, as he was saying it. You know, like I was on my way to my cell when he said it so...

Q    All right. Bouerger, you've told me something about what he did. He tried to intervene?

A    Honestly, he did put his hand up like this and tried to block. And I'm showing my -- his hand trying to block Cleckner. Now, I don't know right or left, but he tried to hold Cleckner back.

Q    Okay.

A    Because like I say, Cleckner's known for being a hothead. You know, he was mad looking. And Cleckner [sic] put his hand up like this and tried to hold him back.

Q    Bouerger, you mean?

A    Bouerger -- I'm sorry -- tried to hold Cleckner back, and Cleckner slapped Bouerger's hand away and then grabbed me.  Picked me up, held me up in the air for a few seconds so everybody would go "Oooh," and then blam.

Q    Did Bouerger touch you?

A    That I know of?  At -- from what I remember, you know, Cleckner picked me up, slammed me on the ground.

What I was told by inmates later is that after they -- he slammed me, then every -- they all piled up on me, and other officers came in. Everybody piled on me.  They were all mushing me and doing the normal, you know, twist your arms around.

And -- and then they put me in a wheelchair, took me out in the hallway.  But I don't remember a wheelchair.  I remember waking up, and they were dragging me by my feet down the hallway.

Q    Before you contact the ground, did Bouerger touch you?

A    No, sir.

Q    Are you aware of anything that Bouerger did that harmed you?

A    Only by word of mouth from other inmates.

Q    And what is that word of mouth?

A     That after they -- they had -- when I was

on the ground, like I was had -- they said I was like

-- looked like I was having a seizure.  I was

flapping around.  Blood was everywhere.

         They said that -- that, you know, they

twisted your arms and got on top of you.  And, you

know, that -- and I don't know.  I mean, I don't -- I

think that the roughness of it was a little

excessive.

         But normally when there's any altercation

with an inmate and a deputy, that they -- they're

supposed to cuff you up and -- and secure you, you

know, or whatever.  I was told that he did that.

         Do I know -- are you asking me did -- do

I feel like -- you know, all I know is what I was

conscious for.  What I've heard is that he piled on

with everybody else.  But what I know myself

personally is that until -- like you said, before I

hit the ground, he didn't touch me.  I don't really

know what happened after I hit the ground 'cause I

was unconscious.

         Q     So what is it that you're suing Bouerger

about?  What did he do wrong?

         A     I -- I'm -- haven't made any decision on

who I'm suing or what I'm suing.  I just contacted my

attorney and told them.  You know, basically they gathered information.  They looked at the film, and they made the decision on who to sue or whatever.

I only just told them what happened, and they -- most of what they got from this incident, my lawyers, is from what they saw on the film, I would assume, you know.  But -- so I don't know exactly who to sue or what to sue.  I'm not familiar with who did anything.  I don't know the legal process.  I just told them what happened, and this is where we're at so...

Q    Are you aware of anything that Bouerger did that caused you harm?

A    Only by word of mouth of other inmates.

Q    And that's what you've told me already?

A    Yes, sir.

MR. WAYMIRE:  Do you want to take a break?

THE WITNESS:  Can I ask you a question?

MS. BURTON:  Not in his presence, but we're good to take break if he wants to.  I mean, I...

THE WITNESS:  I have one question, and it might actually be something that you'd -- that you'd wanted to hear so.  But I want to ask her

first so...

MS. BURTON:  Well, can we go off the record for a second?

(Discussion off the record.)

MR. WAYMIRE:  Off video at 3:38.

(Brief Recess.)

MR. WAYMIRE:  All right.  Back on the video at 3:44.

BY MR. WAYMIRE:

Q    When we left off, you were perhaps going to clarify something, and I'm happy to let you clarify or add whatever you want.

A    I pretty much gave you all I can.  Well, I thought -- I mean, I thought it was something more, but I answered your question as far as I can do unless you have -- you know, you want to ask me anything further about it.  I don't mind answering but...

Q    So you mentioned earlier or you used the phrase:  Blood everywhere.  You went from -- you started in the dorm.  You ended up in Medical.  Where was the blood everywhere?

A    On me.  And then the other inmates told me that they couldn't believe all the blood or whatever.  I heard.  I haven't seen the film myself,

but I was also told in the camera that you can see
blood.

     Q     In the dorm?

     A     Yes, sir.

     Q     Because that's where the inmates were?

     A     I had blood all over my shirt so, but the
inmates said that it was gruesome looking and that
there was blood everywhere so that's what I'm going
by.  But I did have blood on my shirt and my jumpsuit
so -- and my face and my neck.

     Q     You told me that when Cleckner and
Bouerger came in, Coach said:  We got one needs his
ass kicked?  Yes?

     A     Yes, sir.

     Q     Did Coach say anything else?

     A     I don't think so.  That's all I heard.
And when I heard that, I kind of wasn't paying much
more attention to her.  I was looking at the guys
coming, you know, so...

     Q     Were Cleckner and Bouerger in the dorm at
that time?

     A     Yes, they were coming around.  In order
for them to get to where I was, they had to go past
her and her desk.  And it's kind of a
horseshoe-shaped desk.  So they were going around her

desk, and she stepped around the desk and was -- said
something to them as they were coming by.

Q    Are you aware of anything else that
Officer Coach communicated to Bouerger --

A    No, sir.

Q    -- or Cleckner?

A    I'm sorry.  No, sir, I'm not.

Q    So even before they got in the dorm, they
would have had to get some kind of call?

A    Yes, sir.

Q    Do you know anything about that?

A    She called them on the radio.  I mean,
that's -- that -- let me take that back.  To me, it's
obvious that they came because she called them.

That's how it normally goes.  She either
calls on the phone or the radio in order to say:
Hey, I need some assistance down here or whatever.
That's how it generally goes.

Did I hear the call or did I see the
call?  No.

Q    So when you regained consciousness, your
testimony is you were outside the dorm?

A    Yes, sir.

Q    In the hallway?

A    Yes, sir.

Q    So is this the hallway?  There are a lot of hallways; right?  Was this the hallway that's right outside the dorm or some other hallway we're talking about?

A    This is the hallway -- there's actually this -- yeah, there's actually not a lot of hallways.  They're -- they're real big wide, one down the center, you know.

It was -- I think you're asking me, did they take me on a side hallway or anything like that or...

Q    No, I'm asking you where you were.  If you can describe for us?

A    I was in the hallway in between Medical and my dormitory.  They were dragging me down the hallway towards Medical, which is, yes, it's right outside of the dormitory kind of.  It comes out, and then goes down towards Medical, I guess.

Q    And who was there?  What officers were there?

A    I couldn't -- I don't really know all who was there.  There was maybe one or two.  Now, I think there was one or two more officers.  I know there was at least one more officer.  And -- and I know that Cleckner and Bouerger was there.

And there was one other officer.  I think he was a gray-haired officer, but I'm not exactly 100 percent -- 100 percent sure.  But there was definitely at least one more officer there.

Q    And you're being dragged, you say, down the hall?

A    Yes, sir, by my feet.

Q    So we got two officers, one with each foot?  Is that the way it worked?

A    No, there was more officers than just the two.  They had me by my -- the people that were in the -- let me reiterate on what I -- what I said earlier.

They had me, dragging me by my feet and by my jumpsuit.  You know, they -- they -- you had a couple guys -- like I -- I would, I mean, I don't know 'cause I just woke up.  I was unconscious, you know.

But I had -- my feet were being pulled on by some -- it could have been one on each foot, or it could have been one holding both foot [sic].  I really can't say.  But I know that my feet were -- at one point I felt like I was being drug backwards.

But they also -- there was -- there was definitely a point -- if I remember correctly now,

there was definitely a point that I was face-first, and they had my jumpsuit. You know, like holding me by my -- carrying me by my clothes, like lifting me kind of like you would carry a suitcase or something. But instead of the handles, they were using my jumpsuit as handles basically.

Q    When you use the term "drag," that tells me that some part of your body is contacting the ground. Is that the way it was or not?

A    Yes, yes. At one -- for some time that, yeah, I think so. My knees, when they had me on my face like dragging me with my face down, my knees and -- and -- and stuff were dragging the ground. My feet maybe, you know. Like -- I don't -- I can't really say, sir. I was, you know, just coming out of being knocked unconscious.

But they were like dragging me down the hallway. Whether or not a portion of my body was on the floor or not, I really don't remember that exactly so...

Q    And then you say that at some point Cleckner jumped on you and tried to choke you?

A    I was -- no, I'm not going to say he jumped on me. I was -- I was in and out of consciousness going down the hallway. I woke up, and

I was right outside of the doorway that goes into the patio section of the medical ward.

The door was open.  My feet were -- if I remember correctly, my feet were headed into the -- into the doorway.  Cleckner was on top of me with his hands around my throat.

Q    Did Cleckner actually apply pressure to your throat?

A    He was -- yeah.  I mean, he was -- I started screaming, and he let me go.  But I don't know 'cause I was unconscious.  When I woke up, he had me around the throat.  So I don't know had he been choking me prior 'cause I was unconscious so I don't know exactly what happened.

But when I started screaming, he jumped back and pulled his hands back and then ran.  He kind of -- and kind of jumped up and ran kind of away from me when I screamed at the top of my lungs.

Q    Did you feel pain?

A    Lots of pain, you know.  I mean...

Q    In your throat area?

A    Oh, I don't know, sir.  Honestly, I can't remember if I felt pain or not.  I know he was choking me, and that's all I remember.

Q    You were able to yell or scream so

that --

        A        Yes, sir.

        Q        -- would tell us that your airway was not
constricted.  Would you agree with that?

        A        At the time that I screamed, it wasn't.
But he was choking me, and I was snatching and
jerking.

                And did he enable me to scream?  I don't
know.  I mean, I -- I -- I don't want to be biased,
you know.  I mean, maybe I squirmed out of it and
screamed.  Maybe he let me scream maybe.  I don't
know.  But I took my opportunity that I had to scream
and screamed, you know, so.

                I don't know if I fought to enable -- to
enable myself to be able to scream or if he allowed
me to scream by letting up pressure.  I couldn't
honestly say, but somehow some way I was able to
scream, yes, right.

        Q        Is there some kind of physical injury to
you from -- from that, from Cleckner?

        A        From the throat?

        Q        Yes, sir.

        A        No.  No, sir.

        Q        And so you -- your back was to the floor?

        A        I was on the -- on my back, yes, sir, on

the floor.

        Q    And Cleckner was on top of you?

        A    Straddling me.  His legs -- his knees
were on either side of my hips, and he had both hands
on my throat.

        Q    What area did you say this was?

        A    Right outside of Medical yard, which is a
patio that's hooked to Medical, which is normally not
where they take you into Medical at.  They normally
take you in the front door so...

        Q    I'm going to show you a -- this is a
still shot on my --

        A    Yeah.

        Q    -- on my computer.

        A    Yes, sir.

             That's the yard.  That's the patio.

        Q    That's what you're talking about?

        A    Yes, sir.

        Q    All right.  So what I'm going to do is
make this...

        A    I think that this is the door over here.
I'm not positive 'cause I don't -- there's a door
somewhere on this -- one door is -- goes into the
Medical, and the other door is where I was.  I think
that it's over here, but I'm not positive.

MS. BURTON:  Wait a second.  Can I see
    that?

         THE WITNESS:  I can't tell which door is
    which, you know.  Is that my feet there?  So
    that's the door that I was coming in, and that's
    the other door.  Normally they don't take anybody
    through that yard right there, you know.
    That's...

BY MR. WAYMIRE:

    Q    So this is -- for the record, the
timestamp is 6-30-2020.  It says Tue for Tuesday,
T-U-E, 14:20:34.  Bottom right it says:  Med pod.
Med pod R-E-C-R.  And I'm going to just...

    A    Rec yard, med pod -- med pod rec,
recreation.

    Q    Okay.  So I'm going to make a still shot
of this, and we'll just make this Defendant's
Exhibit 1.  I'm just going to have to send this to
the court reporter and counsel.  That way everybody
knows what we're looking at.

         (Defendants' Exhibit 1 marked and later
    remarked as Defendants' Exhibit 2 for
    identification.)

    A    (No response.)

BY MR. WAYMIRE:

Q    So this incident with Cleckner on top of you happened while you were in this patio area?

A    On the way into it.  I was outside of -- I was in the hallway about to go through -- the door for the patio was open.

Q    Uh-huh.

A    Okay.  And my feet might or might not have been in the patio already, but that was the way I was going through the door was feet first into the patio.

He was on top of me in the hallway outside of the recreation patio, but the door was open.  That was the direction that I was obviously headed, you know, and then ended up going, you know, afterward.

Q    What other officers were there?

A    I -- I can't remember, sir.  I couldn't. I -- I remember that -- that Bouerger was there, and I remember that there was an officer.  I want to say he had gray hair, but you can't quote me on that because, like I say, I woke up and he was choking me. I wasn't really counting officers, you know, so...

Q    When you say choking, it's one thing to have hands touching somebody's neck.  It's another thing to apply pressure.  Do you agree with that

distinction?

     **A**    Yes, sir.

     **Q**    Okay.  So I think you're telling us that -- that Cleckner's hands were contacting your neck?

     **A**    Yes, sir.

     **Q**    Was Cleckner applying pressure?

     **A**    Yes, sir.

     **Q**    To what part of your neck?

     **A**    He was choking me.  I mean...

     **Q**    So your windpipe?

     **A**    The center of my throat.  I don't know. I'm not a -- like is this my windpipe?  Then, yeah.

     **Q**    Uh-huh.

     **A**    Then, yes.

     **Q**    And then when you yell, Cleckner jumped back?

     **A**    I screamed.  Yes, he jumped and ran. Like he jumped off of me and took off running basically.

     **Q**    Okay.

     **A**    He looked scared if you want me to add something, I mean, real quick.  I scared him when I screamed or whatever.

     **Q**    Aside from Bouerger, Cleckner and Officer Coach, can you identify anybody else, any other

officers --

          A     No, sir.

          Q     -- who were dealing with you?

          A     I'm sorry.  No, sir.  I didn't wait for you to finish your question.

          But, no, I don't.  I'm not saying there wasn't anybody.  I just can't identify them and don't remember if there was anybody else or not.

          Q     Okay.  Do you know one way or another whether you had a seizure in this incident?

          A     So can I give you like -- can I just -- when I woke up in -- in Medical, they said -- when I got in Medical and I kind of, you know, came to, I was like:  Hey, you know, what's going on?

          And they said:  You had a seizure.  You had a seizure.  And they kept saying it over and over like they were trying to convince me that I had a seizure.  And they said it like four times.

          I was like:  I had a seizure?  And they're like:  Yeah.  And I was like:  I did?  And they're like:  Yeah, you got a history of seizures. And I was like:  I do?  And they're like:  Yeah.  And then I said:  Well, was that before or after the officers slammed me on my head?  And when I did, they slammed the door, and that was it.

When my wife called, which she called because they she got the text from -- from me saying: Call up here. They're harassing me or whatever. She said that they -- that they told her that I had a seizure and that I was in Medical. Didn't say a word about any assault or anything like that. They told her: He had a seizure. He's in Medical.

So for -- until I got a chance to talk to her, she thought I just had a seizure. And she found that that was odd because I called her with an emergency 9-1-1 text saying: You got to help me. Call up here. And then all of a sudden I had a seizure, and I don't have any history of seizures or anything like that. But they said I did so...

Q   So do you have a belief about whether you had a seizure or not?

A   I believe that -- no. If I had a seizure, it was because they slammed me on my head. I mean, if I did have one, yeah. But I don't know if head trauma causes you to have a seizure or not. But if it does, then I probably did have a seizure. I don't know.

But everybody told me that when they slammed me on my head, I was flapping around like -- like a fish, like looking like I was having a

seizure.

I, in my opinion, they were trying to convince me that I had a seizure, hoping that I didn't remember what really happened is what, in my opinion. But they kept saying: You had a seizure. You had a seizure. And I'm thinking: No, you slammed me on my head, you know. I mean...

Q   Do you have a memory of actually having a seizure?

A   I don't know what -- I mean, I don't know what having a seizure would feel like or what. I've never had one so I don't -- I mean, I just know that I was unconscious and that I was beat up. And, you know, I don't know technically if I had a seizure or not. I don't know how I would know that so...

Q   All right. So excluding this particular incident, have you had any seizure ever in your life other than that?

A   No, sir, never. Nothing similar to a seizure at all.

Q   You used the term wife. Have you been married?

A   I keep saying wife because I consider her my wife, but she's technically my fiancee'.

Q   I'm just trying to figure out. Have you

ever been married?

A    Oh, no, sir.  No, sir, I haven't.  Sorry.

Q    And this -- this gal who was your fiancee', that's Kayla?

A    Kayla Roberts, yes, sir.

Q    When you sent messages to Kayla or anybody else from the jail, was that always over the kiosk; correct?

A    I talked to her on the phone and wrote her letters.

Q    Gotcha.  Was that through an email-type system when you -- when you wrote messages?

A    These messages, yes, sir, that was. Whatever they -- the jail email messaging thing is, is what I used.

Q    Gotcha.  Did you -- well, let's talk briefly about grievances.  I know you filed one about the mattress incident.  Yes?

A    Yes, sir, I did.  I'm sorry.

Q    And then did you continue to file grievances about other incident -- incidents?

A    Multiple, multiple on this offense, everything.

    I grieved the fact that I was -- my Bible got thrown away.

I grieved the fact that she flipped me over and hit my elbow.

I grieved the fact that she wasn't letting me out of my cell for multiple days.

And I grieved the fact that they beat me up.

And then I grieved the fact that they didn't -- they weren't doing medical. Like I say, when it first happened, they put me on a laptop and said: Hold your elbow up. And that was their examination. I grieved that.

How can you properly examine me over a laptop? You know, you're not even -- the doctor is not even in the building. And I've got serious injuries, and you're diagnosing me on a laptop. When I wrote that grievance, they sent me to the hospital.

Q    Which hospital was this?

A    It's in Perry. It's the Houston County -- I don't know. It's the closest one to the jail, and it's in Perry, Georgia.

Q    Okay. Well, let me get some background information from you.

A    Yes, sir.

Q    Have you ever been involved in a lawsuit before?

```
1          A     No, sir.

2          Q     Have you ever made a claim against

3    anybody that turn into a lawsuit?

4          A     Never, sir, no.  No type of insurance or

5    anything like that.

6          Q     Have you ever made a workers'

7    compensation claim?

8          A     No, sir.

9          Q     How about filed bankruptcy?

10         A     No, sir.

11         Q     I think you told me you have no history

12   whatsoever of back injuries or pain?

13         A     No, sir.

14         Q     That's correct?  Do you agree with that?

15   Before this incident.

16         A     You're asking me, have I ever had a back

17   injury before?

18         Q     Yeah, before this incident.

19         A     No, sir, I haven't so...

20         Q     Mental health treatment.  Ever done that?

21         A     A small amount, sir.

22         Q     After this incident?

23         A     Yes, sir.

24         Q     And what -- was that connected with this

25   incident somehow?  Or was it someplace...
```

A    Can I?  Yes, sir.  I was -- honestly,
I -- I was petrified of police officers after that
point.  They -- I had some -- they gave me some
sedatives.  They gave me a few different types of
medication based on -- it really kind of -- I always
kind of felt like if you're not doing nothing wrong,
the police aren't going to mess with you.  You know,
I had that attitude.

Like, hey, I'm not like a lot of the guys
in jail that:  Oh, the police in this place.  You
know, most of the people in here are guilty honestly,
and most of the people did something wrong.  And, you
know, hey, you knew you were doing wrong going in.
So if -- if they arrest you, you can't be mad at the
police for it.

I've never had that issue with police,
you know.  Even though I'm in jail, I've never been
an antipolice guy because I knew I was doing
something wrong when I did it, you know.  But they --
but after this incident, I kind of am scared to death
of police because, you know, for obvious reasons.  I
mean...

Q    So you sought mental health treatment?

A    Yes, sir.

Q    Explain that.

A    I wrote to the mental health people at

the jail, and they had me evaluated.  And they

prescribed me different kinds of medications and

different types of sleep aids.

         And I was really paranoid in my cell as

far as at night when I'm locked in there because I

felt like:  Hey, I'm locked in here.  There's no one

else in here.  Anything could happen.  They could

come in here and do anything to me and I wouldn't

know.

         Honestly, I -- you know, when the man was

choking me, that's one thing, all the beating and all

that stuff.  But the choking me really scared me.  I

mean, that -- I didn't -- you know, I really honestly

felt like he was going to try to kill me in order to

get out of what he did.  I mean, that was my opinion.

I didn't see any other reason to be choking me while

I was unconscious, you know.

         Q    So at the jail you sought mental health

treatment?

         A    Yes, sir.

         Q    Was that -- did that involve anything

other than medication?

         A    I saw a counselor a few times, and they

prescribed medicine.  And then I -- they gave me a

couple months of the medicine when I got out.  And I just took that and -- and then I tried to -- tried to wash it all away, you know.  I tried to forget it, but I started self-medicating after that.  That's why I ended up getting in trouble, if you ask me.

        Q    By self-medicating, tell me what that means.

        A    Like, you know, I just kind of was depressed and I wasn't working.  I started drinking a little bit, you know, little bit.  I don't drink normally.  So I started drinking and, you know, just kind of my whole life fell apart honestly.

        And if you ask me, I wouldn't be here right now if this wouldn't have happened.  I'd be working still, you know.

        Q    In terms of mental health treatment at the jail, sounds like you had a handful of sessions with somebody where you talked?

        A    Yes, sir.  Yes, sir.

        Q    And were you diagnosed with anything?

        A    Not that I know of.  I mean, I don't know.  They just kept giving me pills.  I kept taking them.  That's about it.

        Q    Do you know what that medication was?

        A    I believe -- I'm pretty sure it was

Trazodone, and -- and there was another one I can't
remember.  But Houston County would have it if you
check.

        Q     Before this incident ever happened, were
you on any kind of medication?

        A     No, sir.

        Q     None whatsoever?

        A     Are you talking about -- what kind of
meds?  Only mental health medication or...

        Q     Any kind of medication.  I mean, when --
before this incident June 30th of 2020, were you on
any kind of medication?

        A     Of any kind ever?

        Q     At the jail.

        A     Oh, I don't think so.  Maybe, possibly.
But I don't -- I don't remember being on any kind,
no.

        Q     All right.

        A     Definitely wasn't on anything for pain or
anything, you know, that would...

        Q     And then after you got out of jail, you
have not been prescribed and you haven't taken any
kind of medication; is that true?  I know -- I know
you got...

        A     Mental health or any kind?

Q    Hold on.  I know you got the supply that they gave you at the jail, and you ran out of that?

A    Right.

Q    Aside from that -- lay that aside.  After you got out of jail in December of 2020, were you prescribed any other kind of medication?

A    For mental health reasons or for any reason?

Q    For anything.

A    I think I received some medication for -- yes, I did, for COVID.

Q    Okay.

A    I had COVID, and they gave me a month or two of medicine or whatever.

Q    Gotcha.  All right.

     After this incident in June of 2020, did you have any other interactions with Officer Coach?

A    No, sir.

Q    So you...

A    Hold on.  Hold on.  Say it -- say it again?  I'm sorry.

Q    Yeah.  The incident June 30th of 2020 --

A    Yes, sir.

Q    -- where, you know, you -- you get taken down --

A     Right, right.

         Q     -- et cetera.  Did you have any other

interaction with Officer Coach?

         A     No, sir.

         Q     Okay.  How about Officer Bouerger?

         A     No, sir.

         Q     How about Officer Cleckner?

         A     No, sir.

         Q     So you're completely segregated from all

those three folks after this?

         A     Once I got out of jail, there's no

interaction because I'm not -- that's the only place

I ever saw them before was in jail so...

         Q     I understand that.  But while you're

still in jail, I mean, you were in jail for another

five months or so.

         A     Oh.

         Q     So in jail did you have any interaction

with those three folks?

         A     Yes, many, many interactions.

         Q     Any -- any mention that had anything to

do with this incident?

         A     Yes, sir.

         Q     Okay.  Tell me about all of those.

         A     Well, there was the normal inmate-officer

things because they -- they didn't segregate me.
They didn't separate me from these people.  You know,
they -- they said that everything is fine, and nobody
did anything wrong.  You shouldn't have came to jail,
and that's that.

Cleckner -- but as far as if you're
asking me if there's any stand-out, did anything said
or anything, is that -- I think that's what you're
asking me is, was there any mention of this or by
them or...

Q    That's included in my question.  I'd
certainly want to know that.

A    Okay.  So say your question again one
more time?

Q    Yeah.  So Coach, sounds like, was
normally one of the officers who came and dealt with
you in the dormitory; right?

A    Right.

Q    Did she keep coming to your dormitory?

A    She -- they -- when this happened, I went
to Medical.  And then when I was released -- I was in
Medical a long time.  But then when I was released
from Medical, they put me in another dorm.

Her shift rotated, and she ended up being
in the dorm that I was in again so, and so did -- and

Cleckner, he come -- goes everywhere in the jail.  So I'm going to see him a lot.  So that's that.

Q    So let's just stick with Coach for example.

A    Okay.

Q    Sounds like she was supervising the dorm where you were?

A    Yes, sir.

Q    At least once, maybe several times?

A    Yes, sir.

Q    Was there any kind of -- anything that you would call an adverse interaction where she did something that wasn't appropriate or was out of line for an officer toward you?

A    Well, honestly, sir, no, I think that it was actually the opposite.  I think she kind of -- after that incident, I think she kind of backed away from me and kind of treated me basically like she treated everybody else after that point.

Q    All right.  So let's go to Bouerger.  Did you have any other interaction with him?

A    Bouerger, no.  No.  No.  I mean -- I mean, yes, but not anything extracurricular, no.

Q    Might have passed him in the hall?  Might have seen him but nothing that was inappropriate?

A       Nothing, right.

Q       Okay.  And how about Cleckner?

A       Cleckner came to my cell when I got to
Medical.  He came in the dorm and -- now, let me just
say that Cleckner will come in when an officer needs
to use the bathroom or something like that.  Cleckner
will come in and take that officer's spot and let
that officer have a 30-minute break or 15-minute
break, and that's a common occurrence.

He came into my dorm after that, and he
said that -- no, to -- to relieve an officer, I'm
sorry, to your thought.  But he came and wanted to --
I mean, he came to relieve the officer that was in
the dormitory, and he was up there bragging about it.

He was saying:  Yeah, I got one's going
-- you know, he's probably going to have to sue me
'cause there was blood everywhere, blah, blah, blah.
And he was making all these derogatory remarks about
how he beat me up and stuff.  He was like bragging
about it basically.

Then I heard him.  I think that he didn't
realize I could hear him, you know.  Then he came
down to my cell, and he -- and he said:  Hey, we all
good, right?  Okay.  And -- and I was like:  What
does that mean exactly?  He's like:  Well, you know,

I had to do what I had to do.  You know, you

shouldn't have came at me.  And I said:  Came at you?

What do you mean came at me?  You -- you attacked me

from -- you know, like:  Come on, get real, you know.

And he was like:  Well, you know,

sometimes you got to use force.  I wish you would

have -- he's like telling me -- he's like basically

trying to make it sound like, you know, he was

justified in what he did, and he knew he wasn't.

But he -- but, you know, his choice of

words were -- if he would have said:  Hey, I'm sorry,

you know, I shouldn't have done that to you, then,

you know, we might not be sitting here today.  But he

didn't.  He said:  We're good.  Like he didn't want

to apologize.  He wanted to just clear the air

without saying he did anything wrong, and he knows

for sure that he did something wrong so...

But that was that.  But he was bragging

about it.  He was -- yes, you asked me was there any

adverse?  Yeah, he was up there laughing about it

saying:  I got one's going to have to sue me 'cause

there was blood everywhere, ha, ha, ha.  He was

making jokes.

And then there's, you know, 20 inmates

that'll tell you that he was in Medical bragging

about it, how he had to -- yeah, I had to rough one

up, ha, ha, ha, 'cause that's what he does.  You

know, that's his reputation.  That's why they call

him Brock.

Q    Who else would have heard Cleckner say

the things that you are claiming?

A    I have multiple inmates that -- that will

verify that and maybe 15 or so.  Their names and --

and contact information are written down.  I haven't

furnished those to my lawyer.

Q    Have not?

A    I have not.  At this point I have not

because I -- I've been incarcerated so I'm not able

to go to my storage unit and get this paperwork that

I have.

But I have copy of all the grievances.  I

have a copy of all the inmates that saw the incident

and their phone numbers, their contact information.

Everybody wrote all that.  They wrote all that down

before I even -- before I even got out of Medical

they had that.

You know, they were -- people wrote

grievances on this incident, and that's not a normal

occurrence.  Normally you -- you talk about what you

did.

But there was people in the dorm that wrote grievances on this matter saying that they were horrified by the incident and they don't feel comfortable in the dormitory with Cleckner working because they just watched him savagely attack some inmate.

And they didn't even have anything to do with it. They just felt like they were supposed to write that in order to -- you know, that people didn't like what went on. I mean, the whole dorm was upset about it. You know, people -- there was a small uprising behind this, you know.

Q    So you have written statements from other inmates about this incident?

A    I didn't say I had written statements. I had their phone numbers and their contact information written down.

Q    Whose names do you remember right now?

A    I can't remember any of them, sir, but I have them all. And I can -- I can -- I know like, you know, 'cause like that one guy's name is Buck. I remember him very clearly, you know. But he was -- he was -- 'cause he came to my dorm and said: Look, I'm going to tell them what I saw, you know. You need me to tell them 'cause I can't believe I just

saw that and blah, blah, blah.  But I don't know his

real name.  His real name is not Buck.  It's written

down on my paperwork, you see.

          Q     You haven't given any of that to your

lawyer?

          A     No.

          Q     All right.  Does anybody else have access

to that place?

          A     Kayla does, yes.

          Q     Can you get a message to her and get her

to...

          A     I'll be calling her.

          Q     Yeah.

          A     And, also, they wrote grievances so their

names will be -- plus, everybody that was an inmate

in that dormitory.  The entire dormitory saw it so

every inmate in the dormitory that was present at the

time of this interaction saw the invoca -- you know,

and I talked to 80 percent of them, and 80 percent of

them said:  Hey, I'll tell them exactly what I saw

because everybody was horrified by the event.

          Q     Yeah.  So let me focus in on where you

claim that Cleckner was bragging about or somehow

talking about the incident to other people.  After

the incident's happened, now he's talking about it?

A    After I'm out of Medical, yes, sir.

Q    Who would have heard Cleckner making those statements?

A    Multiple people.  He was at the desk, and there was a group of inmates around him.  But he's a real big, raw, raw, raw.  You know, he's got a real deep, loud voice.  He's a -- he's a big body builder guy so he -- his booming voice and I could hear him.

And, you know, honestly I was down on the floor with my ear to the door trying to hear him because I -- I was curious as to what he was going to be saying about it, you know.

But everybody was -- you know, you got inmates that are -- you know, they're hoodlums and they're -- and they're laughing.  And, hey, look who's down there.  There's that guy, you know, and trying to boost things up and trying to make a scene about it.

So, you know, when he commented about it, he was -- you know, he wasn't in any way repentant.  He was -- and that's what really bothered me, you know, is, he wasn't repentant at all.  He was laughing about it, you know, so...

Q    So do you know any person's name who...

A    No, but I can furnish those.  I'm sorry,

I cut you off but sorry about that.

Q    Any person's 'name who would have heard those statements?

A    I -- not that I can recall right now, but I can furnish you with that information later.

Q    And it sounds to me like at some other time you were in Medical, and you heard him talking?

A    No, sir.

Q    No.  So the only time you heard him talking about this incident -- Cleckner -- was when he came to a dorm where you were?

A    Yes, sir.

Q    True?  You were locked down; is that right?  You were in your cell at least?

A    I wasn't locked down, but I was in my cell.

Q    You were in your cell?

A    I chose to be in my cell because here he comes, and I don't want to be out there around him so...

Q    Cleckner is at the -- the officer desk with some inmates around him?

A    Yes, sir.

Q    And he makes some statements?

A    Yes, sir.

Q   And then after that, he went and talked to you?  He went to your cell?

A   He walked down to the cell.  And he had to because they were passing out food and stuff, you know, and he came down there.

No, actually he just walked down there on his own and came down there to the glass, you know -- you know, and made comments, you know.  But they weren't any kind of repentant comments.  They were like, you know:  You should have -- that's-what-you-get comments, you know.

Q   So other than -- well, just tell me everything that he said to you.

A   I can't remember exactly what he said.  But it was all pertaining to:  You got to -- you know, you should have -- you know, that's what you get, you know, basically.

He said -- the exact words that I can remember were:  We're good; right?  It was the first thing he said when he walked up.  And I was like -- and matter of fact, I think I did say:  Is that an apology?  And he said:  Apology?  You know, or:  You shouldn't have came at me, you know, like.  And I was like:  What?  I couldn't even believe you said that.  Came at you?  You know, you -- I definitely didn't do

that, you know.

So but basically he was trying to soften it up without actually admitting he did anything wrong, is what his intentions were.

Q    That discussion lasted 30 seconds or less?

A    Yes, sir, if that.  Fifteen seconds.

Q    All right.  And are you aware of any other instances where Cleckner said or did anything that you feel like had some relationship to this incident?

A    That's what I was -- when -- when you asked me about something happening in Medical or hearing something in Medical, that's what I was referring to, but it was a third party.  I heard it through someone else that he was in Medical bragging.

You said:  I heard it in Medical.  But if I said that, that's s not what I meant.  What I was saying was, he was -- somebody told me, lots of inmates.  You know, four or five inmates told me.  Because anywhere you go in the jail there's five or six inmates.  There's never one.

But five or six inmates that came back from Medical said that he was up there bragging about the fact that:  I got one's going to have to sue me

because there's blood everywhere, blah, blah, blah.
And I roughed him up and, you know, that kind of
thing.  He was bragging about the fact of what he did
to me so...

          Now that's something I heard through
somebody else.  I mean, I didn't hear that physically
with my own ears so...

     Q     Who told you that?

     A     Four or five inmates that went to
Medical.

     Q     Can you remember any of their names?

     A     No, but I can furnish you with their
names.  I wrote everything down at the time that this
was happening.  I documented everything.

          And there's also grievances that I wrote,
and I put these people's names in the grievances.
And I don't know that -- that the State will -- I
mean, the county will furnish those grievances, but
there was a written record of them.

          Oh, I do have physical copies of the
grievances, too.  So Kayla can produce you with those
as well.

     Q     Beside your grievances, you seem to have
indicated that you wrote down notes about this or
information about this; is that true?

1          A     Yes, sir.

2          Q     Are we talking about notebook paper?

3     Spiral notebook?  What?

4          A     I used the back of -- of request forms,

5     different things that we have, you know, that --

6     forms and stuff that I wrote on the back.

7               I did this because when I -- when this

8     first happened, my public defender who was

9     representing me on the criminal charges I was

10    incarcerated for, told me:  You need to write

11    everything down.

12              He subpoenaed the footage and sent the

13    footage to the lawyers I have now.  But he told me:

14    I want you to write everything down that happens,

15    every note, every name, every everything.

16              So I did that, and I documented

17    everything that happened to me from that point

18    forward.  From the time he told me that on, until I

19    got out.

20         Q     And you still have that?

21         A     Yes, sir.

22         Q     How much paper are we talking about?  How

23    many pages?

24         A     Maybe a -- you know, it's thicker than it

25    should be because I'm writing around stuff that's on

the paper, but, you know, a good size stack of.

I mean, a lot of it's probably not relevant.  It's just that he told me to write everything down, so I wrote everything.  Every medical appearance I went to, every -- everything that I did -- that I did and everything that had anything to do with Medical or my treatment there or anything like that I wrote down.

Q    And you still have that?

A    Yes, sir.

Q    Where is it?

A    It's in our storage unit.  Kayla has the key to it.

Q    Have you ever turned that over to your attorney?

A    No, sir.

Q    Okay.  How much -- well, let me -- let me just say, lawsuits almost always are about money; right?  I mean, that's -- that's what you're asking for?  That's what a lawsuit does.  That's the only thing it can do usually.  Okay?

With that in mind, what are you asking for here?

MS. BURTON:  And I'll object as to form.

THE WITNESS:  Yeah, I don't -- not

necessarily.  I didn't -- I'm not specifically

just asking for money.  I didn't say that.

          You're saying that, that that's what

they're about.  But I'm not saying that's what

it's about.

          I feel like part of that, you know, I'm

concerned with -- with the money that I'm losing

and have lost.  Yes.

          But at the same time, I mean, I feel like

this man needs -- this doesn't -- you know, a lot

of people in the dormitory told me:  Hey, you need

to do something about it.  Don't forget this.

Don't let this go.  Don't get out and forget all

about this because he needs to be -- something

needs to happen to him.  This is not right.

          And they were saying:  You owe it to all

of us to push this to the limit because that man

don't deserve to be working around, and they're

all nervous.  Nobody wants to be around that kind

of thing, you know.  So they're all telling me:

Hey, you need to get justice for all of us

basically because, you know.

          But, yeah, I mean, am I out for -- for

blood?  No.  But, I mean, I don't think he's -- in

my opinion, I don't think that people like that

should be able to commit stuff.  I mean, if I
would have done that to him, they would be putting
me in prison for a long, long time.

But he -- they told me:  Oh, he did
everything within the confines of -- of -- that's
normal operating procedure.  He didn't do a thing
wrong.  And that really kind of bugged me a
little, you know.  So I think he needs to be
disciplined.

It's not my job to say he needs to lose
his job or whatever, but I don't think he's
supposed to be doing this.  And so I think
something needs to be -- I'm kind of out for
justice on that part.

And money-wise, he definitely has
affected my ability to make money.  If he hasn't
-- if he hadn't, I wouldn't be sitting here right
now.   That's the honest truth.  I've never sued
anybody in my life.  I don't want to sue anybody.

But if I can't do what I used to be able
to do and I'm not going to be able to make the
money I used to make, I think somebody should
compensate me for that, you know.  Understandably,
I think.  I don't know.

BY MR. WAYMIRE:

165

**Q    So how much compensation are you looking**

**for?**

         **A    Twenty million dollars.  No.  I mean, no,**

**I don't know.  That's not -- I don't think that I'm**

**qualified to say that.**

         **How much do I want?  Of course, I want as**

**much as I can get.  I think that I should be**

**compensated for what I've -- what I've -- suffering**

**that I've -- that I've went through.  I don't know.**

**I mean, I've never been through this before so I**

**don't know what's available and what.**

         **But I feel like I should be given money**

**as opposed to what happened to me.  As far as the**

**damage concern, I've heard them say punitive damages**

**or whatever.  I'm not sure exactly what that means.**

**But I believe I'm entitled to something like that.**

         **I do feel like -- and I know for a fact**

**that my ability to make money -- look, all my life**

**I've done construction.  Okay, I've worked.  I make**

**my money.  You know, you have a different skill set.**

**My money has been made with physical labor, you know,**

**with my brain but also with physically using my --**

**the strength of my back to -- to commit -- complete**

**these jobs.  I can't do that anymore.  He took that**

**from me.**

So I feel like whatever I would have made had he not have done this, I feel like he should -- that's what they should pay me.  So you figure up how much I was making, how much -- you know, what I could have made by the amount of time that -- that would be estimated that I would have left, plus some for the -- for the -- for the -- for my pain and suffering, and that would be fair to me.

Q    Is there something that indicates to you that your back won't get any better?

A    Hasn't in two years.  Other than that, no.  Seems like a long time to still have an injury, you know.  So most of the injuries I have heal up real fast so...

Q    So far as Officer Coach, I know she's involved in this incident.  I mean, are you suing her for some kind of physical injury that you got?

A    The elbow, the pulling of the mattress, slinging my elbow.  It wasn't a major injury, but she wasn't right to do that.  They even told me that she was wrong to do that to me.

The nine days that she threw my Bible in the trash, to me that's highly disrespectful.  That's my religion, and that bothered me a bunch.  What that's worth?  Who knows.  That's not for me to say,

I don't think.  But I definitely feel like that was

something that -- it was really offensive that she

threw my Bible away, honestly.

          Oh, and the fact that she is -- kind of

was the cause of all this, if you ask me.  I mean,

this is -- without her, none of -- I don't know that

this would have happened.  I mean...

          And then that coupled with the fact that

she said, "We got one needs his ass kicked," might

have been what led him to slam me on the ground.  I

mean...

     Q    Going back to the mattress incident real

briefly, Coach is in there because you haven't made

your bed.  You got locked down, and now she's back?

Is that the -- that's the setup, right, if I

remember?

     A    She -- no.  She -- yes, yes.  I'm sorry.

Yes, that's -- she came through.  I hadn't made my

bed.  She -- she locked me, said that, you know, she

doesn't say anything.  She just don't open your door

when it's time for it open.  She saw that that didn't

affect me any, you know.

          So later when I'm smiling on my bed like:

Hey, good, thank you for not opening my door instead

of everybody else is kicking the door:  Hey, let me

out, I'm laying there going:  I appreciate you not opening my door.

          That bothered her.  So then she decides to do a room cell inspection, and that's when she opened on my door, throwed [sic] my Bible away and snatched the mattress and flipped me over.

     Q    So in this room cell inspection, you're laying on your bed; right?

     A    Yes, sir.  I'm sorry.

     Q    And what does a room cell inspection normally involve?

     A    It normally involves everybody step out of the cell.  You step out of the cell, and then she searches for any contraband that you might have.  She takes people's mattress, has been known to take people's mattress in addition to the four hours, which I'm pretty sure she's not allowed to do that but I can't say for a fact.  But that's her extra punishment.

          You know, like if it doesn't bother you, sone people don't get out of bed.  Okay, some people don't get out of bed for the -- to make their bed.  She gives them four hours, but they don't even know it because they sleep through the four hours.  They never get up to begin with.  So lunch time comes,

they jump up.

Well, that bothers her because what was their punishment?  They were going to be in bed anyway.  So that's why she came in to snatch my mattress was because she didn't want me, you know, enjoying my four hours of solitude.  She wanted me to be punished during that time so she snatched my mattress away.  That way I couldn't lay there and read a book.  I had to be uncomfortable.

Q    Yeah.  You're awake, right, when she comes?

A    Yes, sir.

Q    And you understand there's some kind of -- she wants to search the cell; is that right?

A    Yes, sir.

Q    And did she give you any kind of orders?

A    No, sir.  She just walked in and snatched my mattress.

Q    And that, I mean, your full body weight is on the mattress; right?

A    I'm on my side, yes, sir.

Q    So the mattress comes out?

A    She pulls it like as if you would snatch a table cloth out from a -- a setting.  She pulled the mattress.

But me, had I been on my back, she wouldn't have been able to pull the mattress. But I was on my side. So when she pulled, it flipped. You know, it flipped me, you know, 'cause I was laying on my -- on my side.

Q    And as a result of that, your elbow banged the...

A    My elbow banged the bed and...

Q    Steel bunk?

A    Yes, sir.

And that's documented. There's a -- the -- they -- when I wrote the grievance, the deputy took pictures of that and even reprimanded her for that so...

Q    Okay.

A    Can I reiterate one thing that I said to you?

Q    Sure. Go ahead.

A    When you asked me how much I expected and I said 20 million, I mean, that was -- you know, you asked me how much. If I can rephrase your question was, how much money do you want?

Well, you know, yeah, everybody -- do I expect something like that? No. I mean, I'm not trying to just get ridiculous. But, you know, I said

that as kind jokingly 'cause you asked me, you know,

how much money do I want?  Well, how much money does

anybody want?  We want a lot, you know.  But do I

deserve 20 million?  No, I don't think so.  I just

wanted to make that clear.  I mean...

     Q    Well, what's the lowest fair value that a

jury should award to you?

        MS. BURTON:  I'm going to object, the

  same objection.

     A   (No response.)

BY MR. WAYMIRE:

     Q   You can answer the question.

     A   So do I still answer?

        Well, I would have to -- before I could

answer that, I would have to figure out what my

projected lifespan would be, and that would let me

know how much money I'm losing in this case.

        And then -- and then I don't know what's

fair for the damages I received.  Like what do they

pay people for their suffering?  My back's hurting

right now.  I don't feel like I should have to go

through that because -- because of him.

        What is that worth?  I don't know.  I'd

have to get some kind of comparison on what -- what

-- what that's worth basically.  I mean, does that

sound right or no?

If you want me to say wages-wise, tell me how long you think that I would -- you could estimate that I would live, and I can calculate up that times the amount of money I think that I would have made during that time. And I could give you a figure based on loss of wages.

As far as the pain and suffering, that type of thing goes, I don't know what that's worth, sir, so I really couldn't give you an accurate figure.

Q Your Complaint in this case mentions the First Amendment which provides a number of -- number of rights, one of which is free speech, and there are others. I'm trying to figure out where that fits into this case, so I have a response to one of your -- one of the questions.

Your response to one of our questions, and I think it answers the question but you tell me. I'm just going to read the part that I think explains. Quote -- and this is in response to -- this is in response to Interrogatory 7, Cleckner Interrogatory 7.

It says: Plaintiff asserts that defendant Deputy Jacob Cleckner used excessive force

and attacked plaintiff without reason.

Defendants Coach and Bouerger further

created what plaintiff believes to be the conditions

that activated plaintiff's injuries, including

negligently placing plaintiff in a chair after a

seizure, causing further injuries.

Plaintiff believes this conduct was in an

attempt to stifle and suppress plaintiff's right to

reasonable objections and in consideration of

plaintiff's need to maintain communications with

those in the community who support plaintiff and

plaintiff's Complaint that he was set up to have more

books than the number authorized in order to suffer

punishment, period.

Is that what we're talking about so far

as First Amendment free speech in this case?

A    Sir, you kind of lost me there.  I -- I

don't -- I didn't write that so I'm -- you know, I

got -- I'd have to -- to review it before I could

speak on it.  I haven't -- I didn't write that.  So

my lawyers wrote that.

Are you asking me, do I feel like my free

speech was prohibited?  Or, you know, do I feel like

my -- what are you asking me exactly?

Q    Give me a second.

Paragraph 43 of your Complaint, which I'm happy to let you read, says: Assuming arguendo that defendants' violent actions were in response to any action by plaintiff, comma...

A    I'm sorry.  Start over?  I apologize.  I drifted off there.

MS. BURTON:  Can I recommend that we just put this into the record, and let him review it?

MR. WAYMIRE:  Yeah.  No, I'm going to read it here.

MS. BURTON:  Okay.

BY MR. WAYMIRE:

Q    Assuming arguendo that defendants' violent actions were in response to any action by plaintiff, comma, defendants' actions were solely in response to protected speech by plaintiff, a violation of his First Amendment rights.

So what protected speech were they reacting to?

A    I don't understand, sir.  I don't want to answer that 'cause I don't understand what you're saying or what you're asking me.

Q    Okay.  Well, look it, here's 43 -- paragraph 43.

A    Yeah, it would be better if I could read

it.

MS. BURTON:  Can I see that for a second?

THE WITNESS:  Yes, ma'am.  Not trying to
be difficult.  I just don't understand.  I like to
know what I'm -- what I'm saying.

MS. BURTON:  Which paragraph?

MR. WAYMIRE:  Forty-three.

THE WITNESS:  What's arguendo mean?

BY MR. WAYMIRE:

Q    For the sake of argument.

A    Okay.  I'm the plaintiff.  Defendants'
actions were solely -- defendant's actions were
solely in response to protected speech.

I'm not going to say what the defendants
-- what their actions were based on.  I don't know
what their actions were.  How would I know what they
were thinking or what they were responding to or
doing?

Q    Understanding you don't know what's going
through their heads, I get that.  What kind of speech
by you do you think that anybody -- any officer was
reacting to?

A    When they assaulted me?

Q    Yeah.

A    So you're asking me -- so can you phrase

your question where I can understand it more clearly?
You're saying, what did they say?  What did they
prohibit me from -- what did I say that caused them
to do this?  Or...

          Q    I think that's what your Complaint
alleges.  And so I'm trying to figure out what it is
that you -- yeah, what it is that you said that was
protected by the First Amendment that caused some
officer to do something that you're suing them about?

          A    Oh, what -- what do I feel like they
violated my First Amendment rights on?

          Q    Yeah.

          A    Well, first, you'd have to clarify what
the First Amendment guarantees or doesn't guarantee.
Or I need to know what the First Amendment is before
I could answer that.

          Q    It guarantees a number of things.  It
guarantees free speech, freedom of religion.

          A    Well, the religion would be a big one.
She threw my Bible in the trash can.

          Q    It guarantees a number of -- of things.

          A    Well, that's one.  You said you -- you
want everything.  Well, that's one of them other
than -- so keep going, and I'll tell you what else I
feel like.

Q    There's the right to petition the
government.  So, for example, filing a lawsuit is one
of those.

        A    Do I feel like they inhibited me from
that or -- I feel like they inhibited me by not
letting me use the kiosk to contact my family about
what they you were doing.  So that would, I guess,
would be a freedom of speech.  They stopped me from
being able to call out for help.

             I feel like they definitely throwed (sic)
my Bible in the trash can -- threw my Bible in the
trash can, and that's protected by the First
Amendment; correct?  My right to religious whatever?

             I mean, you got to -- I mean, I would
really have to see the First Amendment before I could
say in which way did they violate the First
Amendment.  I'd have to really know what that is.  I
don't -- I'm not familiar.  I know some of it, but
I'm not familiar with all of it so I really don't
feel comfortable in answering that, you know.

        Q    Okay.  Well, let's talk about your
criminal history.

             All right.  I'm going to call this
Defendant's Exhibit 2.  I'm just giving -- I'm just
letting you --

A     Yes, sir.

         Q     -- see this to the extent it might jog
your memory.

         A     Okay.

               (Defendants' Exhibit 2 marked and later
    remarked as Defendants' Exhibit 1.)
BY MR. WAYMIRE:

         Q     My basic question is -- set of questions
involves mostly felony convictions.

         A     Yes, sir.

         Q     But let's just talk about convictions in
general aside from traffic tickets and things of that
nature.

         A     Yes, sir.

         Q     So let's just go backwards in time or
forwards if you like.  But let's talk about your
convictions, what they are, where they were, where
they happened.

         A     All of them?

         Q     Yeah.

         A     Or start over here and...

         Q     Yeah, start with the beginning.

         A     Okay, so...

         Q     Or start at the end and go backwards,
whichever you prefer.

A    All right.  So we have involuntary manslaughter.  This happened in -- when I was a teenager which was, you know, 30 years ago or whatever.

My best friend overdosed in my hotel room and it was a horrific event and I was very distraught about it, wish it wouldn't have happened.  It's one of the worst incidents that happened in my life. Definitely not something I caused or wanted to happen.  This is a -- him over -- overdosing in the -- in my hotel room.  I shared some drugs with him. After he -- after I told him no multiple times, I finally agreed to give him some, and then he overdosed.

He -- my girlfriend was 100 pounds at the time, used double the amount that he did.  So for whatever reason, he was highly susceptible to that, or it was -- had a low tolerance, I guess you would say, and he overdosed.

We didn't know he overdosed.  He slept in the bed with someone else all night long.  He had died in his sleep.  We were all watching a movie.  We all fell asleep.  And when we woke up in the morning, it was time to check out of the hotel room.  All of us got out except him, and then we come to find out

that he had passed away.

    Q    That was the involuntary manslaughter?

    A    Yes, sir.

    Q    Looks like in the same case you were
charged with a drug offense?

    A    Yes, sir.

    Q    And when were those convictions?

    A    1996, sir.

    Q    When were you last incarcerated on
account of that?

    A    2003.  I got out in 2003.

    Q    Do you have any convictions after that?

    A    Yes, sir.

    Q    Okay.  Tell me those.

    A    We have a possession.  Actually --
actually, no, I'm sorry.  There was something before
that.  Would you want to talk about that?  Or you
asked me was there any after it.  I guess, I'll
just...

    Q    Let's just go after.

    A    Okay.  After it, I have a -- I don't.  I
mean, I don't see any here.  Or do you want me to try
to remember?

            No, I have -- afterward, I have a --
having a false identification.  It's -- it's -- it

was actually worded as identity fraud, but it was me having a false identification in order to secure a job that I couldn't get because I was a convicted felon.  That was in 2010.

         Q    Where was that?

         A    Houston County.

         Q    Was that a felony conviction?

         A    Yes, sir.

         Q    And when were you last incarcerated on that?

         A    The -- that was it.  It was approximately 2004 area, somewhere along that line.  Oh, no, I'm sorry.  2010.  2010 is when that was.

         Q    So how long did you serve on that?

         A    I served eight months approximately, maybe 10 at the most.

         Q    All right.  And so you were released in 2010?

         A    May have been 2011.  I would receive the sentence in 2010, but I think that I received the sentence in December.  And I did another 45 days which would have put me into January of 2011.

         Q    All that time was served in the Houston County Jail?

         A    Yes, sir.

Q    Any after that?

A    Convictions?  No.

Q    All right.  So far as charges, I know you've still got pending charges from 2020; correct?

A    Yes, sir.

Q    And then you got new charges that landed you here in the Bibb County Jail; correct?

A    Yes, sir.

Q    What are you charged with so far as...

A    Theft by receiving a motor vehicle.

Q    Is that the only charge?

A    Giving false name.  Misdemeanor and a felony.

Q    Okay.  When do you expect those to be resolved?

A    Hopefully here in the next -- tomorrow would be nice, but I'm -- I'm -- realistically I'm hoping to be out for the summertime, you know.

Q    Do you have a trial scheduled?

A    No, but it's -- it's a -- this crime, this county has lots of crime and lots of problems and lots of violent crime and this type of thing.

       Theft by receiving is generally looked at as a very low felony.  And -- and I'm not on probation, and I haven't been convicted of anything

in 10 years or 13 years.

So it's looking -- my lawyer says it looks pretty good for me to get probation or even something smaller maybe.  Time served maybe.

Q    All right.  Aside from convictions in Houston County, do you have convictions in any other jurisdiction?

A    I have a -- no, I don't think so.  Don't quote me.

I have been arrested in Florida.  I went to jury trial on one.  I don't want to say for a fact.

I mean, it's been a long, long road.  I know that I haven't -- I know that I've gotten my life together and I haven't -- until this incident happened, I wasn't getting in any trouble, you know.  I was staying out of trouble.

But since I was not -- haven't even been able to work, you know, so I -- maybe I -- I'm not saying I did because -- but maybe I resorted to other means to try to support my family and stuff because I couldn't earn the money I used to earn.

Q    So Florida criminal proceedings.  Tell me about those.

A    Sir?

**Q**     You said you had a jury trial in Florida?

          **A**     Yes, sir.  I had an instance where a man

in -- we were at a hotel going to the Keys to go

fishing.  A man -- a man tried to sexually assault

my -- my fiancee' at the time.  I've been engaged

before.  I've never been married before, but I was

with a woman, well, off and on for about 10 years.

          And we went down to Florida to go

fishing.  And we stopped at a -- it was at night, and

I didn't want her to go into the Keys at night.

Because in the daytime it's real pretty.  You're

going across the bridges at night, you really can't

see anything.

          So we stopped at a hotel in order to wait

for the morning.  And then she walked to the store,

and somebody sexually assaulted her on the way.

          Then he chased her back into our hotel

room.  And I slammed the door.  He kicked the door

down.  He kicked the door, went over to the window,

tried to get in.  Then he ended up kicking the door

in.

          And I -- right before the door -- the

doorknob flew off and right before the door busted

open, I grabbed a lamp.  And when he kicked the door

in, when he walked in, I smashed him with the lamp.

And they looked at my record and arrested me for whatever crime, you know, an aggravated battery or whatever.

But then when -- because based on my record that I have a violent crime when I was a teenager, so which really wasn't even a violent crime but that's how they look at it. Oh, they seen the manslaughter so they charged me with aggravated battery or something and something else I can't remember.

But I went to jury trial because I wasn't guilty. I mean, Florida has got a real liberal stand-your-ground law. And, I mean, he kicked our door in and was trying to attack us. So I hit him with a lamp one time. So, I mean, that's -- so they...

Q    You were acquitted?

A    Yes, sir.

Q    Okay. If you folks will give me about five minutes, let's take a break. I probably don't have many more questions.

A    Okay.

MR. WAYMIRE:  Off video at 4:50.

(Brief Recess.)

MR. WAYMIRE:  All right. Let's go back

on.  It's 4:54 p.m.

I'm going to stop my questioning here.  I understand that there's certain documents that are out there that I suspect that I've asked for that I don't have; that if I had them, I might ask you more questions about.

So I propose that you evaluate whatever documents there are.  If you produced them, then you produced them.

If they're privileged, then assert the privilege, and we'll talk about that.

But if there are other documents that I'm entitled to and that I have questions about, I propose that we reopen the deposition and let me ask those questions.

Subject to that, I will conclude today.

Is that agreeable?

MS. BURTON:  That's fine.

I just -- I have one question.

MR. WAYMIRE:  Oh, okay.

FURTHER EXAMINATION

BY MS. BURTON:

Q    Just one.

A    Yes, ma'am.

Q    So going back to some of the other

incidents that you were recounting with Mr. Cleckner, and it was that first incident that you were discussing regarding a joke that was made to Mr. Cleckner about him being gay with -- the inmate incident?  Okay, so -- yes.

     A     Oh, oh, oh, oh, no, it wasn't a joke.  It was a -- it was, he was frisking.  He was frisking a guy.

     Q     Uh-huh.

     A     And apparently he got a little too frisky.  And the guy said:  Hey, what are you -- blah, blah, blah, a fag or whatever like that.

          That's common occurrence.  That happens like every time you get frisked somebody says something like that.

     Q     Okay.

     A     Some officers are a little more feely than others.  So when one's real feely, then the common thing to say is:  Hey, man, you know, that's mine 'cause you -- you know, something like that.

     Q     So when the -- so, I guess, with the -- can you describe the reaction of the inmate when he felt that he was being felt up a little too much?  Was it out of anger?

     A     Yeah, he got mad and called him a fag.

1    **Q**    Well, can you tell me anything about his

2    physical demeanor on that?

3              MR. WAYMIRE:  Whose?

4              MS. BURTON:  The inmate's.

5              THE WITNESS:  He snatched his hands kind

6      of like a little bit off the wall a little bit.

7      Like:  Hey.  You know, like he jerked when

8      Cleckner was frisking him.

9              Cleckner does this thing.  Okay, if you

10     want me to just totally reiterate, Cleckner does

11     this thing where, okay, they put their hands on

12     either side of your leg like you see on TV, and

13     they go up your leg to feel anything.

14             Well, Cleckner sometimes does this thing

15     where he -- bam -- and slaps you -- you -- you

16     know, your testicles, you know, on purpose to try

17     to rough.  And, you know, so people get mad about

18     that and they're like:  Hey, man, you know, blah,

19     blah, blah, so...

20     **Q**    Did that happen at this incident?

21     **A**    Yeah, it happens a lot of times.  I mean,

22     most of the time when he frisks people, he does that.

23             Some officers do it lightly.  Some of

24     them give you a little slap, you know, so.  He's one

25     of the slappers.  Sorry.  I mean, it's true.  I

can't -- what do you want me to do?  I don't...

        Q     Give me a minute on that one.

        A     He's slap-happy.  Okay?

        Q     Okay.  Okay.  Physically other than kind
of, I guess, what you just described was recoiling
with your body language, was there any other --

        A     No.

        Q     -- physical manifestations from the
inmate?

        A     I apologize for not letting you finish
your question.

        Q     That's okay.

        A     But it sounds like you're asking me, did
he do any kind of physical thing to warrant being
treated like that?  No, absolutely not.

              He just jerked because somebody slapped
him in the testicles, you know, like, which is
understandable.  And then -- and then Cleckner -- no,
he -- Cleckner did it because he called him a fag,
not because the guy jerked at him or anything like
that, if that's what you're asking me.

              MS. BURTON:  Okay.  I don't have any
    other questions.

              MR. WAYMIRE:  Okay.  We're done for today.

              MS. BURTON:  All right.

1          MR. WAYMIRE:  Thank you, folks.

2          MS. BURTON:  I appreciate it.

3          THE WITNESS:  Thank you.

4          MR. WAYMIRE:  Off video -- so go ahead if

5     you want this on video.

6          COURT REPORTER:  No, it doesn't have to

7     be.

8          MR. WAYMIRE:  Off video at 4:57.

9          COURT REPORTER:  What are we going to do

10    about read and sign?

11         MS. BURTON:  So he's going to reserve for

12    now.  We'll reserve signature on this.

13         COURT REPORTER:  Okay.  So you want a

14    copy so he can read it?

15         MS. BURTON:  Well...

16         COURT REPORTER:  'Cause he can't get out.

17         MS. BURTON:  Yeah, that's true.  I don't

18    need to order a copy so I guess we'll waive

19    signature.

20         COURT REPORTER:  Okay.  And you want it?

21         MR. WAYMIRE:  Yes, please.  Can you give

22    me an electronic, please?

23         COURT REPORTER:  Only?

24         MR. WAYMIRE:  Yeah.

25         (Deposition Concluded at 4:57 p.m.)

**(Pursuant to the Rule 30 (e) of the Federal Rules of Civil Procedure and/or OCGA 9-11-30 (e), signature of the witness has been waived.)**

**C E R T I F I C A T E**

GEORGIA:

FULTON COUNTY:


    I hereby certify that the foregoing deposition was stenographically recorded by me as stated in the caption, and the colloquies, questions and answers were reduce to typewriting under my direction; that the foregoing transcript is a true and correct record of the evidence given.

    The above certification is expressly withdrawn and denied upon the disassembly or photocopying of the foregoing transcript, unless said disassembly or photocopying is done under the auspices of BULL AND ASSOCIATES, INC., Certified Court Reporters, and the signature and original seal is attached thereto.

    I further certify that I am not a relative, employee, attorney or counsel of the parties, nor am I a relative or employee of such attorney or of any party, nor am I financially interested in the outcome of the action.


    This 11th day of April, 2023.

                            _____

                             GAYE D. TRAYNOR, RPR
                             Certified Court Reporter and
                             Notary Public. My commission
                             expires March 31, 2024.

# DISCLOSURE

          Pursuant to Article 10.B of the Rules and Regulations of
the Judicial Council of Georgia, I make the following disclosure:

          I am a Georgia Certified Court Reporter. I am here as a
representative of BULL AND ASSOCIATES, INC.

          Bull and Associates, Inc. was contacted to provide court
reporting services for this deposition. Bull and Associates, Inc.
will not be taking this deposition under any contract that is
prohibited by O.C.G.A 9-11-28 (c)., O.C.G.A. 15-14-37(a) and (b).

          Bull & Associates, Inc. has no contract/agreement to provide
reporting services with any party to the case, any counsel in the case,
or any reporter or reporting agency from whom a referral might have
been made to cover this deposition.

          Bull & Associates, Inc. will charge its usual and customary
 rates to all parties in the case, and a financial discount will not
  be given to any party to this litigation.

                    OFFICIAL CODE OF GEORGIA ANNOTATED 15-14-37
(a)       Contracts for court reporting services, not related to a
          particular case or reporting incident, between a certified
          court reporter or any person with whom a certified court
          reporter has a principal and agency relationship and any
          attorney at law, party to an action, or party having a
          financial interest in an action, are prohibited. Attorneys
          shall not be prohibited from negotiating or bidding reasonable
          fees for services on a case-by-case basis.

(b)       In order to comply with subsection (a) of this Code Section,
          each certified Court Reporter shall make inquiry regarding
          the nature of the contract for his or her services directed
          to the employer or the person or entity regarding said
          Court Reporter's services as an independent contractor.

06-30-2020 Tue 14:20:34

Defense Exhibit

2