# In The Matter Of:

*ADAM SINDELL vs.*

*LATONYA COACH, et al.*

---

*JACOB CLECKNER*

*June 24, 2023*

---

*American Court Reporting Company, Inc.*

*2751 Buford Highway, NE*

*Suite 100*

*Atlanta, Georgia 30324-5486*

*(404) 892-1331 - (800) 445-2842*

Original File 88504 fix.txt

**Min-U-Script® with Word Index**

1

1          IN THE UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF GEORGIA
2                     MACON DIVISION

3

4
     ADAM SINDELL,
5
              Plaintiff,
6
        v.                          Civil Action File
7
                                    No: 5:22-cv-00365-TES
8    LATONYA COACH, et al.,

9              Defendants.

10

11

12

13          The videoconference deposition of JACOB

14     CLECKNER, taken on behalf of the Plaintiff, taken

15     pursuant to agreement of counsel, taken for all

16     purposes authorized by the Federal Rules of Civil

17     Procedure; the reading and signing of the

18     deposition being reserved; taken before Bonnie L.

19     Smith, RPR, Certified Court Reporter, commencing

20     at 10:02 a.m., on this the 24th day of June,

21     2023, via Zoom Videoconference.

22

23

24

25

2

1   APPEARANCES OF COUNSEL:

2   For the Plaintiff:

3        JESSICA BURTON, ESQ.
         Bernard & Johnson, LLC
4        Dunwoody Park, Suite 100
         Atlanta, Georgia 30338
5        404-477-4755
         jessica@justice.law
6

7   For the Defendants:

8        JASON WAYMIRE, ESQ.
         Williams Morris & Waymire
9        4330 South Lee Street NE, Suite 400-A
         Buford, Georgia 30518
10       678-541-0790
         jason@wmwlaw.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                      C O N T E N T S

2                  E X A M I N A T I O N

3                                              Page

4    Cross-Examination by Ms. Burton ...................4

5

6

7                      E X H I B I T S

                                              Page
8    Plaintiff's          Description          Marked

9    Exhibit 1      Video of Jail Pod             46

10   Exhibit 2      Video of Interview            73

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    P R O C E E D I N G S

2              WHEREUPON, the following proceedings were

3    taken pursuant to the Federal Rules of Civil

4    Procedure.

5              COURT REPORTER:  Will counsel please

6         introduce themselves and state any objection to

7         the witness being sworn in remotely.

8              MS. BURTON:  Jessica --

9              MR. WAYMIRE:  Jason Waymire -- sorry.  Go

10        ahead.

11             MS. BURTON:  Jessica Burton on behalf of

12        plaintiff, Adam Sindell.

13             MR. WAYMIRE:  Jason Waymire on behalf of the

14        defendants and we have no objection to remote

15        swearing.

16             MS. BURTON:  No objection from plaintiff.

17             (Whereupon,

18                        JACOB CLECKNER

19        was called as a witness and, having first been

20        duly sworn, was examined and testified as

21        follows:)

22                        CROSS-EXAMINATION

23    BY MS. BURTON:

24        Q    Good morning, Mr. Cleckner.  My name is

25    Jessica Burton.  I represent the plaintiff, Adam

5

1  Sindell, in this case.  It's good to see you this

2  morning and I appreciate you doing this on a Saturday.

3       A    No problem.  No problem at all.

4            MS. BURTON:  And, Jason, do you agree to

5       reserve all objections except for the form of the

6       question or responsiveness of the answer until

7       the first use?

8            MR. WAYMIRE:  Yeah.  And we'll reserve the

9       right to read and sign.

10           MS. BURTON:  Perfect.

11           MR. WAYMIRE:  And we also discussed before

12      the deposition that certain -- at least one

13      interrogatory is mistaken because it got copied

14      and pasted from somebody else's.  So that's my

15      fault.  It's number three.

16           MS. BURTON:  Right.

17           MR. WAYMIRE:  So I think you're just going

18      to have to ask Mr. Cleckner what the response is

19      to that rather than rely on my error.

20           MS. BURTON:  Yes.  And we'll get to that at

21      some point in the deposition so that way we'll be

22      able to clarify it better then.

23           So this is going to be the deposition of

24      Jacob Cleckner taken by agreement and notice of

25      counsel.

BY MS. BURTON:
Q My name is Jessica Burton. I represent Mr. Sindell. I just have some preliminary stuff to go over with you before we get started if that's okay.
A Sounds good.
Q So you do understand that you are under oath; correct?
A Yes, ma'am.
Q And have you ever given a deposition before?
A No, ma'am.
Q Have you ever testified in court before?
A No, ma'am.
Q Okay. So just to kind of give you a little basis of what the ground rules for a deposition is, just let me ask a question and you just give a response. So, basically, I'm just going to ask that you wait for me to finish a question before you give a response so that way we're not talking over each other and the court reporter can more easily take it down.
A All right.
Q And also I would request verbal responses. The court reporter can't transcribe, you know, certain body language. So if you're, like, nodding your head or shaking your head, it doesn't always, you know, fully get on to the transcript. So we want to just

**7**

1    make sure the answers are clear.

2        A    Right.

3        Q    And advise me if you do not understand a

4    question so that way I can just rephrase it.

5    Sometimes I do ask really bad questions.

6        A    Okay.

7        Q    So if you don't understand what I'm asking

8    or if the question for whatever reason was not clear,

9    then just ask me to rephrase it.  If I do ask a

10    question and you respond to it, I'm going to assume

11    that you understood the question.  Is that fair?

12        A    Right.  Yes, ma'am.

13        Q    Okay.  And have you taken any medications

14    today?

15        A    No, ma'am.

16        Q    Okay.  Are you under any prescription

17    medications that you should be taking that you have

18    not?

19        A    No, ma'am.

20        Q    And are you currently under the influence of

21    any drugs or alcohol that might affect your ability to

22    give this deposition today?

23        A    No, ma'am.

24        Q    Okay.  So just -- we're going to start with

25    some background information.  Can you give me your

8

1  full, legal name?

2      A    Jacob, J-A-C-O-B, middle name Alexander,

3  A-L-E-X-A-N-D-E-R, last name Cleckner,

4  C-L-E-C-K-N-E-R.

5      Q    Perfect.

6          MS. BURTON:  And I'm okay with going off the

7      record for this portion of it if that's okay with

8      you, Jason.

9          MR. WAYMIRE:  Okay with me.

10          (Whereupon, a discussion was held off the

11      record.)

12          MS. BURTON:  I'm comfortable with going back

13      on the record now.

14          MR. WAYMIRE:  Okay.

15          MS. BURTON:  Okay.  Are we back on the

16      record?

17          COURT REPORTER:  Yes.

18          MS. BURTON:  Perfect.

19  BY MS. BURTON:

20      Q    So do you currently go by any nicknames or

21  aliases?

22      A    No, ma'am, besides somebody calling me Jake,

23  but I think that kind of refers to the same name.

24      Q    Are there any other names that you've used

25  in the past?

9

1      A     No, ma'am.  Not to my acknowledgement, no.

2      Q     Okay.  And off the record, you did provide

3  your address.  Can you tell me who you live at that

4  address with, whoever is over the age of 18?

5      A     Oh.  Are you talking about, like, now or are

6  you talking about at the time of the incident?  You're

7  talking about now; correct?

8      Q     Now, yes.

9      A     I have my wife and we have our three

10  children together.  Do you want their names?

11      Q     Your wife's name would be great.

12      A     Tiffani, T-I-F-F-A-N-I, and Cleckner,

13  C-L-E-C-K-N-E-R.

14      Q     All right.  Can you tell me what her maiden

15  name is?

16      A     Williams, W-I-L-L-I-A-M-S.

17      Q     How long have you guys been married?

18      A     November -- November will make it two years.

19      Q     You guys are still newlyweds.

20  Congratulations.

21      A     Yes.  And expecting.

22      Q     Oh.  Congratulations.

23      A     Right.  Right.  Hopefully it's not a fourth

24  girl.

25      Q     Wow.  You guys have quite the lovely family.

10

1    I assume nobody is over -- well, any of your children

2    are not over the age of 18; is that correct?

3         A    No, ma'am.  No, ma'am.  Not yet.

4         Q    Well, congratulations again.  That's

5    exciting.

6         A    Thank you.

7         Q    Let's see.  And who is mainly responsible

8    for the bills at your house?

9         A    I am.

10        Q    Okay.  Do you guys rent or own?

11        A    Rent.

12        Q    And does your wife -- does she work?

13        A    Yes.  That is correct.

14        Q    Does she work in the city that you told me

15   that y'all live in?

16        A    She works in McDonough.

17        Q    McDonough.  Okay.  All right.  So we're

18   going to go a little bit into your educational

19   background.  What's the highest level of education

20   you've completed?

21        A    GED.

22        Q    Okay.  And where did you obtain your GED

23   from?

24        A    It was -- it was a testing station.  I think

25   it was out of Riverdale, Georgia, I believe.  That's

1  where I obtained it.

2      Q     And what high school did you attend prior to

3  that?

4      A     Union Grove High School.

5      Q     And what is -- what level of high school did

6  you complete before you left to get your GED?

7      A     I believe it was 10th grade.

8      Q     Is that the only high school that you

9  attended?

10      A     Yes.

11      Q     Okay.  And what year did you get your GED?

12      A     I believe 2016 if I'm not mistaken.

13      Q     Okay.  And what year did you leave school?

14      A     Maybe the same year.

15      Q     2016?

16      A     As far as, like, the high school you mean?

17      Q     Yes.

18      A     Let's see.  So I dropped out in 10th grade.

19  I had to take it when I was 18.  So let's say 2014.

20  Yes.

21      Q     Okay.  Did you say that you were born in '88

22  or '98?

23      A     '98.

24      Q     '98?

25      A     '98.  I'm not that old yet.

1      Q    Well, I was '88, so I was thinking --

2      A    Oh, I'm sorry.  You're still very young.  My

3  apologies.  I thought you said like '68, something

4  like that.

5      Q    All right.

6      A    My apologies.

7      Q    All right.  And did you go to any technical

8  schools or college?

9      A    When I -- when I stayed down in Warner

10 Robins, I attended that Central Georgia Tech.  I was

11 going for my EMT, but I did maybe a couple core

12 classes but nothing really significant.

13     Q    All right.  Do you recall how long you

14 attended school there?

15     A    It had to be maybe close to a year.

16     Q    Did you obtain any certificates while you

17 were there?

18     A    Negative.

19     Q    And then are the other types of any type of

20 schooling or training that you've done law enforcement

21 related?

22     A    Not law -- not law enforcement related

23 unless going to, I guess, the jail-officer school that

24 you attend at GPSTC.  I think you go for -- I've

25 forgot how long the course was.

13

1       Q     Okay.  And when did you go through the
2  jail-officer school?
3       A     You've got to bear with me.  Let me think
4  for a second.
5       Q     Okay.
6       A     It had to be early 2020 if I'm not mistaken
7  possibly.  My dates could be a little mixed up.  I'm
8  not 100-percent accurate.
9       Q     And then did you ever serve in the military?
10      A     Yes.  I'm still in.
11      Q     What branch?
12      A     Army Reserve.  I did six years in the Army
13  National Guard, but I switched over to the Reserves.
14      Q     When did you switch over?
15      A     It will be three months ago I would say.
16      Q     Well, thank you for your service.
17      A     Thank you.
18      Q     What year do you recall that you joined the
19  Army or the Army Reserves?
20      A     February 2017 is when I first enlisted.
21      Q     And then what is your current rank?
22      A     E-5 sergeant.
23      Q     And what job duties does that entail?
24      A     Being an E-5 sergeant, pretty much you're
25  getting with the other soldiers.  Any scope of plans

1   we have for the day, you know, pass it down to

2   leadership or pass it up to leadership.  Any specifics

3   tasks that our higher ranking give us, we pretty much

4   pass it down to the fellow soldiers and really just

5   carrying out any other duties that needs to be done.

6   Because it can kind of vary.

7        Q    And then I'm not trying to get too into your

8   personal life or anything like that, but are you a

9   member of any church or clubs or organizations?

10       A    Negative.

11       Q    Okay.  Do you have any hobbies that you do

12  regularly that you engage with other people?

13       A    Besides exercising.  The only thing else

14  besides that is work.

15       Q    Like going to the gym?

16       A    Yes.

17       Q    Okay.  What gym do you go to?

18       A    It's here in McDonough and Stockbridge.

19  It's called Fitness -- no -- yeah, Fitness 2020.  It

20  used to be a Gold's Gym.

21       Q    All right.  Do you work out with anybody

22  regularly?

23       A    Yes.  Yes.  I have a gym partner.

24       Q    What's the name of the people that you

25  usually work out with?

1    A    Christian, like the religion, and last name

2  Horton, like Horton Hears a Who.

3    Q    And how old is Christian?

4    A    Twenty-seven.

5    Q    And it's pretty much just Christian?

6    A    Yes.  If it's not him, it's by myself.

7    Q    Gotcha.  Have you talked to Christian at all

8  about this lawsuit or anything regarding the incident?

9    A    No, not really.  We don't get really too

10  involved a lot in people's lives and what's going on.

11    Q    And other than all of the stuff that we've

12  already discussed, do you hold any other types of

13  certificates?

14    A    As far as the military, I mean, I completed

15  a basic leadership course to get entrenched from, you

16  know, a foot soldier to a sergeant, to NCO.

17    Q    Okay.  And then when it comes to exercising

18  at this gym with your friend, how often do you guys

19  generally try to go?

20    A    I try to go at least four to five times a

21  week.

22    Q    Okay.  All right.  And then let's get into

23  your employment history.  So once you left high

24  school, what did you do?

25    A    I didn't work until I got my GED.  After I

1  got my GED, I enlisted into the military.  After I got

2  out of the military, I obtained a job called CNC Fence

3  out of McDonough.

4       Q    Called what?

5       A    CNC Fence.

6       Q    Is that S-E-N-S-E?

7       A    No.  C as in cat and then N and then C.

8       Q    I'm sorry.  I thought you said CNC Sense.

9       A    No, fence.  Like wooden fence, chain-link

10 fence.

11      Q    So did you work putting fences up?

12      A    Yes.  That's correct.

13      Q    How long did you do that?

14      A    I would say six months.

15      Q    All right.  And why did you leave that

16 company?

17      A    It was just too strenuous work and not a lot

18 of compensation.

19      Q    By strenuous, do you mean labor intensive?

20      A    Hard labor.  Hard labor.

21      Q    So did you leave because of the hard labor

22 or was it just because the labor that you were

23 performing was just underpaid?

24      A    Yes.  Right there on the second.  Yes.

25      Q    Okay.  And once you left CNC Fence where did

1   you go?

2        A    I went to B2 Contracting.  Like Bravo and

3   then 2 Contracting.

4        Q    And what did you do there?

5        A    I started a whole new trade.  I just started

6   venturing out into the construction world and we used

7   to do heavy civil, which is, you know, moving dirt

8   around, underground utilities, stuff like that.

9        Q    Okay.  And how long did you work there?

10       A    I would say about a year.  About a year.

11       Q    And what was your reason for leaving?

12       A    Almost the same as the first one.  My

13   skills -- you know, I wasn't getting paid what my

14   skills were worth.  And it was a smaller company.  So

15   I just didn't find a good fit there.

16       Q    Okay.  And then what did you do once you

17   left B2 Contracting?

18       A    After that, I went to TW Brown Contracting.

19       Q    And what did you do there?

20       A    So I transitioned into a utility foreman and

21   did the same thing, worked a lot of heavy equipment

22   and heavy utilities, pretty much supervised a crew.

23       Q    And how long were you there for?

24       A    Two years.

25       Q    All right.  And what was your reason for

**18**

1    leaving that job?

2        A    It was more as far as the location.  It was

3    down in Brooks, Georgia, a lot of traveling down

4    south.  I was looking to get up into management and

5    there wasn't really a lot of open positions.  I just

6    felt like I was not able to grow there, so I had to

7    kind of transition somewhere else.

8        Q    And then where did you go after that?

9        A    So that's my current job now.  I work at

10   Plateau Excavation.

11       Q    Okay.  And what do you do there?

12       A    So now I'm the pipe supervisor, underground

13   pipe -- underground utility supervisor.  There you go.

14       Q    How long have you been working there?

15       A    I would say about six months so far.

16       Q    So this is your current job?

17       A    Yes.

18       Q    Then at what point between this job and your

19   prior jobs did you get on with the Houston County

20   Jail?

21       A    Oh, shoot.  My apologies.  I forgot to add

22   that.  So can we rewind?  Let's see.  Okay.  The

23   Houston County Jail was between the B2 and the TW

24   Brown Contracting.

25       Q    So that would have been around 2020?

1        A      Yes.  Yes.

2        Q      And then you started with TW Brown

3   Contracting --

4        A      After that.

5        Q      -- in, like, around 2021?

6        A      Yes.  Correct.  Correct.

7        Q      Okay.  All right.  So let's look into the

8   Houston County job.

9        A      Okay.

10       Q      Okay.  Do you remember roughly what date you

11  started with Houston County?

12       A      I could look back at my resume.  I think it

13  was early 2020 if I'm not mistaken.  I don't know

14  exactly.

15       Q      And do you recall --

16       A      I mean -- sorry.  Go ahead.

17       Q      Did you have anything else to put with that

18  last question?

19       A      No, ma'am.

20       Q      Okay.  Do you recall what the hiring process

21  was?

22       A      So once we got hired on, we had like a big

23  orientation basically that the major -- I've forgot

24  the major at the time, his name.  We would have, like,

25  an orientation or whatever and he'd kind of, like, go

1   over all the policies in the jail and so forth.  Then

2   after that, I think we had, like, a -- maybe a

3   two-week course.  We would do that.  And then through

4   that -- in that training, they would go through the

5   kind of use of force, the taser requirements, pretty

6   much overall the jail policy rules.

7           I believe that was a two-week training

8   course at the jail facility.  And then after so many

9   months after that, that's when we were able to get

10  into the actual jail school at GPSTC in Forsythe.  I

11  could be leaving one or two small things out, but

12  that's just to my acknowledgement.

13      Q   Were you or any of the other jailers POST

14  certified?

15      A   As far as -- you're talking about POST

16  certified as far as like going to the police academy

17  or going to --

18      Q   Correct.

19      A   No, not the police academy.

20      Q   Okay.  So you were not POST certified then?

21      A   Yes.  Correct.

22      Q   Do you know whether any of your colleagues

23  were POST certified?

24      A   I don't believe so.  Because if they were

25  POST certified, then they would have just became,

1   like, a police officer.  So I don't believe so.

2                    MR. WAYMIRE:  Let me speak up here.  Sorry.

3                    MS. BURTON:  I'm sorry?

4                    MR. WAYMIRE:  POST runs both a jail course

5            and a peace officer course.  I think you were

6            using the terminology POST certified for the

7            peace officer course.

8                    MS. BURTON:  Correct.  Yes.

9   BY MS. BURTON:

10       Q    Did you have arrest powers and the police

11   academy training?

12       A    No.  Right.  Because I know there is a

13   certification when getting completed with jail school.

14   So I was trying to make sure I didn't get it mixed up.

15       Q    Right.  And I appreciate the clarification.

16   So thank you.

17       A    Okay.

18       Q    So then you did say you went through

19   use-of-force training.  Can you tell me a little bit

20   about that use-of-force training?

21       A    To my acknowledgment, they would go over

22   kind of how -- you know, if there was, like, someone

23   being combative or unruly, if you had to make those

24   certain requirements as far as just taking control of

25   the inmate and if you had to get him -- you know,

1    place him on the ground or have control, just pretty

2    much having complete -- try to have control of the

3    individual, if that makes sense, the best you can to

4    minimize any other risk involved.

5              So I think, you know, we went over a couple,

6    like, demonstrations, stuff like that.  But just

7    mainly overall it was when you have to engage into a

8    use of force, just maintain control.

9        Q    Did they go over anything that was kind of

10   like a pyramid structure as to what level of force is

11   permitted?

12       A    Yes.  To my acknowledgment, as far as use of

13   force, you know, there was a couple, like, as far as

14   giving, you know, a verbal warning and so many verbal

15   warnings and then after, like, a non-compliance of how

16   many verbal warnings you may have used, and then

17   working up to that final step of use of force.

18       Q    Okay.  What level -- do you recall what

19   level of force you were permitted to use for each step

20   that you have to take in order to be able to use any

21   type of physical force?

22       A    I don't remember, like, 100 percent what

23   each level was.  I don't want to give you a false

24   answer.

25       Q    Okay.  That's fair enough.  I appreciate

1  that.  We obviously want you to be as honest as you

2  can.

3       A    Right.  I don't want to, you know --

4       Q    All right.  Earlier you said you'd never

5  given a deposition or testified in court before.  Have

6  you ever given any other statements under oath?

7       A    No, ma'am.

8       Q    Okay.  Have you ever been a party to any

9  other lawsuit other than this one?

10       A    No, ma'am.

11       Q    Have you ever been arrested?

12       A    No, ma'am.

13       Q    Have you ever been charged with a crime?

14       A    I have when I was a juvenile, but all that

15  got extinguished.

16       Q    All right.  How old were you when you were

17  charged with a crime?

18       A    Maybe 15.

19       Q    What crime were you charged with?

20       A    I think it was like alcohol or something

21  like that.  I remember vaguely.  It was a long time

22  ago.  I think it was alcohol and I got a couple VOPs

23  and that was about it.

24       Q    By alcohol, what do you mean?

25       A    That's the reason why I went to -- got my

**24**

1  GED or whatever.  I brought it to school or whatever

2  and then that's what happened and they charged me with

3  that or whatever.  But I was still a juvenile, so I

4  just got put on probation.

5         Q    So you were convicted of that?

6         A    Yes.

7         Q    Do you remember how long you spent on

8  probation?

9         A    I think it was maybe two years.

10        Q    And they did not arrest you for bringing

11 alcohol to school?

12        A    No.  No, ma'am.

13        Q    All right.  Have you ever had to file

14 bankruptcy?

15        A    No, ma'am.

16        Q    Okay.  And just to go back a little bit to

17 your work history.  So how long do you think that you

18 spent total in law enforcement or at the jail?

19        A    I believe it was a total course maybe of a

20 year.

21        Q    Okay.  Why did you end up leaving Houston

22 County?

23        A    I just didn't like the whole atmosphere.

24 For me, you know, working in the jail system, a lot of

25 these guys -- when a situation would happen, it was a

1    real -- to me, an unhappy place.  To me, I've always

2    liked to talk to individuals, kind of, you know, hear

3    their story and stuff like that.  It really wasn't

4    about all the anger and stuff.

5           I feel like in that jail or any type of jail

6    atmosphere, that's kind of what it revolves around, a

7    bunch of men with testosterone.  I just want to be

8    kind of like a peaceful guy and I just feel like I can

9    never find that peace in those type of environments.

10   Q    That's an interesting thing you just said

11   when it came to you felt like there was a lot of

12   anger.  Was that anger coming from the inmates?

13   A    I would say just kind of the whole

14   atmosphere, you know, just everybody being together.

15   It could be from staff.  It could be from inmates.  It

16   could be, you know, a lot of stuff like that.

17   Q    Did you ever --

18   A    I wouldn't say anger.  I would say more

19   irritation.

20   Q    Do you feel like you took any of that anger

21   or irritation on for yourself?

22   A    No, ma'am.  No.  Huh-uh.

23   Q    Okay.  Do you recall approximately the date

24   that you left the Houston County Jail?

25   A    Maybe at the end of 2020 going into '21

1    early.  Because I know I spent about a year at that

2    facility.  So --

3        Q    Do you recall whether you had any internal

4    complaints against you while you were at the Houston

5    County Jail?

6        A    I don't believe I did.

7        Q    What about informal reprimand?  Did you ever

8    get any informal reprimand?

9        A    Can you clarify more the informal?  What do

10   you mean?

11       Q    Yeah.  So a lot of times, you know, as we go

12   through, you know, our young adult life, we have jobs

13   that we -- as we're learning how to do stuff,

14   sometimes they'll, you know, have to give us verbal

15   redirection or they'll have to write us up for

16   something.

17       A    Oh.  Okay.  Okay.  Yes.  No, ma'am.  I have

18   not.

19       Q    Okay.  Do you recall whether there were any

20   other types of complaints against you, maybe from the

21   inmates or any of their family members?

22       A    No, ma'am.  Not to my -- I mean, usually

23   when I went to a lot of these pods, I mean, I got

24   along with a lot of these individuals and I think a

25   lot of times it went very smooth.  I didn't really

1   have any complaints to my acknowledgment.

2        Q    Did you have any names that you went by with

3   the inmates?

4        A    I think some of them would call me Big Swole

5   or Swole.  That's all I can really think of.

6        Q    Do you know why they called you that?

7        A    Because I was just kind of a bigger guy.

8        Q    Have you ever had any disciplinary actions

9   against you from any of your other jobs?

10       A    No, ma'am.  No, ma'am.

11       Q    Is that including in the military?

12       A    Yes, ma'am.

13       Q    All right.  So when you worked at the

14  Houston County Jail, you said that you went through

15  orientation where you would go through policies and

16  procedures and whatnot.  Were these policies and

17  procedures, like, put in any sort of written form?

18       A    Yes.  We got -- we got this big book.  So

19  whatever -- like a lot of stuff we didn't cover, we

20  can go over it in that book as well about policy and

21  procedures and stuff like that.

22       Q    Did you ever look through the book once you

23  completed your police training?

24       A    Periodically, you know, like, if I had some

25  free time, I'd browse through it and stuff like that.

28

1    But I just didn't look at it every day.

2        Q    How much of what you guys did not cover in

3    your orientation or your training did you look at in

4    the manual?

5        A    I believe most of it was -- it was

6    condensed, if that make sense.  So, you know, in a

7    manual, it's probably like 10 words that can mean a

8    couple.  So a lot of it was pretty much all covered to

9    me.  It was just condensed in the actual training at

10   the building.

11       Q    Okay.  Just to clarify -- because I want to

12   make sure I'm understanding your response to that --

13   are you saying that the actual training portion of it

14   was condensed and it went into more detail in the book

15   or the manual?

16       A    That is correct.

17       Q    Okay.  And then how much of the manual did

18   you -- or, the book or the manual did you actually

19   read through once your training was complete?

20       A    I read a good bit over it.  Like, when I'd

21   go home, sometimes I'd read over it or sometimes if I

22   had some free time, I would browse through it.  But

23   like I said, a lot of it was already covered, so I

24   already knew it in the back of my head.

25       Q    Do you know if you ever finished the book?

1      A      I believe I did.

2      Q      And what were some of the policies regarding

3  interactions with inmates?

4      A      A couple simple ones as far as, you know,

5  not, you know, getting involved in anything that could

6  get yourself in trouble or contraband, you know, stuff

7  that wasn't allowed into the jail facilities.  And

8  then as far as, like, talking to individuals, you had

9  to -- like, use of force, you had to have, like, a

10  written -- or, like, a verbal execution, if that makes

11  sense.  Like, you had a couple verbal warnings.

12          If they don't understand -- I'm trying to

13  put it into words for you.  If they don't -- after so

14  many verbal warnings, then you could, you know, go to

15  that type of use of force.  Really stuff like that.

16  That's really off the top of my head all that I can

17  remember as far as, like, interacting with inmates,

18  what you should do, what you shouldn't, what things

19  you can or cannot bring into the jail.  Certain

20  procedures like that is the only thing I can remember

21  off the top of my head.

22      Q      Do you remember if there was any policy --

23  when you interacted with inmates, were there any body

24  camera policies?

25      A      Yes.  Yes.

1    Q    What was the policy?

2    A    And most -- whenever you got into contact

3  and you thought there could be a situation that could

4  happen, you know, you had to have your body cam on you

5  so if, like, there's anything that we need to use as

6  far as, like, evidence or anything like that or go

7  back and play it.  That's why we had those body cams.

8    Q    So whenever you -- so I'm sorry.  You said

9  you thought if there was going to be a situation, then

10 you would need to use the body cam?

11   A    You know, if we thought there was going to

12 be something critical, if that makes sense.

13   Q    Can you give me an example of what that

14 would entail?

15   A    Like, let's say I'm having a conversation

16 with an inmate that I could find him very aggressive.

17 He could maybe harm me or one of my, you know, fellow

18 coworkers.  We need to have that body cam on so we can

19 actually witness the stuff that couldn't be seen.

20 Because sometimes maybe a lot of stuff maybe the

21 camera couldn't pick up something, you know, stuff

22 like that.

23   Q    And so was it -- was it mandatory for you to

24 have your body camera at that time?

25   A    To my acknowledgment, a lot of it really

1    depends on what areas you were located in in the jail.
2    Because I really don't recall -- I don't believe it
3    was 100-percent mandatory.  I think, you know, it was
4    depending on what location you were in the jail.
5        Q    What locations would require your body
6    camera?
7        A    You know, as far as any type of pod, if
8    you're on movement, which is kind of like you're kind
9    of -- if anybody needs assistance and stuff like that.
10   So most cases, you know, you need to have your body
11   cam.  But, you know, I -- yeah, I would say it would
12   be mandatory.  I don't know 100 percent.  I don't want
13   to give you a false answer.
14       Q    So you said either if you go into pods or if
15   you're going to help someone who needs assistance.
16   What does that mean, to help someone who needs
17   assistance?
18       A    It could be anything from them, like,
19   needing a paper towel or something to write with, a
20   paper.  There could be an incident with an inmate.  It
21   could be a lot of different things.
22       Q    Okay.  So you mean -- and correct me if I'm
23   wrong please because I'm asking for clarification.  So
24   when you say that if somebody needs assistance, you
25   mean either inmates or potentially your colleagues; is

1    that correct?

2         A     Yes.  Yes.  Yes.

3         Q     So going back to that being part of policy,

4    do you recall if you had ever violated any policy?

5         A     No, ma'am.  No, ma'am.

6         Q     Is that, no, you don't recall or, no, you

7    have not?

8         A     No, I have not.  I pretty much remember, you

9    know, to my acknowledgment, you know, following all

10   the procedures.

11        Q     Okay.  What about your colleagues?  Do you

12   remember your colleagues ever violating any policies?

13        A     No, I don't.  No, ma'am.  I don't believe,

14   no.

15        Q     And do you recall giving an interview to any

16   of your supervisors regarding the incident that we're

17   going to talk about here in just a few minutes?

18        A     There was like an investigator.  I know I

19   did a recording as far as I had to talk about the

20   incident and give my statements.

21        Q     What was that investigator's name?

22        A     It started with an R.  I would have to find

23   out.  It was like R -- I really don't remember.

24        Q     Do you remember that investigator asking if

25   you had a body camera on at the time of the incident?

1        A    No, ma'am.  I don't remember.

2        Q    Okay.  Do you recall if you did have a body

3    camera on at the time of the incident?

4        A    No, ma'am.  Because it's been almost four

5    years ago.  No, ma'am.  I do not remember.

6        Q    All right.  So let's actually talk about the

7    incident.  So do you understand that by the incident

8    what I'm referring to is an encounter that you had

9    with my client, Adam Sindell, on or about June 30th of

10   2020?

11       A    Yes, ma'am.

12       Q    Okay.  So prior to that date, do you know if

13   you ever had any interactions with Mr. Sindell prior

14   to that?

15       A    No, ma'am.  The only thing is like in

16   passing or if I went to a pod, I've seen him.  But

17   other than that, no, ma'am.

18       Q    So you never spoke with him before?

19       A    No, ma'am.

20       Q    Okay.  Do you know if any of your colleagues

21   interacted with him prior to that date?

22       A    There could have been some more senior, you

23   know, veterans in there that probably spoke to him.  I

24   don't know their relations with him.

25       Q    So no other colleagues essentially flagged

1   him to you?

2        A    No, ma'am.

3        Q    Okay.  So other than just having seen him at

4   the jail, were you familiar with him at all other than

5   that?

6        A    No, ma'am.

7        Q    And then on the day in question, how did you

8   come to encounter him that day?

9        A    As far as going to the incident?  Is that

10  what you mean?

11       Q    Right.  So how did you come to encounter him

12  right prior to the incident?

13       A    Do you want me to kind of go over briefly

14  the whole scenario of how I got up to it?  Is that

15  what you mean?  I want to make sure I say the right

16  thing.

17       Q    Why don't we do this?  Do you remember kind

18  of going to work that day?

19       A    Yes.  I mean, I still remember kind of

20  pretty much the incident.  I couldn't tell you what I

21  ate for breakfast and stuff like that.  You know, I

22  can't vaguely remember exactly what pod.  I couldn't

23  have been in a pod if I came to assist.  So I'm pretty

24  sure it was lunch break.  I just don't remember, so --

25       Q    Well, do you remember -- well, do you

**35**

1    remember anything from work that day other than the

2    incident, like what you were doing prior to that

3    incident?

4         A    No, ma'am.

5         Q    Okay.  So then generally speaking, whenever

6    you would go into the Houston County Jail to start

7    your workday, what time would you generally get to

8    work?

9         A    So we had a briefing room.  We had to be in

10   that briefing room at 5:45 a.m.

11        Q    Okay.  And then how long are you in the

12   briefing room?

13        A    I'd say about 15 minutes.

14        Q    Okay.  And then what do you guys do in the

15   briefing room?

16        A    Just kind of go over who's going to be in

17   what pod, if there was any kind of incidents over the

18   prior shift so that we're all aware of the situations,

19   stuff like that.

20        Q    Was there any situation that you recall

21   there being that day that would have put you on high

22   alert for your workday following?

23        A    No, ma'am.  No, ma'am.

24        Q    Okay.  So then after you leave the briefing

25   room, what do you do?

36

1      A      What we do is -- whatever pod we are

2  assigned to, then we go relieve the other officer.

3      Q      Okay.  So what pod do you remember being

4  assigned to that day?

5      A      I can't recall, I mean, exactly which pod I

6  was in.  I can't -- I can't remember off the top of my

7  head exactly what pod I was in.

8      Q      Do you know if it was Mr. Sindell's pod?

9      A      No, ma'am.  No, ma'am.  Because -- yeah, no,

10  ma'am.

11      Q      Do you recall who was assigned to his pod

12  that day?

13      A      It was Ms. Coach.  I don't remember her

14  first name.

15      Q      Do you remember what pod that was?

16      A      I think it was Lima.

17      Q      Is that L pod?

18      A      Yes, ma'am.

19      Q      Is there any -- well, is there any

20  categorizations that you had for L pod as far as

21  inmates, what inmates you would decide to put in L

22  pod?

23      A      Can you repeat what you said one more time?

24  I'm sorry.  I'm just trying to give you the best

25  answer.

1    Q    So let me kind of just give you a little

2    background.  So I do a lot of indigent defense in

3    Gwinnett County.  And so they do have different pods

4    and a lot times they are for different reasons.

5    Sometimes they'll have pods for people who come in as

6    veterans.  They have pods that are set specifically

7    for people who have mental health issues.  They have

8    pods for discipline, pods for people who are more

9    aggressive that you need to be on a more heightened

10    alert for --

11    A    Okay.

12    Q    -- an intake pod and stuff like that.

13    A    Right.  I gotcha.  We had a mental health

14    pod and a disciplinary pod.  But as far as any other

15    big pods, I really don't know what our chain of

16    command really assigned these individuals.  That

17    wasn't really my partaking.  So I couldn't really give

18    you -- to me, it was just another regular housing dorm

19    for the males to my acknowledgment.

20    Q    So that would be L pod would be just a

21    regular housing pod?

22    A    Yes.  Yes.

23    Q    So nothing indicated that there would be any

24    more aggression in this pod than any other pod; is

25    that right?

38

1        A       Right.  Right.  Yes, ma'am.

2        Q       Okay.  And so then -- so you get to work.

3    You do the briefing room.  You go to your assigned pod

4    which is not the one that is Mr. Sindell's pod.  So

5    then what happens then?

6        A       So to my acknowledgment, I don't know if it

7    was lunchtime or -- there was a point where I was

8    maybe released from whatever pod I was in and there

9    was a call that they needed assistance in Lima pod,

10   which that was Ms. Coach's pod.

11       Q       Okay.  And then what was -- did she indicate

12   why she needed assistance?

13       A       I believe she said a refusal for lockdown.

14       Q       Was the entire jail on lockdown at the time?

15       A       I don't believe so.  Because some of these

16   pods I just can't remember.  Like I said, I can't

17   remember.  Sometimes they would have rotation.  Like a

18   top tier come out or a bottom tier and it could be

19   lunchtime.  And at this point in time, Lima pod, the

20   whole pod was supposed to be locked down.

21       Q       So then would deputies -- well, I say

22   deputies -- would the jailers have authority to put

23   their pod on lockdown separate from what the rest of

24   the jail would be doing?

25       A       They could.  Yes, ma'am.

1    Q    All right.  What are some reasons they would

2    put the pod on lockdown?

3        A    If there was potentially -- like, if, you

4    know, the housing -- the housing pod was too out of

5    control that people, you know, weren't listening to

6    verbal commands.  They could have been hurting each

7    other, fighting.  Sorry.  Did you lose me there?

8        Q    No, I'm here.

9        A    As far as like, you know, fighting, refusing

10   verbal commands, stuff like that.  In most cases, a

11   whole pod wouldn't get locked down unless there was a

12   fight or something like that.  The whole pod would get

13   locked down so they can investigate what's going on.

14   That's a lot of times why they would lock down a pod.

15   It could be other reasons.  I just don't remember.

16       Q    All right.  And I think that you testified

17   earlier that it was around lunchtime when the call

18   came in that Coach needed assistance.  Was that right?

19       A    To my acknowledgment, yes, ma'am.

20       Q    Okay.  And I think I might have understood

21   that you mentioned that lunchtime might be a reason

22   for locking them down.  I did understand that

23   correctly?

24       A    Yes, ma'am.  Yes, ma'am.

25       Q    Okay.  Do you know if that's the reason why

1    the pod was on lockdown?

2       A    I believe so, because after the inmates, you

3    know, eat their lunch and everything else, they have

4    to be locked down so the staff can actually rotate and

5    take their lunch as well.

6       Q    So you mean like the person who was assigned

7    to the pod?  So the jailer who's assigned to the pod

8    can go and take a lunch; is that right?

9       A    And get relieved and stuff like that.  Yes,

10   ma'am.

11      Q    Okay.  Do you know if Coach was about to

12   take her own lunch?

13      A    I don't remember.  No, ma'am.

14      Q    Okay.  So then you get the call from Coach

15   stating that she needed assistance.  And then what

16   happened after that?

17      A    I walked into the pods and everyone was

18   locked down.  I already heard Ms. Coach telling

19   Mr. Sindell lock down.  I walked in the pod.  Right

20   when I walked in, I seen him.  He seen me.  I told

21   him, hey, you need to lock down.  I got a little

22   closer.  Hey, you need to lock down.  And he was not

23   even acknowledging anything I was saying pretty much.

24      Q    Do you recall there being any indication

25   that Sindell had permission to be at the kiosk at the

41

1   time?

2       A    No, ma'am.  Because then there wouldn't have

3   been a call for assistance over the radio.

4       Q    Okay.  And so when you arrived to L pod to

5   assist Coach, what happened?

6       A    Like I said, I walked in.  Ms. Coach has

7   already given him I don't know how many commands to

8   lock down.  He was refusing.  I walked in.  I told him

9   to lock down.  He refused again.  I walked up closer,

10  told him to lock down.  He refused.

11          Then when he turned around and looked at me,

12  he kind of in my eyes dropped his shoulder like he was

13  either going to attack me or to my acknowledgment I

14  don't know what his plan of action was.  And that's

15  when I took him to the ground to gain control.

16      Q    Okay.  What do you mean by dropped his

17  shoulder?

18      A    Like, drop your shoulder as far as your arm,

19  like if you're going to punch something, have

20  something in your hands.

21      Q    Can you --

22      A    Say again?

23      Q    Can you demonstrate it?

24      A    So, like, say if you're standing right here

25  and all of the sudden you step back.  Like, right

**42**

1  before you throw a throw or something, your shoulder

2  drops back.  Does that make sense?

3       Q    It does, yes.

4       A    Yes.

5       Q    Do you recall what the rest of -- so you're

6  saying that you thought that he had a dropped

7  shoulder.  Was there anything else about his body

8  language that you recall?

9       A    That was really the biggest indicator, you

10  know.  Because I didn't know -- I didn't know him.  I

11  had never had any prior experience with him.  So I

12  didn't know what he's capable of and I just didn't

13  want to take a chance for me and my coworkers for

14  anybody to get hurt.

15       Q    How many people do you recall coming to the

16  pod with?

17       A    It was me and Boerger who came to the pod.

18       Q    Was there a third person that was with you?

19       A    After the incident, like, medical.  But

20  that's later on.  But coming into the pod, just me and

21  Boerger.

22       Q    Okay.  And was Coach still in the pod as

23  well?

24       A    Yes, ma'am.

25       Q    Where was Coach located at this time?

43

1       A    She was still sitting I believe at that desk
2    that we sit at inside the pod, behind the desk.
3       Q    Okay.  And then where was Boerger located?
4       A    He was -- he was beside me the whole time.
5       Q    He was beside you?
6       A    Correct.
7       Q    Do you recall seeing Mr. Sindell's hands?
8       A    As far as, like, before the incident?
9       Q    Right.  Before the incident.  So whenever
10   you walk in and you're telling him to lock down and
11   you're saying that you see he drops his shoulder, do
12   you see his hands?
13      A    Right.  So after I told him three times,
14   actually when I got up to him, like, face to face and
15   when I saw him, his fist was closed.
16      Q    His fists were closed?
17      A    Yes.
18      Q    And how clearly do you remember that
19   incident?
20      A    As far as the verbal commands and how I
21   gained control with him and that, I remember pretty
22   vaguely.
23      Q    Pretty vaguely?
24      A    Yes, ma'am.  Like, I can pretty much still
25   recall that incident.

**44**

1      Q    Okay.  So you mean pretty clearly?

2      A    Yes.  Like, as far as like the verbal

3   commands, me taking him down.  Now, as far as, like,

4   the little things, like, in between, like, I remember

5   mostly of it.  I can't tell you 100 percent.  So I'm

6   not going to say 100 percent.

7      Q    Do you remember the lapse of time that it

8   took between the first time that you told him to lock

9   down and then the time that you made physical contact

10  with him?

11     A    I would say between -- between each time I

12  told him, I'd probably say maybe three seconds.  And

13  like I said, it -- the whole pod was locked down.  So,

14  I mean, when I say that, you know, he could hear me.

15  I said that loud enough.

16     Q    All right.  So how clearly do you remember

17  his body language?

18     A    Pretty clearly.  Because when I got up to

19  him, that's when he turned towards me and dropped his

20  shoulder.

21     Q    And you don't know that he was turning

22  towards you because you were talking to him; is that

23  right?

24     A    No.  To me, in my perspective, that's just

25  what I recall.  Like, I felt like he was going to do

**45**

1   something.  Like, I don't know what he was going to

2   do, but that's just kind of how I felt.

3        Q    Okay.  Do you remember if he said anything?

4        A    I don't believe he said anything to me.

5        Q    Okay.  So he never made any threatening

6   comments to you then; is that correct?

7        A    Yes, ma'am.  He didn't.

8        Q    All right.  So we've been going for about an

9   hour.  And I did forget to tell you this at the

10  beginning.  So this is your deposition, so I want to

11  make sure that you are comfortable.  So if at any

12  point you need a break, just let me know.  But usually

13  at, you know, the hour mark, I do like to give the

14  opportunity for a break if we haven't already taken

15  one.  So do you want to break?

16       A    I'm okay unless y'all would like one.  I

17  mean, I'm fine.

18            MS. BURTON:  Jason, do you want one?

19            MR. WAYMIRE:  It's up to you.

20  BY MS. BURTON:

21       Q    Okay.  I'm okay with continuing on.

22       A    Okay.

23       Q    So I'm going to try to pull up a video that

24  I want you to look at, which I will introduce this as

25  plaintiff's exhibit one.

46

1              (Plaintiff's Exhibit 1 was marked for

2         identification.)

3              MS. BURTON:  I can share my screen; right,

4         Madam Court Reporter?

5              COURT REPORTER:  I believe so.

6    BY MS. BURTON:

7         Q    Can you see this?

8         A    Well, now it's a white screen.  Is that how

9    it's supposed to look?

10        Q    No.  It's probably because I made it full

11   screen.  Let me see if I can fix that.  Is that

12   better?

13        A    Yes.  There we go.

14        Q    All right.  So right now, the video is at

15   the five minute, 40 second mark.

16        A    Okay.  Yes.

17        Q    And can you see what writing or typing is up

18   here at the top, left-hand corner?

19        A    Yes.  It's June 30th, 2020.  It is 2:07:43

20   in the afternoon.

21        Q    Okay.  Do you recognize this -- sorry.  That

22   is the date of the incident; is that correct?

23        A    Yes.

24        Q    All right.  And do you recognize what this

25   video is depicting right now?

47

1       A     Yes.

2       Q     What is the location?

3       A     This is kind of like pointing towards the

4   front view, like front area of the pod.

5       Q     Would that be L pod?

6       A     Yes.

7       Q     Okay.  And do you see where my cursor is?

8       A     Yes.

9       Q     So what I'm circling right here, do you

10  recognize this area?

11      A     Yes.

12      Q     All right.  Would this be the desk that

13  Coach would be working at?

14      A     Yes.  Correct.

15      Q     But you don't see her there right now, do

16  you?

17      A     No, ma'am.

18      Q     Okay.  And do you see my cursor right here

19  at the bottom left of the screen?

20      A     Yes.

21      Q     All right.  Can you describe that to me?

22      A     There's an inmate individual looking at the

23  screen or doing something on the screen.

24      Q     What is that screen?

25      A     It's a tablet where they could shoot emails,

1    texts or order commissary.

2         Q    Okay.  And would that be the kiosk?

3         A    Yes.  Yes.

4         Q    All right.  Does every pod have a kiosk?

5         A    Yes.

6         Q    Are there any times that the kiosk is

7    restricted for inmate use?

8         A    As far as like, you know, if they're on

9    lockdown, you know, they cannot be able to use it, if

10   it's broken.  That's the only other thing that I can

11   think of.

12        Q    So there's no, like, time restrictions as

13   far as like, you know, there's only certain times of

14   the day that they're allowed to use it?

15        A    Of course.  Like, when they're out for

16   recreation, when they're able to get out of the cell,

17   that's the time they can use it.  But when everybody's

18   locked down, they're not supposed to be using it.

19        Q    And then you did say -- well, let me ask you

20   this.  What time of day would inmates usually have the

21   lunch rotations?

22        A    I think maybe -- maybe it would come at

23   11:00.  I don't remember 100 percent what the lunch

24   schedule was.  Usually the trays would come in there.

25   They would eat.  And then after they would eat, they

1  would all lock down.  And after they lock down, that's

2  when the rotation for the employees would start

3  rotating.

4       Q    Okay.  So how long would lunch last?

5       A    Maybe 30 minutes I believe.  Thirty minutes,

6  45 minutes.

7       Q    Does each pod have a different time for

8  lunch or does every pod eat at around the same time?

9       A    Right.  Yes.  They all pretty much stay on

10  the same schedule.

11       Q    Okay.  So if lunchtime for -- you know, say

12  J pod is at 11:00 o'clock.  Then for L pod, it would

13  also be at 11:00 o'clock; is that fair to say?

14       A    That is correct.  I mean, you have to take

15  into account the trays coming to the pods.  So it's

16  not exact, but --

17       Q    Okay.  And then how long after the inmates

18  are finished with lunch do the deputies -- I keep

19  saying deputies -- but do the jailers usually take

20  their lunch?

21       A    You said how long?

22       Q    Right.

23       A    Maybe 30 minutes.  I don't -- 45 minutes.  I

24  don't know the exact time we used to have.

25       Q    Okay.  So then if lunch did start at

**50**

1   11:00 o'clock in the morning, then Coach would need to

2   go to lunch sometime between 12:00 and 12:15; is that

3   right?

4        A    Yes, ma'am.

5        Q    Okay.  And how long would jailers usually go

6   and take their lunch for?

7        A    I would say about 30 minutes.

8        Q    Okay.  And so given that timeframe, is it

9   fair to say that Coach should have been back between

10  12:30 and 12:45?

11            MR. WAYMIRE:  Object to form.

12            THE WITNESS:  Possibly, if -- say again?

13            MS. BURTON:  Jason, did you have an

14       objection.

15            MR. WAYMIRE:  Yeah.  I'm just objecting to

16       the extent that calls for speculation.  But he

17       can answer if he knows.

18  BY MS. BURTON:

19       Q    Right.  And please note that I'm only asking

20  to your personal knowledge.

21       A    Right.

22       Q    You know, based on your experience with

23  having worked there for a year, is it your

24  understanding that that is the timeframe that Coach

25  would have been back from her lunch is between 12:30

1    and 12:45?

2         A    Assumably, yes.

3         Q    Okay.  And then you did indicate that the

4    time stamp on this video is at 2:07 and 43 seconds; is

5    that correct?

6         A    Yes.

7         Q    So if we match that up with the timeframe

8    that we just went over for lunch, would that have been

9    during that lunch timeframe?

10        A    No.

11        Q    Okay.  In what relation to lunch would that

12   have been?

13        A    We said that lunch would have been 12:45.

14   So it's already 2:00 o'clock.  Like, two hours past.

15        Q    So is it fair to say that even with a little

16   bit of wiggle room in that schedule, lunch should have

17   been over then?

18        A    That is correct.

19        Q    Okay.  So -- all right.  So we see an inmate

20   down here that you indicated was at a kiosk.  And I'm

21   just going to go ahead and play the video and I might

22   stop it at a certain point and ask you questions about

23   it.  Okay?

24        A    Okay.

25             (Whereupon, the video was played.)

1  BY MS. BURTON:

2      Q    Okay.  So there's three people coming in

3  right here.  Do you see those three?

4      A    Yes.  But I believe the one to your very

5  left at the top corner, that's Ms. Coach.  So she

6  didn't come in the pod as well.  So she was sitting

7  there the whole time.

8      Q    What do you mean?

9      A    Like, if you go back where you start, before

10 you even started the video, she was still in that

11 corner.  See?

12     Q    Okay.  So she's right there.  So she did

13 not -- she's not sitting at the desk.  She's sitting

14 next to the desk; is that right?

15     A    Yes.

16     Q    All right.

17          (Whereupon, the video was played.)

18 BY MS. BURTON:

19     Q    All right.  And then the two people that

20 just walked in front of her, do you recognize those

21 people?

22     A    Hold on one second.  My phone froze.  Yes,

23 ma'am.

24     Q    All right.  Who is the gentleman to the left

25 of the screen?

53

1      A      Boerger.  Mr. Boerger.

2      Q      Okay.  And who is the gentleman to the

3   right?

4      A      That is me.

5      Q      Okay.  And did you hear any audio whenever

6   this was just playing?

7      A      Yes.

8      Q      What was the audio saying?

9      A      I heard two -- two audios about being locked

10  down.

11     Q      Okay.  And I'm going to play it again, but

12  what direction are you and Boerger walking?

13     A      Towards -- towards the inmate.

14            (Whereupon, the video was played.)

15  BY MS. BURTON:

16     Q      Okay.  Do you recognize the inmate at this

17  time?

18     A      It's just another inmate.  I mean, I didn't

19  know who exactly it was.

20     Q      Do you know who that inmate is now?

21     A      Yes.

22     Q      Who is that inmate?

23     A      Sindell.

24     Q      Okay.  And Sindell is still situated behind

25  the kiosk; is that correct?

1       A    That is correct.

2            (Whereupon, the video was played.)

3    BY MS. BURTON:

4       Q    All right.  So I have stopped now at five

5    minutes and 56 seconds in.  So right here to the -- to

6    the right, this individual that I am circling, is that

7    you?

8       A    Yes.  That is correct.

9       Q    And it looks like you were indicating off to

10   the side.  Do you see that?

11      A    That's correct, yes.

12      Q    Okay.  Can you tell me what you're telling

13   him at this point?

14      A    I was telling him he needs to lock down to

15   his cell, which is located where I'm pointing.

16      Q    Okay.  And then this would be Boerger right

17   to the left of you?

18      A    That's correct.

19      Q    The left side of the screen.  If we're from

20   your point of view, he would be to the right of you;

21   correct?

22      A    That is correct.

23      Q    And you see the inmate, Mr. Sindell?

24      A    That is correct.

25      Q    Okay.  Tell me what his body language is --

1   hold on.  Let me go back and stop it again.

2              (Whereupon, the video was played.)

3   BY MS. BURTON:

4       Q    So when he moves away from the kiosk, I want

5   you to tell me about his body language.

6       A    Okay.

7       Q    Okay.  How was he walking towards you?

8       A    It seemed to me he's walking, you know,

9   relatively at a pace towards the direction of us.  So

10  I could take it as a threat.  That's how I feel.

11      Q    You said he was walking at what kind of

12  pace?

13      A    I would say kind of a fast manner towards

14  us.

15      Q    You would call that a fast pace?

16      A    Okay.  Now once you kind of got it a little

17  better, no, ma'am.  I would say just a moderate pace.

18      Q    A moderate pace.  Okay.  And where are his

19  hands located?

20      A    To the side of him.

21      Q    Okay.  And I want you -- I'm going to play

22  it one more time.  Hopefully I don't have to play it

23  again, but can you tell me once I stop it if you can

24  tell me if you can see which way his hands are

25  facing --

1       A     Okay.

2       Q     -- or what his hands are doing?

3       A     Okay.

4             (Whereupon, the video was played.)

5             THE WITNESS:  His hands are still closed.

6  BY MS. BURTON:

7       Q     Okay.  You didn't see his palms up, his

8  palms out?

9       A     Yes.  But they were still closed.

10      Q     Okay.  So who closed the gap between where

11 you -- so Mr. Sindell is here and you were there.  Who

12 closed the gap?

13      A     Both of us.

14      Q     Okay.  Did he make -- at this point when we

15 see you grab him, had he made any sort of physical

16 threats against you or -- had he made any type of

17 verbal or physical threat against you?

18      A     Not verbal, but as far as when we're both

19 walking towards him, he has his hands closed like that

20 and his shoulder movement to me, what I'm thinking,

21 you know, is he could be possibly attacking me.

22      Q     Okay.  Let's see.

23            (Whereupon, the video was played.)

24 BY MS. BURTON:

25      Q     Sorry.  I'm trying not to have to watch the

1   same parts over.  It's hard to move it over to the

2   right spot, especially with my Internet connection.

3   All right.  I guess I'll have to --

4        A    Do you mind pausing just for a second so I

5   can get my charger?

6        Q    I'm sorry?

7        A    Do you mind pausing for a second so I can --

8             MR. WAYMIRE:  He wants to take a break.

9             MS. BURTON:  Yeah.  Let's do a five-minute

10        break.

11             THE WITNESS:  Okay.

12             MR. WAYMIRE:  Yeah.  Just stay on the call.

13             THE WITNESS:  Okay.  Wonderful.

14             MS. BURTON:  If you need to mute yourself,

15        then go ahead and mute yourself.

16             MR. WAYMIRE:  Okay.

17             THE WITNESS:  Okay.  Thank you.

18             MR. WAYMIRE:  Mute it and turn off the

19        video, but stay on the call.

20             THE WITNESS:  Gotcha.

21             (Whereupon, a recess was taken from 11:09

22        a.m. p.m. until 11:16 a.m.)

23   BY MS. BURTON:

24        Q    Okay.  Is everyone back?

25        A    Yes.

1      Q    All right.  I'm going to share my screen

2   again.

3      A    All right.

4      Q    Okay.  So we are back.  I had to rewind it

5   back.  It's at the 5:50 mark.

6           (Whereupon, the video was played.)

7   BY MS. BURTON:

8      Q    Was Mr. Sindell saying anything to you at

9   that time?

10     A    I don't remember.  I don't believe so.  I

11  don't know what he was saying.

12     Q    Did you -- did you hear him trying to speak

13  to you at this time anyway?

14     A    No, ma'am.

15     Q    Okay.  So at this time, you don't remember

16  him saying anything to you.  So it's fair to say he

17  did not make any type of verbal threat against you; is

18  that correct?

19     A    Yes.  That is correct.

20     Q    Did he raise his hands at you?

21     A    Raise his hand?

22     Q    Correct.

23     A    No, ma'am.  He didn't raise his hand.

24     Q    So is it fair to say that his arms remain by

25  his side pretty much the entire time before you

59

1    physically make contact with him?

2        A    He hands were by his side and when I walked

3    up to him, his shoulder, the way he gestured towards

4    me, it felt like he could possibly throw a punch at

5    me.  I don't know.  That's just how I perceived it.

6        Q    Okay.  And can you describe what just

7    occurred right before I paused the video.  And right

8    now we're at --

9        A    I grabbed him by the waist as I placed him

10   on the ground.

11       Q    Okay.  Hang on one second.  Right now we're

12   at the six-minute mark and four seconds into that.

13   And you just stated that you had grabbed him and

14   placed him on the ground; is that correct?

15       A    That is correct.

16       Q    Okay.  And so right now where it's currently

17   paused, can you tell me what's going on right here?

18       A    We were trying to roll him over so we could

19   put -- so we could restrain him and put handcuffs on

20   him so we could have control over him.

21       Q    So you could what over him?

22       A    Have control.

23       Q    Have control over him.  Okay.

24            (Whereupon, the video was played.)

25   BY MS. BURTON:

1      Q    Okay.  So I'm pausing it now at six minutes

2   and 12 seconds in.  Mr. Sindell is still on the

3   ground; is that correct?

4      A    That is correct.

5      Q    Do you know if he is conscious at this

6   point?

7      A    Yes.  He was saying something.  I don't

8   recall.  But he was.  Yes, ma'am.

9           (Whereupon, the video was played.)

10   BY MS. BURTON:

11      Q    All right.  And you guys are picking up

12   Mr. Sindell.  Right now do you see whether or not he

13   is assisting in getting up?

14      A    No, ma'am.  He's not.

15      Q    Can you describe his body right now?

16      A    Really, he's just not trying to get up at

17   all.  So we have to do all the, you know, getting him

18   up.

19      Q    Is he conscious in this moment?

20      A    I don't recall exactly that moment if he was

21   or not.

22      Q    Okay.  Does he look conscious?

23           MR. WAYMIRE:  Object to form.

24           THE WITNESS:  To me, in the moment, it's

25       kind of hard to tell.

1                  (Whereupon, the video was played.)

2      BY MS. BURTON:

3          Q    All right.  Okay.  And what are you guys

4      doing -- so now it's at six minutes and 30 seconds in.

5      What are you guys doing at this point?

6          A    We were trying to get him up off the ground

7      to have him sit on a chair.

8          Q    Okay.

9          A    But he was kind of not going with our

10     commands at all.

11         Q    Okay.  And you still don't know at this

12     point whether he's conscious?

13         A    No, ma'am.

14         Q    Okay.

15         A    No, ma'am.

16                  (Whereupon, the video was played.)

17     BY MS. BURTON:

18         Q    Okay.  So now we are at seven minutes and

19     one second in.  What is happening right now?

20         A    So when me and Boerger try to sit him on the

21     chair and I believe the other assistant was coming in,

22     then he somewhat, I guess, went into a seizure mode.

23     And that's when we realized that he was having a

24     seizure, so we were trying to assist him and get help.

25         Q    Okay.  And then how were you assisting him?

**62**

1      A      Pretty much make sure all of the chairs were
2   out of the way so, if he was having a seizure, he
3   didn't hurt himself in the process.
4      Q      Okay.  And then I see there's now two more
5   people who are now in the pod; is that correct?
6      A      That is correct.
7      Q      Actually, no, I think three.  So
8   initially --
9      A      Yes, three.  It would be three more.
10     Q      Okay.  So three more.  So can you tell me
11  where -- okay.  Can you tell me where you were located
12  at this time?
13     A      So if you go over to the right, not the
14  individual that's closest to us but the one right next
15  to him, I believe that's me.  I really can't tell at
16  the angle of this.  I can't tell which one is really
17  me.
18     Q      Let me back up to -- all right.  Let me back
19  up to six minutes and 23 seconds in.  All right.  So
20  is this Ms. Coach --
21     A      Yes.
22     Q      -- right here to the left with the mask on?
23     A      Yes.
24     Q      And then this is you --
25     A      Yes.

1    Q    -- right here?  And your head is facing

2  towards the camera; correct?

3    A    Yes.

4    Q    Okay.  And then this individual right here

5  is Boerger; is that correct?

6    A    That is correct.

7    Q    Okay.

8         (Whereupon, the video was played.)

9  BY MS. BURTON:

10   Q    Okay.  So I'm just going to pause right here

11  at six minutes and 33 seconds in just to make sure we

12  have everybody's identity correct.

13   A    Yes.

14   Q    So this is Coach here that is hanging back

15  away from you, Mr. Boerger and then Mr. Sindell;

16  right?

17   A    That is correct.

18   Q    Okay.  And then the person that is here

19  holding Mr. Sindell that is closest to the camera is

20  Boerger; is that correct?

21   A    That is correct.

22   Q    All right.  And then the one that is close

23  to the windows, that is you; right?

24   A    That is correct.

25   Q    Okay.

1          (Whereupon, the video was played.)

2     BY MS. BURTON:

3          Q    And it's six minutes and 37 seconds in and

4     we see someone walking in here up to the top left of

5     the screen.  Do you see that?

6          A    That is correct.

7          Q    Okay.  Do you recognize who that individual

8     is?

9          A    I can't, off the top of my head, remember

10    his name.  No, I can't remember his name off the top

11    of my head.

12         Q    Do you remember who it is, even though you

13    can't remember his name?

14         A    Deputy Curry maybe.  I believe it's Deputy

15    Curry looking by the individual that I have, the

16    visual.

17         Q    Now, is he another jailer?

18         A    Yes.

19         Q    Okay.  All right.

20              (Whereupon, the video was played.)

21    BY MS. BURTON:

22         Q    All right.  And now it's at six minutes and

23    49 seconds in.  Do you see someone walking in again?

24         A    Yes.

25         Q    All right.

1              (Whereupon, the video was played.)

2    BY MS. BURTON:

3        Q    All right.  And at six minutes, 54 seconds,

4    do you see another person walking in?

5        A    Yes.

6        Q    Do you -- at this point, can you recognize

7    either of those other two individuals?

8        A    The two at the moment walking in, no, ma'am.

9        Q    Okay.  So then let's make sure that we have

10   everybody who has already been identified in here

11   correct.  So the one here with the back to the camera,

12   is that you?

13       A    Yes.

14       Q    All right.  And then the head that's here in

15   the middle, is that Boerger?

16       A    Correct.

17       Q    All right.  And the one that is behind the

18   chairs, is that who you think is Curry?

19       A    Yes.

20       Q    All right.  And then here in the back close

21   to the windows, is that Coach?

22       A    Yes.

23       Q    Okay.

24            (Whereupon, the video was played.)

25   BY MS. BURTON:

1      Q    So pausing it at six minutes and 57 seconds

2  in, it looks like there's a gentleman here with a mask

3  on.  Can you identify who that is?

4      A    He was another deputy.  I can't remember his

5  name, though.

6      Q    Okay.  And then what about the individual

7  here that is right next to the desk?

8      A    That was Lieutenant Craig.

9      Q    All right.  Who is -- who is Lieutenant

10 Craig?

11     A    She is a the lieutenant of that shift, in

12 charge.

13          (Whereupon, the video was played.)

14 BY MS. BURTON:

15     Q    Okay.  At seven minutes and five seconds in,

16 what's happening with Mr. Sindell right now?

17     A    So what it appears to us, it looks like he

18 was having a seizure.  So we were trying to help

19 control him a little bit so he wouldn't hurt himself

20 or hit his head on something.  So we were kind of

21 trying to make space and make sure he didn't hurt

22 himself if he was having a seizure.

23     Q    Do you know what caused the seizure?

24     A    I do not.  To my recollection, no, ma'am, I

25 do not.

1              (Whereupon, the video was played.)

2    BY MS. BURTON:

3         Q    Okay.  So now we're at seven minutes and 30

4    seconds in.  And what is going on right now?

5         A    Apparently he is still having a seizure.

6         Q    Okay.  And then I see that somebody went

7    over to the desk and is behind the desk or sitting at

8    the desk.  Can you tell me who that is?

9         A    I believe that's Ms. Coach.

10        Q    Okay.  All right.  And who is behind her?

11        A    I can't see.  The time is in the way.

12        Q    Okay.

13        A    I can't tell.

14        Q    Is Mr. Sindell still in handcuffs?

15        A    I believe so.  I don't remember if he was or

16   not.

17        Q    Do you remember if you or any of your

18   colleagues attempted to take the handcuffs off of him

19   at this time while he was having a seizure?

20        A    I do not remember.  I don't believe so.  I

21   don't know.

22              (Whereupon, the video was played.)

23   BY MS. BURTON:

24        Q    Okay.  So we are at seven minutes and 40

25   seconds in and the individual who was just behind

1    Coach is now walking here.  Can you tell me what he is

2    doing?

3         A    I have no clue.  It looks like he's just

4    walking to possibly help or assist.

5         Q    Okay.  You don't see what he's doing with

6    his hands?

7         A    No, ma'am.

8              (Whereupon, the video was played.)

9    BY MS. BURTON:

10        Q    How about now?

11        A    I still really vaguely can't -- I can't see.

12        Q    I'm just going to back it up to seven

13   minutes and 34 seconds in and you can just let me know

14   there.

15        A    I still do not know exactly what he's doing.

16   Oh, he's putting gloves on.

17        Q    Do you know what Ms. Coach is doing at the

18   desk?

19        A    No, ma'am.  She could be trying to radio for

20   medical down there.  I don't know exactly what she was

21   doing.

22        Q    Okay.  Do you recall her saying that she was

23   calling for medical?

24        A    I don't remember.

25              (Whereupon, the video was played.)

**69**

1    BY MS. BURTON:

2        Q    Okay.  Do you see other individuals walking

3    into the pod now?

4        A    Yes, ma'am.

5        Q    Okay.  Once you're able to identify them,

6    let me know and I'll stop it.  Okay?

7        A    Okay.

8            (Whereupon, the video was played.)

9    BY MS. BURTON:

10        Q    I'm going to have to stop it here.

11        A    You can stop.  I believe the one close to

12    the desk is Deputy Ross.  But the other two, I still

13    don't remember which one that was.  No, the one next

14    to -- that one to the left of the one I don't know is

15    Coach.

16        Q    This one?

17        A    Yes.  That's Coach.

18        Q    Okay.  And then this one?

19        A    I still don't know his name.  It's another

20    deputy.

21        Q    So none of the people who were in the pod at

22    this point are medical?

23        A    No.

24        Q    Okay.

25            (Whereupon, the video was played.)

1  BY MS. BURTON:

2       Q    Okay.  So now we're at eight minutes and 18

3  seconds in.  What is Mr. Sindell doing?

4       A    He was still -- his legs were kicking

5  around.

6       Q    So is it your impression that he is still

7  having a seizure?

8            MR. WAYMIRE:  Object to form.

9            THE WITNESS:  I believe so.  I can't -- I'm

10       not a medical expert, so I can't really tell you

11       if he was or not.

12  BY MS. BURTON:

13       Q    Right.  I'm just asking from your point of

14  view, from your perspective.

15       A    From my point of view, possibly.

16            (Whereupon, the video was played.)

17  BY MS. BURTON:

18       Q    Okay.  So now we're at eight minutes and 25

19  seconds in.  Were you able to see where Mr. Sindell's

20  legs finally were still?

21       A    Yes.

22       Q    Okay.  At that time, did his body seem to be

23  calming down at all?

24       A    I believe so.  Yes, ma'am.

25       Q    Okay.  All right.  I don't think I need to

1  show anything else from this video as of this moment,

2  so I'm going to stop sharing my screen.

3          And you said that you did not have really

4  any encounters with Mr. Sindell prior to this; is that

5  correct?

6      A    Yes, ma'am.  I have not.

7      Q    So you have no personal knowledge of

8  Mr. Sindell or any medical conditions; is that right?

9      A    Yes, ma'am.  I don't.

10     Q    All right.  So you're not aware that he's

11 never had a seizure prior to this?

12     A    Correct.

13     Q    And it's your -- and to your knowledge, you

14 don't know what triggered that seizure?

15     A    No, ma'am.

16     Q    Did you have a body camera on at the time?

17     A    I don't recall.

18     Q    I mean, if I were to pull the video back up

19 and pull up a screen shot, would you be able to tell

20 me whether or not you see a body camera on there?

21     A    Sure.  Yes, ma'am.

22     Q    Okay.  Let me try one more time and then

23 hopefully I'm done with the video.

24          (Whereupon, the video was played.)

25 BY MS. BURTON:

1        Q    Okay.  So this is you right here; is that
2    correct?

3        A    Yes, ma'am.

4        Q    All right.  Are you able to see whether or
5    not you have a body camera?

6        A    I can't tell.  The body cameras are black
7    and the shirts are kind of like navy blue, so it's
8    kind of hard to tell.

9        Q    Okay.  Let's see if we can get you closer to
10   the camera.

11            (Whereupon, the video was played.)

12   BY MS. BURTON:

13       Q    How about right now?  Can you see if there's
14   a body camera?

15       A    There's something on -- do you see about
16   the -- if you're looking at the left shoulder -- I
17   don't know -- yeah, the left shoulder what we're
18   looking at, I can't really tell if that's it.  Because
19   me and Boerger both have it.  That could possibly be a
20   body cam.  I don't -- I honestly don't know.

21            (Whereupon, the video was played.)

22   BY MS. BURTON:

23       Q    It's a little bit closer.  Can you see what
24   it is now?

25       A    It looks like a body camera right there to

1    the left shoulder.

2        Q    All right.  Did you have a radio on you at

3    the time?

4        A    Yes, ma'am.

5        Q    Where would the radio have been?

6        A    It would have been on my -- if we're looking

7    at it, it would have been the right hip.

8        Q    The right hip.  So is this what your

9    radio -- or, where your radio would have been?

10        A    Yes.  Correct.

11        Q    Okay.  Okay.  I might have to pull one other

12    video.

13        A    Okay.

14        Q    I'm not sure if I'm going to be able to open

15    it.  Sorry.  I'm having a little bit of trouble

16    pulling it up.

17        A    That's all right, ma'am.

18        Q    Oh, here we go.  Okay.  Let's try this.

19            (Whereupon, the video was played.)

20    BY MS. BURTON:

21        Q    All right.  Can you see this?

22        A    Yes.

23            MS. BURTON:  Okay.  So I'll enter this as

24        plaintiff's exhibit two.

25            (Plaintiff's Exhibit 2 was marked for

74

1       identification.)

2              MS. BURTON:  And, Madam Court Reporter,

3       please remind me at the end of this deposition to

4       email this over to you.

5    BY MS. BURTON:

6       Q    I'm just going to play a couple of seconds

7    of it until we get to a point where I can ask you

8    questions about it.  Okay?

9       A    Okay.

10             (Whereupon, the video was played.)

11   BY MS. BURTON:

12      Q    All right.  So do you see this individual

13   right here?

14      A    Yes.

15      Q    Is that you?

16      A    Yes.  That's correct.

17      Q    Okay.  Do you recognize where you're

18   sitting?

19      A    Yes.

20      Q    Where are you?

21      A    I believe -- I mean, I don't 100 percent --

22   I believe I'm at an investigator's office.

23      Q    Is that an investigator whose last name

24   starts with an R?

25      A    Yes.

1      Q    Do you remember giving this interview?

2      A    Yes.

3      Q    Okay.

4           (Whereupon, the video was played.)

5    BY MS. BURTON:

6      Q    Okay.  Did you hear what you just told the

7    investigator?

8      A    Yes.

9      Q    When you said she called and said that there

10   was someone who refused to lock down, are you

11   referring to Ms. Coach?

12     A    Yes.

13     Q    Okay.

14          (Whereupon, the video was played.)

15   BY MS. BURTON:

16     Q    Okay.  Did you hear where you said where

17   Mr. Sindell's hands were?

18     A    As far as his -- what the situation I was

19   talking about as far as like he bowed up and his hands

20   were clenched?  Is that what you mean?

21     Q    Yeah.  You said -- did you just tell the

22   investigator that Mr. Sindell's hands were at his

23   stomach?

24     A    Yes.  But that was after -- that was after I

25   placed him on the ground.

76

1      Q    Okay.  Gotcha.  Thank you for clarifying

2  that.

3           (Whereupon, the video was played.)

4  BY MS. BURTON:

5      Q    Okay.  So when you were just talking to the

6  investigator about what happened after you handcuffed

7  Mr. Sindell and tried to get him to the chair and then

8  you called medical --

9      A    Correct.

10     Q    -- did you hear yourself tell the

11  investigator anything about Mr. Sindell having a

12  seizure or what you perceived to be a seizure?

13     A    Not yet.  No, ma'am.

14     Q    Okay.

15          (Whereupon, the video was played.)

16  BY MS. BURTON:

17     Q    Sorry.  Hold on.  I might have to go on

18  because the audio is cutting out.

19     A    All right.

20          (Whereupon, the video was played.)

21  BY MS. BURTON:

22     Q    All right.  So I'm going to pause it there

23  because I think it's going to have to buffer for a few

24  more minutes because the sound is cutting in and out.

25     A    Okay.

1      Q    So what you have just described to the

2  investigator in the video, can you kind of summarize

3  that here for the record?

4           MR. WAYMIRE:  I'm going to object.  The

5      video speaks for itself.  I don't understand

6      why -- well, you can ask him that, but you can

7      hear exactly what he said.

8           MS. BURTON:  Right.  You can hear exactly

9      what he said.  I'm just wanting his understanding

10      of what he just told the investigator just for

11      purposes of putting it on to the record for the

12      reporter to be able to take it down into the

13      deposition.

14           I mean, this is obviously going to be

15      attached into the deposition.  So, you know, the

16      video is going to control, but I'm just trying to

17      get him to summarize what he just stated to the

18      investigator.

19           THE WITNESS:  Okay.  That little segment

20      right there, he clenched his -- bowed up his

21      chest and clenched his fists.  And then once I

22      realized that he was doing that, then I wrapped

23      him around the waist and I took him to the ground

24      and went with him to the ground.

25  BY MS. BURTON:

1       Q    Okay.  Did you say that Mr. Boerger assisted

2    getting Mr. Sindell to the ground?

3       A    Yes.

4       Q    So when you say that he assisted Mr. Sindell

5    going to the ground, can you describe what you mean by

6    that?

7       A    Like, when he was falling to the ground, he

8    assisted his falling.

9       Q    So just to make sure that I understand this

10   correctly, do you mean that he was trying to break the

11   fall?

12      A    That is correct.

13      Q    Okay.  Do you recall whether Mr. Sindell's

14   head hit the ground?

15      A    To my acknowledgement, I believe his head

16   did not hit the ground.

17      Q    Okay.  Let's see if the audio will

18   cooperate.

19           (Whereupon, the video was played.)

20   BY MS. BURTON:

21      Q    All right.  I'm going to pause it right

22   there at six minutes and five seconds in.

23      A    Okay.

24      Q    Mr. Cleckner, do you remember how long after

25   the incident you gave this interview?

79

1        A     It had to be the same day I believe.

2        Q     The same day?  Is it fair to say that your

3    memory would have been better of the incident than it

4    is now, four years later?

5        A     Of course.

6        Q     And do you recall just telling the

7    investigator that Mr. Sindell looked unconscious once

8    he went to the ground?

9        A     Say again?

10       Q     Do you recall just telling the -- or, do you

11   recall telling the investigator -- or, hearing

12   yourself just tell the investigator that once

13   Mr. Sindell was to the ground and his arm was

14   underneath him that he seemed unconscious?

15       A     Yes.

16       Q     All right.

17             (Whereupon, the video was played.)

18   BY MS. BURTON:

19       Q     Okay.  So we're at seven minutes and 24

20   seconds in.  Did you hear the investigator ask you if

21   you had your body camera on?

22       A     Yes.

23       Q     And what was your answer to him?

24       A     No.  But he was asking about if -- about

25   other interactions if I had a body cam on; correct?

80

1  That's what you're asking me?

2      Q    Well, no.  I was just asking if -- I mean,

3  the lieutenant had just asked if you had your body

4  camera on and he didn't clarify either way.  So what

5  did you understand it to mean?

6      A    Say again?

7      Q    What did understand it to mean?

8      A    All I'm doing is going off the questions you

9  asked about did I have a body camera and I said no.

10     Q    I'm sorry.  Could you repeat that answer?

11 You were breaking up on my end pretty badly.

12     A    On the video, I said, no, I did not have a

13 body camera on me.

14     Q    Do you know if you provided any body camera

15 video with your responses to your -- or, to our

16 requests for discovery?

17     A    I don't believe so.  I don't remember.

18     Q    Do you know if you've ever reviewed any body

19 camera footage of the incident itself?

20     A    No, ma'am.  I don't think so.  I don't

21 remember.

22     Q    All right.  Had you ever had any other

23 physical encounters with any other inmates other than

24 Mr. Sindell prior to that incident?

25     A    Not before.  I don't believe so.  No, ma'am.

1      Q      What about after?

2      A      It could have been a couple here and there,

3  but I don't think anything, like, where I had to write

4  incidents or anything like that.  I don't think

5  anything serious --

6      Q      Did you --

7      A      -- to my acknowledgment.

8      Q      I'm sorry.  I did not mean to interrupt you.

9      A      No, you're fine.

10     Q      Did you write any reports up after the fact

11  of this particular incident?

12     A      Yes.  I believe we had to write a report for

13  this incident.

14     Q      Okay.  When you made that physical contact

15  with Mr. Sindell, do you recall what you were feeling

16  or thinking at the time?

17     A      In my mind, I was worrying about trying to

18  secure him for potentially him harming me or Boerger

19  and trying to secure him in the moment.

20     Q      Okay.  What -- can you describe the surface

21  of the flooring in the location of L pod where the

22  incident occurred?

23     A      I guess it would probably be concrete I

24  guess you could say.

25     Q      Concrete?

1       A       Yes.

2       Q       Okay.  So is it fair to characterize your

3   physical encounter with Mr. Sindell as you grabbing

4   him by the waist?

5       A       Say it one more time, ma'am.

6       Q       The way that you had made that -- the way

7   that you initiated the physical -- the physical

8   interaction with Mr. --

9               (Whereupon, there was an audio disruption.)

10  BY MS. BURTON:

11      Q       So sorry about that.  Can we take a break?

12      A       Yes.  Go ahead.

13              (Whereupon, a recess was taken from 11:52

14      a.m. until 11:58 a.m.)

15  BY MS. BURTON:

16      Q       I think before the interruption I was asking

17  about when you made physical contact with Mr. Sindell.

18  Is it fair to characterize that as you grabbing him

19  around the waist?

20      A       That is correct.

21      Q       Okay.  And did you pay attention to where

22  his head was going at all?

23      A       No, not in the moment, because I was worried

24  about trying to get him to the ground.

25      Q       Okay.  So you don't know where his head hit,

1   if at all then?  Is that fair to say?

2        A    Well, to my acknowledgment, Boerger was to

3   my side and he was assisting as I was taking him down.

4   Boerger was on the right side of me I believe helping

5   right before he fell to the ground with assisting his

6   head, if that makes sense, to my acknowledgment.

7        Q    All right.  So is it just that you were

8   assuming that he was assisting with his head or that's

9   what you were thinking in the moment?

10       A    That's what I was thinking in the moment.

11       Q    Okay.  But you didn't actually see where his

12  head landed; is that correct?

13       A    No, ma'am.  No, ma'am.  No, ma'am.

14       Q    All right.  Let me see.  And so y'all did

15  end up taking Mr. Sindell to medical to receive

16  medical treatment.  Do you know what the findings were

17  of his medical condition right after the incident?

18       A    I do not.  No, ma'am.  I don't.  I don't

19  remember.

20       Q    All right.  Did you have any -- well, did

21  you oversee Mr. Sindell's pod at all in the days

22  following the incident?

23       A    I don't believe so.  I mean, I know -- I

24  don't know when I saw him again, but we had that

25  conversation like we was talking about in the video

1    where I was trying to reach out to him and tell him I

2    was just doing my job and stuff like that, but he

3    didn't want to hear it.

4         Q    Okay.  And you don't remember if you were

5    over his pod that day or not?

6         A    On the day of the incident?

7         Q    No, whenever you tried to have that

8    conversation with him a few days later.

9         A    I could have been.  That sounds about right.

10   Because that's really the only way I would have come

11   in contact with him.

12        Q    So do you recall -- assuming for argument's

13   sake if you were over the pod that day, do you

14   remember if there would have been any sort of

15   indications from the medical staff as far as any

16   medical needs that he might have needed?

17        A    No, ma'am.

18        Q    Okay.  So I think we've already named you,

19   Coach, Boerger and Curry as those being involved in

20   the incident.  After seeing the video again, do you

21   recall any of the other officers' names or anybody

22   else that might have been involved with this incident?

23        A    I believe you had Deputy Larson I believe in

24   the video as well.

25        Q    Is that the one --

1          MR. WAYMIRE:  You said something about a

2     lieutenant earlier as well.

3          THE WITNESS:  Yes.  And Lieutenant Craig.

4     Correct.

5          MS. BURTON:  Thank you for that reminder.

6  BY MS. BURTON:

7     Q    And then the others, you just don't recall

8  what their names were; is that right?

9     A    Correct.  Correct.

10     Q    Do you know if you submitted a copy of the

11  report that you wrote on the incident pursuant to our

12  request for discovery?

13     A    I don't.  No, ma'am.  I don't remember.  I

14  don't know.

15          MR. WAYMIRE:  This is Jason.  I responded to

16     all the discovery.  So --

17          MS. BURTON:  Yeah.  And I'm going to

18     doublecheck.  If anything's missing, I'll contact

19     you.

20          MR. WAYMIRE:  Okay.

21  BY MS. BURTON:

22     Q    Do you know who else would have written any

23  incident reports?

24     A    Is this question pertaining to me?

25     Q    Yes.

1      A      I'm assuming the parties who are involved.
2   I mean, that's the only thing I could say about who
3   wrote an incident.
4      Q      Okay.  Do you think everyone who was
5   involved would have written an incident report?
6      A      Yes.
7      Q      Would it have been policy for them to do so?
8      A      Yes.  I believe so.
9      Q      Okay.  And just to go back earlier in your
10  testimony, I believe that you said that wearing a body
11  camera would have been policy if there would have been
12  anticipation of an incident; is that correct?  Does
13  that characterize your prior testimony correctly?
14     A      I don't 100-percent remember the policy
15  regulations on the body cams.
16     Q      Okay.  Did you anticipate that there would
17  be possibly an incident whenever Coach called for your
18  assistance?
19     A      No, ma'am.
20     Q      Okay.  Is that despite the fact that you
21  thought Mr. Sindell was noncompliant with Coach's
22  orders to lock down?
23     A      Right.  I didn't know what I would be
24  walking into.  I didn't know.
25     Q      Okay.  And then just to kind of make sure I

87

1    covered this -- I'm not sure that I did -- we

2    established that it was past lunchtime.  So do you

3    know of any other reason why L pod would have been

4    locked down that day?

5         A    No, ma'am.

6         Q    Okay.  I think I'm almost done.  So just

7    give me a few minutes.

8         A    No, you're fine.

9         Q    Is it required for the new deputies coming

10   in as jailers to take an oath of office?  Do you take

11   an oath of office as a jailer in Houston County?

12        A    Of course.  I believe so.

13        Q    Do you remember what your oath --

14        A    I just --

15        Q    I'm sorry.  Go ahead.

16        A    Say again?

17        Q    Do you remember what your oath of office

18   would have been?

19        A    I don't remember.

20        Q    Okay.  So would you be able to tell me

21   whether anything in this incident would have been

22   violative of that oath of office that you took?

23             MR. WAYMIRE:  Object to form.

24             THE WITNESS:  No, ma'am.  It wasn't.

25   BY MS. BURTON:

1      Q    It's fine.  You can still answer the

2    question.

3           MR. WAYMIRE:  He did.

4           THE WITNESS:  I just -- I can't give you an

5      answer.

6    BY MS. BURTON:

7      Q    Did you -- after the incident, did you

8    discuss the incident with anyone else?

9      A    No, ma'am.

10     Q    So you never discussed it with your

11   colleagues?

12     A    After the incident, no, ma'am.

13     Q    Okay.  Is it fair to assume that you had to

14   discuss it with the internal investigation detectives

15   or investigators?

16     A    Of course, yes.

17     Q    But other than those individuals, is there

18   anybody within the jail that you would have discussed

19   this with?

20     A    No, ma'am.

21     Q    Okay.  What about outside of the jail?

22     A    No, ma'am.

23     Q    In the four years since you had -- since

24   this incident has occurred, have you discussed it with

25   anyone, including your friends or family members?

1      A      No, ma'am.

2      Q      All right.  Do you have social media?

3      A      Yes.

4      Q      Did you discuss it on social media?

5      A      Negative.

6      Q      Do you recall what the outcome was of that

7   internal investigation?

8      A      I don't.

9      Q      Were you ever written up for it?

10      A      No, ma'am.

11      Q      Were you ever reprimanded formally or

12   informally?

13      A      No, ma'am.

14      Q      Do you know if anybody else was ever

15   disciplined in relation to the incident?

16      A      No, ma'am.

17      Q      Was Sindell disciplined because of the

18   incident?

19      A      I don't -- I don't -- I don't know.  I don't

20   believe so.

21      Q      All right.  And we've already discussed a

22   brief conversation that you had with Mr. Sindell after

23   the incident.  Have you had any other contact other

24   than that with Mr. Sindell since the incident?

25      A      No, ma'am.

1    Q    Okay.  I think I might have had a couple

2    questions.  Hold on.  Let me just doublecheck my notes

3    and make sure.  Would the investigator have been

4    George Runyon?

5    A    Yes.  There you go.  That sounds familiar.

6    Q    Okay.  And then in your response to

7    interrogatory number three where we asked for you to

8    fully describe the basis for each of your defenses

9    that you raised in the answer of our complaint, you

10   indicated that you relied upon the information from a

11   fellow officer.  Would that fellow officer have been

12   Coach?

13   A    Yes.

14   Q    What information was it from her that you

15   had relied on?

16   A    The information that was called over on the

17   radio.

18   Q    And what information would that have been?

19   A    I can't give you a 100-percent accurate

20   answer because I just don't remember.

21   Q    Okay.  Was the information essentially just

22   that she told an inmate to lock down and he was still

23   standing at the kiosk?

24   A    Yes.

25   Q    Okay.  All right.  And then you also said

1    that plaintiff was taken to the ground.  By taken to

2    the ground, do you mean that you had physically put

3    him on the ground?

4        A    Yes.

5        Q    Okay.  So we did request the identity of any

6    type of records, books, documents, anything like that,

7    that would essentially support your defenses to this.

8    I do think that your counsel indicated that we had

9    everything, but can you give me a list of what those

10   types of documents would be?

11           MR. WAYMIRE:  I'm going to object.  That

12        calls for legal conclusions about the elements of

13        a defense which he's not going to know.  But he

14        can tell you whatever documents he knows about

15        this incident.  Go ahead.

16           THE WITNESS:  The only documents that Jason

17        had provide me with was the evidence of the video

18        of the incident.

19   BY MS. BURTON:

20       Q    And what types of documents?

21       A    The videos we've seen we went over.

22       Q    Okay.  Anything other than the videos?

23       A    The videos, I believe the incident statement

24   I wrote.  That's about it to my acknowledgment.

25       Q    Do you know if Mr. Sindell ever had to be

1    transported outside of the jail in order to receive

2    any further medical treatment?

3         A    I don't believe so.

4         Q    Okay.  So then other than speaking with

5    Mr. Waymire -- because I don't want to know anything

6    that you've discussed with him -- what else did you do

7    in order to prepare for today's deposition?

8         A    Plenty of sleep, eat well, try to briefly go

9    over the video so I had better, you know, memory of

10   what happened that day.

11        Q    Okay.  Did you review any reports in

12   addition to that?

13        A    Mostly I went over the physical evidence of

14   the videos so I could actually pertain to my memory.

15        Q    Have you ever read or heard any statements

16   made by any of your colleagues regarding the incident?

17        A    No, ma'am.

18        Q    Okay.  And then other than the videos, have

19   you ever reviewed any other materials, not even just

20   for today's deposition preparation, but in general

21   have you reviewed any other materials regarding this

22   incident?

23        A    No, ma'am.

24        Q    Okay.  And is there anything else that you

25   can recall about the incident that we have not already

1  discussed?

2      A    No, ma'am.

3      Q    All right.  Is there anything else that you

4  would like to say about the incident?

5      A    No, ma'am.

6          MS. BURTON:  Okay.  That is all the

7      questions that I have.  Your attorney might have

8      some questions for you.

9          MR. WAYMIRE:  I don't have any questions.

10         (Whereupon, the deposition was concluded at

11     12:11 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

94

1                          DISCLOSURE

2   STATE OF GEORGIA           Deposition of Jacob Cleckner

3   COUNTY OF COBB             Date: June 24th, 2023

4              Pursuant to Article 10.B of the Rules and
    Regulations of the Board of Court Reporting of the
5   Judicial Council of Georgia, I make the following
    disclosure:

6
               I am a Georgia Certified Court Reporter.  I
7   am here as a representative of American Court
    Reporting Company, Inc.

8
               I am not disqualified for a relationship of
9   interest under provisions of O.C.G.A. 9-11-28(c).

10             American Court Reporting Company, Inc., was
    contacted by the offices of Jessica Burton, Esq., to
11  provide court reporting services for this deposition.

12             American Court Reporting Company, Inc., will
    not be taking this deposition under any contract that
13  is prohibited by O.C.G.A. 15-14-37(a) and (b).

14             American Court Reporting Company, Inc., has
    no exclusive contract to provide reporting services
15  with any party to the case, any counsel in the case,
    or any reporter or reporting agency from whom a
16  referral might have been made to cover this
    deposition.

17
               American Court Reporting Company, Inc., will
18  charge its usual and customary rates to all parties in
    the case, and a financial discount will not be given
19  to any party to this litigation.

20             This the 24th day of June, 2023.

21

22

23             _____
                BONNIE L. SMITH, RPR, CCR
24                    CCR-B-2432

25

95

1                    C E R T I F I C A T E

2    STATE OF GEORGIA)

3    COUNTY OF COBB)

4         I hereby certify that the foregoing transcript

5    was taken down, as stated in the caption, and the

6    proceedings were reduced to typewriting under my

7    direction and control.

8         I further certify that the transcript is a true

9    and correct record of the evidence given at the said

10   proceedings.

11        I further certify that I am neither a relative or

12   employee or attorney or counsel to any of the parties,

13   nor financially or otherwise interested in this

14   matter.

15        This the 24th day of June, 2023.

16

17

18

19

20

21

22

23   _____

24        BONNIE L. SMITH, RPR, CCR B-2432

25

1                       E R R A T A     S H E E T

2   In Re:  Adam Sindell v. Latonya Coach, et al
                United States District Court
3               File No. 5:22-cv-00365-TES

4   Deposition of Jacob Cleckner, taken on June 24th,
    2023.
5
    I have read the transcript of my deposition and find
6   that no changes are necessary _____.
                                        Jacob Cleckner
7   or

8   Having read the transcript of my deposition, I wish to
    make the following changes:  (Please state reason.)
9

10  Page _____,  Line _____:

11  Page _____,  Line _____:

12  Page _____,  Line _____:

13  Page _____,  Line _____:

14

15

16

17

18  _____

19        Jacob Cleckner

20

21

22

23

24

25

Case 5:22-cv-00365-CAR    Document 18    Filed 08/15/23    Page 98 of 113
ADAM SINDELL vs.                                                                JACOB CLECKNER
LATONYA COACH, et al.                                                              June 24, 2023

## A

**ability (1)**
  7:21
**able (13)**
  5:22;18:6;20:9;22:20;
  48:9,16;69:5;70:19;71:19;
  72:4;73:14;77:12;87:20
**academy (3)**
  20:16,19;21:11
**account (1)**
  49:15
**accurate (2)**
  13:8;90:19
**acknowledgement (3)**
  9:1;20:12;78:15
**acknowledging (1)**
  40:23
**acknowledgment (13)**
  21:21;22:12;27:1;30:25;
  32:9;37:19;38:6;39:19;
  41:13;81:7;83:2,6;91:24
**action (1)**
  41:14
**actions (1)**
  27:8
**actual (3)**
  20:10;28:9,13
**actually (8)**
  28:18;30:19;33:6;40:4;
  43:14;62:7;83:11;92:14
**Adam (3)**
  4:12,25;33:9
**add (1)**
  18:21
**addition (1)**
  92:12
**address (2)**
  9:3,4
**adult (1)**
  26:12
**advise (1)**
  7:3
**affect (1)**
  7:21
**afternoon (1)**
  46:20
**again (14)**
  10:4;41:9,22;50:12;

53:11;55:1,23;58:2;64:23;
79:9;80:6;83:24;84:20;
87:16
**against (6)**
  26:4,20;27:9;56:16,17;
  58:17
**age (2)**
  9:4;10:2
**aggression (1)**
  37:24
**aggressive (2)**
  30:16;37:9
**ago (3)**
  13:15;23:22;33:5
**agree (1)**
  5:4
**agreement (1)**
  5:24
**ahead (7)**
  4:10;19:16;51:21;57:15;
  82:12;87:15;91:15
**alcohol (5)**
  7:21;23:20,22,24;24:11
**alert (2)**
  35:22;37:10
**Alexander (1)**
  8:2
**A-L-E-X-A-N-D-E-R (1)**
  8:3
**aliases (1)**
  8:21
**allowed (2)**
  29:7;48:14
**Almost (3)**
  17:12;33:4;87:6
**along (1)**
  26:24
**always (2)**
  6:24;25:1
**anger (5)**
  25:4,12,12,18,20
**angle (1)**
  62:16
**anticipate (1)**
  86:16
**anticipation (1)**
  86:12
**anything's (1)**
  85:18
**apologies (3)**

**12:3,6;18:21**
**Apparently (1)**
  67:5
**appears (1)**
  66:17
**appreciate (3)**
  5:2;21:15;22:25
**approximately (1)**
  25:23
**area (2)**
  47:4,10
**areas (1)**
  31:1
**argument's (1)**
  84:12
**arm (2)**
  41:18;79:13
**arms (1)**
  58:24
**Army (4)**
  13:12,14,19,19
**around (10)**
  17:8;18:25;19:5;25:6;
  39:17;41:11;49:8;70:5;
  77:23;82:19
**arrest (2)**
  21:10;24:10
**arrested (1)**
  23:11
**arrived (1)**
  41:4
**assigned (7)**
  36:2,4,11;37:16;38:3;
  40:6,7
**assist (4)**
  34:23;41:5;61:24;68:4
**assistance (10)**
  31:9,15,17,24;38:9,12;
  39:18;40:15;41:3;86:18
**assistant (1)**
  61:21
**assisted (3)**
  78:1,4,8
**assisting (5)**
  60:13;61:25;83:3,5,8
**Assumably (1)**
  51:2
**assume (3)**
  7:10;10:1;88:13
**assuming (3)**

**83:8;84:12;86:1**
**ate (1)**
  34:21
**atmosphere (3)**
  24:23;25:6,14
**attached (1)**
  77:15
**attack (1)**
  41:13
**attacking (1)**
  56:21
**attempted (1)**
  67:18
**attend (2)**
  11:2;12:24
**attended (3)**
  11:9;12:10,14
**attention (1)**
  82:21
**attorney (1)**
  93:7
**audio (5)**
  53:5,8;76:18;78:17;82:9
**audios (1)**
  53:9
**authority (1)**
  38:22
**aware (2)**
  35:18;71:10
**away (2)**
  55:4;63:15

## B

**B2 (3)**
  17:2,17;18:23
**back (24)**
  8:12,15;19:12;24:16;
  28:24;30:7;32:3;41:25;
  42:2;50:9,25;52:9;55:1;
  57:24;58:4,5;62:18,18;
  63:14;65:11,20;68:12;
  71:18;86:9
**background (3)**
  7:25;10:19;37:2
**bad (1)**
  7:5
**badly (1)**
  80:11
**bankruptcy (1)**

24:14

**based (1)**
50:22

**basic (1)**
15:15

**basically (2)**
6:16;19:23

**basis (2)**
6:14;90:8

**bear (1)**
13:3

**became (1)**
20:25

**beginning (1)**
45:10

**behalf (2)**
4:11,13

**behind (6)**
43:2;53:24;65:17;67:7,
10,25

**beside (2)**
43:4,5

**besides (3)**
8:22;14:13,14

**best (2)**
22:3;36:24

**better (5)**
5:22;46:12;55:17;79:3;
92:9

**big (4)**
19:22;27:4,18;37:15

**bigger (1)**
27:7

**biggest (1)**
42:9

**bills (1)**
10:8

**bit (8)**
10:18;21:19;24:16;28:20;
51:16;66:19;72:23;73:15

**black (1)**
72:6

**blue (1)**
72:7

**body (33)**
6:23;29:23;30:4,7,10,18,
24;31:5,10;32:25;33:2;
42:7;44:17;54:25;55:5;
60:15;70:22;71:16,20;72:5,
6,14,20,25;79:21,25;80:3,9,

13,14,18;86:10,15

**Boerger (18)**
42:17,21;43:3;53:1,1,12;
54:16;61:20;63:5,15,20;
65:15;72:19;78:1;81:18;
83:2,4;84:19

**book (6)**
27:18,20,22;28:14,18,25

**books (1)**
91:6

**born (1)**
11:21

**both (4)**
21:4;56:13,18;72:19

**bottom (2)**
38:18;47:19

**bowed (2)**
75:19;77:20

**branch (1)**
13:11

**Bravo (1)**
17:2

**break (8)**
34:24;45:12,14,15;57:8,
10;78:10;82:11

**breakfast (1)**
34:21

**breaking (1)**
80:11

**brief (1)**
89:22

**briefing (6)**
35:9,10,12,15,24;38:3

**briefly (2)**
34:13;92:8

**bring (1)**
29:19

**bringing (1)**
24:10

**broken (1)**
48:10

**Brooks (1)**
18:3

**brought (1)**
24:1

**Brown (3)**
17:18;18:24;19:2

**browse (2)**
27:25;28:22

**buffer (1)**

76:23

**building (1)**
28:10

**bunch (1)**
25:7

**BURTON (82)**
4:8,11,11,16,23,25;5:4,
10,16,20;6:1,2;8:6,12,15,18,
19;21:3,8,9;45:18,20;46:3,
6;50:13,18;52:1,18;53:15;
54:3;55:3;56:6,24;57:9,14,
23;58:7;59:25;60:10;61:2,
17;63:9;64:2,21;65:2,25;
66:14;67:2,23;68:9;69:1,9;
70:1,12,17;71:25;72:12,22;
73:20,23;74:2,5,11;75:5,15;
76:4,16,21;77:8,25;78:20;
79:18;82:10,15;85:5,6,17,
21;87:25;88:6;91:19;93:6

## C

**call (8)**
27:4;38:9;39:17;40:14;
41:3;55:15;57:12,19

**called (9)**
4:19;14:19;16:2,4;27:6;
75:9;76:8;86:17;90:16

**calling (2)**
8:22;68:23

**calls (2)**
50:16;91:12

**calming (1)**
70:23

**cam (6)**
30:4,10,18;31:11;72:20;
79:25

**came (4)**
25:11;34:23;39:18;42:17

**camera (22)**
29:24;30:21,24;31:6;
32:25;33:3;63:2,19;65:11;
71:16,20;72:5,10,14,25;
79:21;80:4,9,13,14,19;
86:11

**cameras (1)**
72:6

**cams (2)**
30:7;86:15

**can (68)**

6:19;7:4,25;9:3,14;14:6;
18:22;21:19;22:3;23:2;
25:8;26:9;27:5,20;28:7;
29:16,19,20;30:13,18;
36:23;39:13;40:4,8;41:21,
23;43:24;46:3,7,11,17;
47:21;48:10,17;50:17;
54:12;55:23,23,24;57:5,7;
59:6,17;60:15;62:10,11;
65:6;66:3;67:8;68:1,13;
69:11;72:9,13,23;73:21;
74:7;77:2,6,6,8;78:5;81:20;
82:11;88:1;91:9,14;92:25

**capable (1)**
42:12

**carrying (1)**
14:5

**case (1)**
5:1

**cases (2)**
31:10;39:10

**cat (1)**
16:7

**categorizations (1)**
36:20

**caused (1)**
66:23

**cell (2)**
48:16;54:15

**Central (1)**
12:10

**certain (6)**
5:12;6:22;21:24;29:19;
48:13;51:22

**certificates (2)**
12:16;15:13

**certification (1)**
21:13

**certified (6)**
20:14,16,20,23,25;21:6

**chain (1)**
37:15

**chain-link (1)**
16:9

**chair (3)**
61:7,21;76:7

**chairs (2)**
62:1;65:18

**chance (1)**
42:13

ADAM SINDELL vs.
LATONYA COACH, et al.

JACOB CLECKNER
June 24, 2023

characterize (3)
82:2,18;86:13
charge (1)
66:12
charged (4)
23:13,17,19;24:2
charger (1)
57:5
chest (1)
77:21
children (2)
9:10;10:1
Christian (4)
15:1,3,5,7
church (1)
14:9
circling (2)
47:9;54:6
city (1)
10:14
Civil (2)
4:3;17:7
clarification (2)
21:15;31:23
clarify (4)
5:22;26:9;28:11;80:4
clarifying (1)
76:1
classes (1)
12:12
clear (2)
7:1,8
clearly (4)
43:18;44:1,16,18
CLECKNER (7)
4:18,24;5:18,24;8:3;9:12;
78:24
C-L-E-C-K-N-E-R (2)
8:4;9:13
clenched (3)
75:20;77:20,21
client (1)
33:9
close (4)
12:15;63:22;65:20;69:11
closed (7)
43:15,16;56:5,9,10,12,19
closer (4)
40:22;41:9;72:9,23
closest (2)

62:14;63:19
clubs (1)
14:9
clue (1)
68:3
CNC (4)
16:2,5,8,25
Coach (26)
36:13;39:18;40:11,14,18;
41:5,6;42:22,25;47:13;50:1,
9,24;52:5;62:20;63:14;
65:21;67:9;68:1,17;69:15,
17;75:11;84:19;86:17;
90:12
Coach's (2)
38:10;86:21
colleagues (9)
20:22;31:25;32:11,12;
33:20,25;67:18;88:11;
92:16
college (1)
12:8
combative (1)
21:23
comfortable (2)
8:12;45:11
coming (7)
25:12;42:15,20;49:15;
52:2;61:21;87:9
command (1)
37:16
commands (6)
39:6,10;41:7;43:20;44:3;
61:10
comments (1)
45:6
commissary (1)
48:1
company (2)
16:16;17:14
compensation (1)
16:18
complaint (1)
90:9
complaints (3)
26:4,20;27:1
complete (3)
11:6;22:2;28:19
completed (4)
10:20;15:14;21:13;27:23

concluded (1)
93:10
conclusions (1)
91:12
concrete (2)
81:23,25
condensed (3)
28:6,9,14
condition (1)
83:17
conditions (1)
71:8
Congratulations (3)
9:20,22;10:4
connection (1)
57:2
conscious (4)
60:5,19,22;61:12
construction (1)
17:6
contact (8)
30:2;44:9;59:1;81:14;
82:17;84:11;85:18;89:23
continuing (1)
45:21
contraband (1)
29:6
Contracting (6)
17:2,3,17,18;18:24;19:3
control (12)
21:24;22:1,2,8;39:5;
41:15;43:21;59:20,22,23;
66:19;77:16
conversation (4)
30:15;83:25;84:8;89:22
convicted (1)
24:5
cooperate (1)
78:18
copied (1)
5:13
copy (1)
85:10
core (1)
12:11
corner (3)
46:18;52:5,11
correctly (3)
39:23;78:10;86:13
counsel (3)

4:5;5:25;91:8
County (11)
18:19,23;19:8,11;24:22;
25:24;26:5;27:14;35:6;
37:3;87:11
couple (10)
12:11;22:5,13;23:22;
28:8;29:4,11;74:6;81:2;
90:1
course (12)
12:25;15:15;20:3,8;21:4,
5,7;24:19;48:15;79:5;
87:12;88:16
COURT (9)
4:5;6:11,19,22;8:17;23:5;
46:4,5;74:2
cover (2)
27:19;28:2
covered (3)
28:8,23;87:1
coworkers (2)
30:18;42:13
Craig (3)
66:8,10;85:3
crew (1)
17:22
crime (3)
23:13,17,19
critical (1)
30:12
CROSS-EXAMINATION (1)
4:22
current (3)
13:21;18:9,16
currently (3)
7:20;8:20;59:16
Curry (4)
64:14,15;65:18;84:19
cursor (2)
47:7,18
cutting (2)
76:18,24

**D**

date (5)
19:10;25:23;33:12,21;
46:22
dates (1)
13:7

Case 5:22-cv-00365-CAR    Document 18    Filed 08/15/23    Page 101 of 113
ADAM SINDELL vs.                                                    JACOB CLECKNER
LATONYA COACH, et al.                                                June 24, 2023

**day (18)**
14:1;28:1;34:7,8,18;35:1,
21;36:4,12;48:14,20;79:1,2;
84:5,6,13;87:4;92:10
**days (2)**
83:21;84:8
**decide (1)**
36:21
**defendants (1)**
4:14
**defense (2)**
37:2;91:13
**defenses (2)**
90:8;91:7
**demonstrate (1)**
41:23
**demonstrations (1)**
22:6
**depending (1)**
31:4
**depends (1)**
31:1
**depicting (1)**
46:25
**deposition (14)**
5:12,21,23;6:9,14;7:22;
23:5;45:10;74:3;77:13,15;
92:7,20;93:10
**deputies (5)**
38:21,22;49:18,19;87:9
**Deputy (6)**
64:14,14;66:4;69:12,20;
84:23
**describe (6)**
47:21;59:6;60:15;78:5;
81:20;90:8
**described (1)**
77:1
**desk (11)**
43:1,2;47:12;52:13,14;
66:7;67:7,7,8;68:18;69:12
**despite (1)**
86:20
**detail (1)**
28:14
**detectives (1)**
88:14
**different (4)**
31:21;37:3,4;49:7
**direction (2)**

**dirt (1)**
17:7
**disciplinary (2)**
27:8;37:14
**discipline (1)**
37:8
**disciplined (2)**
89:15,17
**discovery (3)**
80:16;85:12,16
**discuss (3)**
88:8,14;89:4
**discussed (8)**
5:11;15:12;88:10,18,24;
89:21;92:6;93:1
**discussion (1)**
8:10
**disruption (1)**
82:9
**documents (5)**
91:6,10,14,16,20
**done (4)**
12:20;14:5;71:23;87:6
**dorm (1)**
37:18
**doublecheck (2)**
85:18;90:2
**down (37)**
6:19;12:9;14:1,4;18:3,3;
38:20;39:11,13,14,22;40:4,
18,19,21,22;41:8,9,10;
43:10;44:3,9,13;48:18;49:1,
1;51:20;53:10;54:14;68:20;
70:23;75:10;77:12;83:3;
86:22;87:4;90:22
**drop (1)**
41:18
**dropped (5)**
11:18;41:12,16;42:6;
44:19
**drops (2)**
42:2;43:11
**drugs (1)**
7:21
**duly (1)**
4:20
**during (1)**
51:9
**duties (2)**

53:12;55:9

**E**

**E-5 (2)**
13:22,24
**Earlier (4)**
23:4;39:17;85:2;86:9
**early (3)**
13:6;19:13;26:1
**easily (1)**
6:19
**eat (5)**
40:3;48:25,25;49:8;92:8
**education (1)**
10:19
**educational (1)**
10:18
**eight (2)**
70:2,18
**either (5)**
31:14,25;41:13;65:7;80:4
**elements (1)**
91:12
**else (13)**
14:13;18:7;19:17;40:3;
42:7;71:1;84:22;85:22;
88:8;89:14;92:6,24;93:3
**else's (1)**
5:14
**email (1)**
74:4
**emails (1)**
47:25
**employees (1)**
49:2
**employment (1)**
15:23
**EMT (1)**
12:11
**encounter (4)**
33:8;34:8,11;82:3
**encounters (2)**
71:4;80:23
**end (5)**
24:21;25:25;74:3;80:11;
83:15
**enforcement (3)**
12:20,22;24:18
**engage (2)**

13:23;14:5

14:12;22:7
**enlisted (2)**
13:20;16:1
**enough (2)**
22:25;44:15
**entail (2)**
13:23;30:14
**enter (1)**
73:23
**entire (2)**
38:14;58:25
**entrenched (1)**
15:15
**environments (1)**
25:9
**equipment (1)**
17:21
**error (1)**
5:19
**especially (1)**
57:2
**essentially (3)**
33:25;90:21;91:7
**established (1)**
87:2
**even (5)**
40:23;51:15;52:10;64:12;
92:19
**everybody (2)**
25:14;65:10
**everybody's (2)**
48:17;63:12
**everyone (3)**
40:17;57:24;86:4
**evidence (3)**
30:6;91:17;92:13
**exact (2)**
49:16,24
**exactly (10)**
19:14;34:22;36:5,7;
53:19;60:20;68:15,20;77:7,
8
**examined (1)**
4:20
**example (1)**
30:13
**Excavation (1)**
18:10
**except (1)**
5:5

ADAM SINDELL vs.
LATONYA COACH, et al.

JACOB CLECKNER
June 24, 2023

**exciting (1)**
  10:5
**execution (1)**
  29:10
**exercising (2)**
  14:13;15:17
**exhibit (4)**
  45:25;46:1;73:24,25
**expecting (1)**
  9:21
**experience (2)**
  42:11;50:22
**expert (1)**
  70:10
**extent (1)**
  50:16
**extinguished (1)**
  23:15
**eyes (1)**
  41:12

## F

**face (2)**
  43:14,14
**facilities (1)**
  29:7
**facility (2)**
  20:8;26:2
**facing (2)**
  55:25;63:1
**fact (2)**
  81:10;86:20
**fair (12)**
  7:11;22:25;49:13;50:9;
  51:15;58:16,24;79:2;82:2,
  18;83:1;88:13
**fall (1)**
  78:11
**falling (2)**
  78:7,8
**false (2)**
  22:23;31:13
**familiar (2)**
  34:4;90:5
**family (3)**
  9:25;26:21;88:25
**far (30)**
  11:16;15:14;18:2,15;
  20:15,16;21:24;22:12,13;

  29:4,8,17;30:6;31:7;32:19;
  34:9;36:20;37:14;39:9;
  41:18;43:8,20;44:2,3;48:8,
  13;56:18;75:18,19;84:15
**fast (2)**
  55:13,15
**fault (1)**
  5:15
**February (1)**
  13:20
**Federal (1)**
  4:3
**feel (4)**
  25:5,8,20;55:10
**feeling (1)**
  81:15
**fell (1)**
  83:5
**fellow (4)**
  14:4;30:17;90:11,11
**felt (5)**
  18:6;25:11;44:25;45:2;
  59:4
**Fence (6)**
  16:2,5,9,9,10,25
**fences (1)**
  16:11
**few (4)**
  32:17;76:23;84:8;87:7
**fight (1)**
  39:12
**fighting (2)**
  39:7,9
**file (1)**
  24:13
**final (1)**
  22:17
**finally (1)**
  70:20
**find (4)**
  17:15;25:9;30:16;32:22
**findings (1)**
  83:16
**fine (4)**
  45:17;81:9;87:8;88:1
**finish (1)**
  6:17
**finished (2)**
  28:25;49:18
**first (6)**

**4:19;5:7;13:20;17:12;**
  36:14;44:8
**fist (1)**
  43:15
**fists (2)**
  43:16;77:21
**fit (1)**
  17:15
**Fitness (2)**
  14:19,19
**five (5)**
  15:20;46:15;54:4;66:15;
  78:22
**five-minute (1)**
  57:9
**fix (1)**
  46:11
**flagged (1)**
  33:25
**flooring (1)**
  81:21
**following (4)**
  4:2;32:9;35:22;83:22
**follows (1)**
  4:21
**foot (1)**
  15:16
**footage (1)**
  80:19
**force (9)**
  20:5;22:8,10,13,17,19,21;
  29:9,15
**foreman (1)**
  17:20
**forget (1)**
  45:9
**forgot (3)**
  12:25;18:21;19:23
**form (6)**
  5:5;27:17;50:11;60:23;
  70:8;87:23
**formally (1)**
  89:11
**Forsythe (1)**
  20:10
**forth (1)**
  20:1
**four (5)**
  15:20;33:4;59:12;79:4;
  88:23

**fourth (1)**
  9:23
**free (2)**
  27:25;28:22
**friend (1)**
  15:18
**friends (1)**
  88:25
**front (3)**
  47:4,4;52:20
**froze (1)**
  52:22
**full (2)**
  8:1;46:10
**fully (2)**
  6:25;90:8
**further (1)**
  92:2

## G

**gain (1)**
  41:15
**gained (1)**
  43:21
**gap (2)**
  56:10,12
**gave (1)**
  78:25
**GED (7)**
  10:21,22;11:6,11;15:25;
  16:1;24:1
**general (1)**
  92:20
**generally (3)**
  15:19;35:5,7
**gentleman (3)**
  52:24;53:2;66:2
**George (1)**
  90:4
**Georgia (3)**
  10:25;12:10;18:3
**gestured (1)**
  59:3
**girl (1)**
  9:24
**given (5)**
  6:9;23:5,6;41:7;50:8
**giving (3)**
  22:14;32:15;75:1

ADAM SINDELL vs.
LATONYA COACH, et al.

JACOB CLECKNER
June 24, 2023

**gloves (1)**
68:16
**Gold's (1)**
14:20
**Good (5)**
4:24;5:1;6:5;17:15;28:20
**Gotcha (4)**
15:7;37:13;57:20;76:1
**GPSTC (2)**
12:24;20:10
**grab (1)**
56:15
**grabbed (2)**
59:9,13
**grabbing (2)**
82:3,18
**grade (2)**
11:7,18
**great (1)**
9:11
**ground (22)**
6:14;22:1;41:15;59:10,
14;60:3;61:6;75:25;77:23,
24;78:2,5,7,14,16;79:8,13;
82:24;83:5;91:1,2,3
**Grove (1)**
11:4
**grow (1)**
18:6
**Guard (1)**
13:13
**guess (5)**
12:23;57:3;61:22;81:23,
24
**guy (2)**
25:8;27:7
**guys (11)**
9:17,19,25;10:10;15:18;
24:25;28:2;35:14;60:11;
61:3,5
**Gwinnett (1)**
37:3
**gym (5)**
14:15,17,20,23;15:18

## H

**hand (2)**
58:21,23
**handcuffed (1)**

76:6
**handcuffs (3)**
59:19;67:14,18
**hands (14)**
41:20;43:7,12;55:19,24;
56:2,5,19;58:20;59:2;68:6;
75:17,19,22
**Hang (1)**
59:11
**hanging (1)**
63:14
**happen (2)**
24:25;30:4
**happened (5)**
24:2;40:16;41:5;76:6;
92:10
**happening (2)**
61:19;66:16
**happens (1)**
38:5
**Hard (6)**
16:20,20,21;57:1;60:25;
72:8
**harm (1)**
30:17
**harming (1)**
81:18
**head (18)**
6:23,24;28:24;29:16,21;
36:7;63:1;64:9,11;65:14;
66:20;78:14,15;82:22,25;
83:6,8,12
**health (2)**
37:7,13
**hear (11)**
25:2;44:14;53:5;58:12;
75:6,16;76:10;77:7,8;
79:20;84:3
**heard (3)**
40:18;53:9;92:15
**hearing (1)**
79:11
**Hears (1)**
15:2
**heavy (3)**
17:7,21,22
**heightened (1)**
37:9
**held (1)**
8:10

**help (5)**
31:15,16;61:24;66:18;
68:4
**helping (1)**
83:4
**hey (2)**
40:21,22
**high (7)**
11:2,4,5,8,16;15:23;35:21
**higher (1)**
14:3
**highest (1)**
10:19
**himself (3)**
62:3;66:19,22
**hip (2)**
73:7,8
**hired (1)**
19:22
**hiring (1)**
19:20
**history (2)**
15:23;24:17
**hit (4)**
66:20;78:14,16;82:25
**hobbies (1)**
14:11
**hold (5)**
15:12;52:22;55:1;76:17;
90:2
**holding (1)**
63:19
**home (1)**
28:21
**honest (1)**
23:1
**honestly (1)**
72:20
**Hopefully (3)**
9:23;55:22;71:23
**Horton (2)**
15:2,2
**hour (1)**
45:9,13
**hours (1)**
51:14
**house (1)**
10:8
**housing (4)**
37:18,21;39:4,4

**Houston (10)**
18:19,23;19:8,11;24:21;
25:24;26:4;27:14;35:6;
87:11
**Huh-uh (1)**
25:22
**hurt (4)**
42:14;62:3;66:19,21
**hurting (1)**
39:6

## I

**identification (2)**
46:2;74:1
**identified (1)**
65:10
**identify (2)**
66:3;69:5
**identity (2)**
63:12;91:5
**impression (1)**
70:6
**incident (54)**
9:6;15:8;31:20;32:16,20,
25;33:3,7,7;34:9,12,20;
35:2,3;42:19;43:8,9,19,25;
46:22;78:25;79:3;80:19,24;
81:11,13,22;83:17,22;84:6,
20,22;85:11,23;86:3,5,12,
17;87:21;88:7,8,12,24;
89:15,18,23,24;91:15,18,
23;92:16,22,25;93:4
**incidents (2)**
35:17;81:4
**including (2)**
27:11;88:25
**indicate (2)**
38:11;51:3
**indicated (4)**
37:23;51:20;90:10;91:8
**indicating (1)**
54:9
**indication (1)**
40:24
**indications (1)**
84:15
**indicator (1)**
42:9
**indigent (1)**

Case 5:22-cv-00365-CAR    Document 18    Filed 08/15/23    Page 104 of 113
ADAM SINDELL vs.
LATONYA COACH, et al.
JACOB CLECKNER
June 24, 2023

37:2

**individual (10)**
22:3;47:22;54:6;62:14;
63:4;64:7,15;66:6;67:25;
74:12

**individuals (7)**
25:2;26:24;29:8;37:16;
65:7;69:2;88:17

**influence (1)**
7:20

**informal (3)**
26:7,8,9

**informally (1)**
89:12

**information (6)**
7:25;90:10,14,16,18,21

**initially (1)**
62:8

**initiated (1)**
82:7

**inmate (13)**
21:25;30:16;31:20;47:22;
48:7;51:19;53:13,16,18,20,
22;54:23;90:22

**inmates (14)**
25:12,15;26:21;27:3;
29:3,17,23;31:25;36:21,21;
40:2;48:20;49:17;80:23

**inside (1)**
43:2

**intake (1)**
37:12

**intensive (1)**
16:19

**interacted (2)**
29:23;33:21

**interacting (1)**
29:17

**interaction (1)**
82:8

**interactions (3)**
29:3;33:13;79:25

**interesting (1)**
25:10

**internal (3)**
26:3;88:14;89:7

**Internet (1)**
57:2

**interrogatory (2)**
5:13;90:7

**interrupt (1)**
81:8

**interruption (1)**
82:16

**interview (3)**
32:15;75:1;78:25

**into (27)**
10:18;14:7;15:22;16:1;
17:6,20;18:4;19:7;20:10;
22:7;25:25;28:14;29:7,13,
19;30:2;31:14;35:6;40:17;
42:20;49:15;59:12;61:22;
69:3;77:12,15;86:24

**introduce (2)**
4:6;45:24

**investigate (1)**
39:13

**investigation (2)**
88:14;89:7

**investigator (15)**
32:18,24;74:23;75:7,22;
76:6,11;77:2,10,18;79:7,11,
12,20;90:3

**investigators (1)**
88:15

**investigator's (2)**
32:21;74:22

**involved (7)**
15:10;22:4;29:5;84:19,
22;86:1,5

**irritation (2)**
25:19,21

**issues (1)**
37:7

---

**J**

**JACOB (3)**
4:18;5:24;8:2

**J-A-C-O-B (1)**
8:2

**Jail (26)**
18:20,23;20:1,6,8,10;
21:4,13;24:18,24;25:5,5,24;
26:5;27:14;29:7,19;31:1,4;
34:4;35:6;38:14,24;88:18,
21;92:1

**jailer (3)**
40:7;64:17;87:11

**jailers (5)**

20:13;38:22;49:19;50:5;
87:10

**jail-officer (2)**
12:23;13:2

**Jake (1)**
8:22

**Jason (8)**
4:9,13;5:4;8:8;45:18;
50:13;85:15;91:16

**Jessica (4)**
4:8,11,25;6:2

**job (8)**
13:23;16:2;18:1,9,16,18;
19:8;84:2

**jobs (3)**
18:19;26:12;27:9

**joined (1)**
13:18

**June (2)**
33:9;46:19

**juvenile (2)**
23:14;24:3

---

**K**

**keep (1)**
49:18

**kicking (1)**
70:4

**kind (34)**
6:13;8:23;14:6;18:7;
19:25;20:5;21:22;22:9;
25:2,6,8,13;27:7;31:8,8;
34:13,17,19;35:16,17;37:1;
41:12;45:2;47:3;55:11,13,
16;60:25;61:9;66:20;72:7,
8;77:2;86:25

**kiosk (8)**
40:25;48:2,4,6;51:20;
53:25;55:4;90:23

**knew (1)**
28:24

**knowledge (3)**
50:20;71:7,13

**knows (2)**
50:17;91:14

---

**L**

**labor (5)**

16:19,20,20,21,22

**landed (1)**
83:12

**language (5)**
6:23;42:8;44:17;54:25;
55:5

**lapse (1)**
44:7

**Larson (1)**
84:23

**last (5)**
8:3;15:1;19:18;49:4;
74:23

**later (3)**
42:20;79:4;84:8

**law (4)**
12:20,22,22;24:18

**lawsuit (2)**
15:8;23:9

**leadership (3)**
14:2,2;15:15

**learning (1)**
26:13

**least (2)**
5:12;15:20

**leave (4)**
11:13;16:15,21;35:24

**leaving (4)**
17:11;18:1;20:11;24:21

**left (16)**
11:6;15:23;16:25;17:17;
25:24;47:19;52:5,24;54:17,
19;62:22;64:4;69:14;72:16,
17;73:1

**left-hand (1)**
46:18

**legal (2)**
8:1;91:12

**legs (2)**
70:4,20

**level (6)**
10:19;11:5;22:10,18,19,
23

**Lieutenant (6)**
66:8,9,11;80:3;85:2,3

**life (2)**
14:8;26:12

**liked (1)**
25:2

**Lima (3)**

36:16;38:9,19

**list (1)**
  91:9
**listening (1)**
  39:5
**little (14)**
  6:13;10:18;13:7;21:19;
  24:16;37:1;40:21;44:4;
  51:15;55:16;66:19;72:23;
  73:15;77:19
**live (2)**
  9:3;10:15
**lives (1)**
  15:10
**located (6)**
  31:1;42:25;43:3;54:15;
  55:19;62:11
**location (4)**
  18:2;31:4;47:2;81:21
**locations (1)**
  31:5
**lock (15)**
  39:14;40:19,21,22;41:8,9,
  10;43:10;44:8;49:1,1;
  54:14;75:10;86:22;90:22
**lockdown (6)**
  38:13,14,23;39:2;40:1;
  48:9
**locked (9)**
  38:20;39:11,13;40:4,18;
  44:13;48:18;53:9;87:4
**locking (1)**
  39:22
**long (16)**
  9:17;12:13,25;16:13;
  17:9,23;18:14;23:21;24:7,
  17;35:11;49:4,17,21;50:5;
  78:24
**look (8)**
  19:7,12;27:22;28:1,3;
  45:24;46:9;60:22
**looked (2)**
  41:11;79:7
**looking (6)**
  18:4;47:22;64:15;72:16,
  18;73:6
**looks (5)**
  54:9;66:2,17;68:3;72:25
**lose (1)**
  39:7

**lot (21)**
  15:10;16:17;17:21;18:3,
  5;24:24;25:11,16;26:11,23,
  24,25;27:19;28:8,23;30:20,
  25;31:21;37:2,4;39:14
**loud (1)**
  44:15
**lovely (1)**
  9:25
**lunch (20)**
  34:24;40:3,5,8,12;48:21,
  23;49:4,8,18,20,25;50:2,6,
  25;51:8,9,11,13,16
**lunchtime (6)**
  38:7,19;39:17,21;49:11;
  87:2

## M

**ma'am (102)**
  6:8,10,12;7:12,15,19,23;
  8:22;9:1;10:3,3;19:19;23:7,
  10,12;24:12,15;25:22;
  26:17,22;27:10,10,12;32:5,
  5,13;33:1,4,5,11,15,17,19;
  34:2,6;35:4,23,23;36:9,9,
  10,18;38:1,25;39:19,24,24;
  40:10,13;41:2;42:24;43:24;
  45:7;47:17;50:4;52:23;
  55:17;58:14,23;60:8,14;
  61:13,15;65:8;66:24;68:7,
  19;69:4;70:24;71:6,9,15,21;
  72:3;73:4,17;76:13;80:20,
  25;82:5;83:13,13,13,18;
  84:17;85:13;86:19;87:5,24;
  88:9,12,20,22;89:1,10,13,
  16,25;92:17,23;93:2,5
**Madam (2)**
  46:4;74:2
**maiden (1)**
  9:14
**mainly (2)**
  10:7;22:7
**maintain (1)**
  22:8
**major (2)**
  19:23,24
**makes (4)**
  22:3;29:10;30:12;83:6
**males (1)**

37:19

**management (1)**
  18:4
**mandatory (3)**
  30:23;31:3,12
**manner (1)**
  55:13
**manual (5)**
  28:4,7,15,17,18
**many (6)**
  20:8;22:14,16;29:14;
  41:7;42:15
**mark (4)**
  45:13;46:15;58:5;59:12
**marked (2)**
  46:1;73:25
**married (1)**
  9:17
**mask (2)**
  62:22;66:2
**match (1)**
  51:7
**materials (2)**
  92:19,21
**may (1)**
  22:16
**Maybe (19)**
  11:14;12:11,15;20:2;
  23:18;24:9,19;25:25;26:20;
  30:17,20,20;38:8;44:12;
  48:22,22;49:5,23;64:14
**McDonough (4)**
  10:16,17;14:18;16:3
**mean (37)**
  11:16;15:14;16:19;19:16;
  23:24;26:10,22,23;28:7;
  31:16,22,25;34:10,15,19;
  36:5;40:6;41:16;44:1,14;
  45:17;49:14;52:8;53:18;
  71:18;74:21;75:20;77:14;
  78:5,10;80:2,5,7;81:8;
  83:23;86:2;91:2
**media (2)**
  89:2,4
**medical (13)**
  42:19;68:20,23;69:22;
  70:10;71:8;76:8;83:15,16,
  17;84:15,16;92:2
**medications (2)**
  7:13,17

**member (1)**
  14:9
**members (2)**
  26:21;88:25
**memory (3)**
  79:3;92:9,14
**men (1)**
  25:7
**mental (2)**
  37:7,13
**mentioned (1)**
  39:21
**middle (2)**
  8:2;65:15
**might (10)**
  7:21;39:20,21;51:21;
  73:11;76:17;84:16,22;90:1;
  93:7
**military (5)**
  13:9;15:14;16:1,2;27:11
**mind (3)**
  57:4,7;81:17
**minimize (1)**
  22:4
**minute (1)**
  46:15
**minutes (28)**
  32:17;35:13;49:5,5,6,23,
  23;50:7;54:5;60:1;61:4,18;
  62:19;63:11;64:3,22;65:3;
  66:1,15;67:3,24;68:13;70:2,
  18;76:24;78:22;79:19;87:7
**missing (1)**
  85:18
**mistaken (4)**
  5:13;11:12;13:6;19:13
**mixed (2)**
  13:7;21:14
**mode (1)**
  61:22
**moderate (2)**
  55:17,18
**moment (9)**
  60:19,20,24;65:8;71:1;
  81:19;82:23;83:9,10
**months (4)**
  13:15;16:14;18:15;20:9
**more (17)**
  6:19;18:2;25:18;26:9;
  28:14;33:22;36:23;37:8,9,

24;55:22;62:4,9,10;71:22;
76:24;82:5
**morning (3)**
4:24;5:2;50:1
**most (4)**
28:5;30:2;31:10;39:10
**mostly (2)**
44:5;92:13
**move (1)**
57:1
**movement (2)**
31:8;56:20
**moves (1)**
55:4
**moving (1)**
17:7
**much (16)**
13:24;14:3;15:5;17:22;
20:6;22:2;28:2,8,17;32:8;
34:20;40:23;43:24;49:9;
58:25;62:1
**mute (3)**
57:14,15,18
**myself (1)**
15:6

## N

**name (19)**
4:24;6:2;8:1,2,3,23;9:11,
15;14:24;15:1;19:24;32:21;
36:14;64:10,10,13;66:5;
69:19;74:23
**named (1)**
84:18
**names (5)**
8:24;9:10;27:2;84:21;
85:8
**National (1)**
13:13
**navy (1)**
72:7
**NCO (1)**
15:16
**need (11)**
30:5,10,18;31:10;37:9;
40:21,22;45:12;50:1;57:14;
70:25
**needed (5)**
38:9,12;39:18;40:15;

84:16
**needing (1)**
31:19
**needs (7)**
14:5;31:9,15,16,24;
54:14;84:16
**Negative (3)**
12:18;14:10;89:5
**new (2)**
17:5;87:9
**newlyweds (1)**
9:19
**next (4)**
52:14;62:14;66:7;69:13
**nicknames (1)**
8:20
**nobody (1)**
10:1
**nodding (1)**
6:23
**non-compliance (1)**
22:15
**noncompliant (1)**
86:21
**none (1)**
69:21
**note (1)**
50:19
**notes (1)**
90:2
**notice (1)**
5:24
**November (2)**
9:18,18
**number (2)**
5:15;90:7

## O

**oath (7)**
6:7;23:6;87:10,11,13,17,
22
**Object (6)**
50:11;60:23;70:8;77:4;
87:23;91:11
**objecting (1)**
50:15
**objection (4)**
4:6,14,16;50:14
**objections (1)**

5:5
**obtain (2)**
10:22;12:16
**obtained (2)**
11:1;16:2
**obviously (2)**
23:1;77:14
**occurred (3)**
59:7;81:22;88:24
**o'clock (4)**
49:12,13;50:1;51:14
**off (13)**
8:6,10;9:2;29:16,21;36:6;
54:9;57:18;61:6;64:9,10;
67:18;80:8
**office (5)**
74:22;87:10,11,17,22
**officer (6)**
21:1,5,7;36:2;90:11,11
**officers' (1)**
84:21
**often (1)**
15:18
**old (3)**
11:25;15:3;23:16
**once (12)**
15:23;16:25;17:16;19:22;
27:22;28:19;55:16,23;69:5;
77:21;79:7,12
**one (32)**
5:12;17:12;20:11;23:9;
30:17;36:23;38:4;45:15,16,
18,25;52:4,22;55:22;59:11;
61:19;62:14,16;63:22;
65:11,17;69:11,13,13,14,14,
16,18;71:22;73:11;82:5;
84:25
**ones (1)**
29:4
**only (10)**
11:8;14:13;29:20;33:15;
48:10,13;50:19;84:10;86:2;
91:16
**open (2)**
18:5;73:14
**opportunity (1)**
45:14
**order (4)**
22:20;48:1;92:1,7
**orders (1)**

86:22
**organizations (1)**
14:9
**orientation (4)**
19:23,25;27:15;28:3
**others (1)**
85:7
**out (19)**
10:25;11:18;14:5,21,25;
16:2,3;17:6;20:11;32:23;
38:18;39:4;48:15,16;56:8;
62:2;76:18,24;84:1
**outcome (1)**
89:6
**outside (2)**
88:21;92:1
**over (35)**
6:4,18;9:4;10:1,2;13:13,
14;20:1;21:21;22:5,9;
27:20;28:20,21;34:13;
35:16,17;41:3;51:8,17;57:1,
1;59:18,20,21,23;62:13;
67:7;74:4;84:5,13;90:16;
91:21;92:9,13
**overall (2)**
20:6;22:7
**oversee (1)**
83:21
**own (2)**
10:10;40:12

## P

**pace (5)**
55:9,12,15,17,18
**paid (1)**
17:13
**palms (2)**
56:7,8
**paper (2)**
31:19,20
**part (1)**
32:3
**partaking (1)**
37:17
**particular (1)**
81:11
**parties (1)**
86:1
**partner (1)**

Case 5:22-cv-00365-CAR    Document 18    Filed 08/15/23    Page 107 of 113

ADAM SINDELL vs.                                                      JACOB CLECKNER
LATONYA COACH, et al.                                                  June 24, 2023

14:23

**parts (1)**
57:1

**party (1)**
23:8

**pass (3)**
14:1,2,4

**passing (1)**
33:16

**past (3)**
8:25;51:14;87:2

**pasted (1)**
5:14

**pause (3)**
63:10;76:22;78:21

**paused (2)**
59:7,17

**pausing (4)**
57:4,7;60:1;66:1

**pay (1)**
82:21

**peace (3)**
21:5,7;25:9

**peaceful (1)**
25:8

**people (12)**
14:12,24;37:5,7,8;39:5;
42:15;52:2,19,21;62:5;
69:21

**people's (1)**
15:10

**perceived (2)**
59:5;76:12

**percent (6)**
22:22;31:12;44:5,6;
48:23;74:21

**Perfect (3)**
5:10;8:5,18

**performing (1)**
16:23

**Periodically (1)**
27:24

**permission (1)**
40:25

**permitted (2)**
22:11,19

**person (4)**
40:6;42:18;63:18;65:4

**personal (3)**
14:8;50:20;71:7

**perspective (2)**
44:24;70:14

**pertain (1)**
92:14

**pertaining (1)**
85:24

**phone (1)**
52:22

**physical (11)**
22:21;44:9;56:15,17;
80:23;81:14;82:3,7,7,17;
92:13

**physically (2)**
59:1;91:2

**pick (1)**
30:21

**picking (1)**
60:11

**pipe (2)**
18:12,13

**place (2)**
22:1;25:1

**placed (3)**
59:9,14;75:25

**plaintiff (4)**
4:12,16,25;91:1

**plaintiff's (4)**
45:25;46:1;73:24,25

**plan (1)**
41:14

**plans (1)**
13:25

**Plateau (1)**
18:10

**play (6)**
30:7;51:21;53:11;55:21,
22;74:6

**played (37)**
51:25;52:17;53:14;54:2;
55:2;56:4,23;58:6;59:24;
60:9;61:1,16;63:8;64:1,20;
65:1,24;66:13;67:1,22;68:8,
25;69:8,25;70:16;71:24;
72:11,21;73:19;74:10;75:4,
14;76:3,15,20;78:19;79:17

**playing (1)**
53:6

**please (4)**
4:5;31:23;50:19;74:3

**Plenty (1)**

92:8

**pm (2)**
57:22;93:11

**pod (62)**
31:7;33:16;34:22,23;
35:17;36:1,3,5,7,8,11,15,17,
20,22;37:12,14,14,20,21,24,
24;38:3,4,8,9,10,19,20,23;
39:2,4,11,12,14;40:1,7,7,19;
41:4;42:16,17,20,22;43:2;
44:13;47:4,5;48:4;49:7,8,
12,12;52:6;62:5;69:3,21;
81:21;83:21;84:5,13;87:3

**pods (11)**
26:23;31:14;37:3,5,6,8,8,
15;38:16;40:17;49:15

**point (17)**
5:21;18:18;38:7,19;
45:12;51:22;54:13,20;
56:14;60:6;61:5,12;65:6;
69:22;70:13,15;74:7

**pointing (2)**
47:3;54:15

**police (5)**
20:16,19;21:1,10;27:23

**policies (6)**
20:1;27:15,16;29:2,24;
32:12

**policy (9)**
20:6;27:20;29:22;30:1;
32:3,4;86:7,11,14

**portion (2)**
8:7;28:13

**positions (1)**
18:5

**possibly (8)**
13:7;50:12;56:21;59:4;
68:4;70:15;72:19;86:17

**POST (7)**
20:13,15,20,23,25;21:4,6

**potentially (3)**
31:25;39:3;81:18

**powers (1)**
21:10

**preliminary (1)**
6:3

**preparation (1)**
92:20

**prepare (1)**
92:7

**prescription (1)**
7:16

**pretty (20)**
13:24;14:3;15:5;17:22;
20:5;22:1;28:8;32:8;34:20,
23;40:23;43:21,23,24;44:1,
18;49:9;58:25;62:1;80:11

**prior (13)**
11:2;18:19;33:12,13,21;
34:12;35:2,18;42:11;71:4,
11;80:24;86:13

**probably (5)**
28:7;33:23;44:12;46:10;
81:23

**probation (2)**
24:4,8

**problem (2)**
5:3,3

**Procedure (1)**
4:4

**procedures (5)**
27:16,17,21;29:20;32:10

**proceedings (1)**
4:2

**process (2)**
19:20;62:3

**provide (2)**
9:2;91:17

**provided (1)**
80:14

**pull (4)**
45:23;71:18,19;73:11

**pulling (1)**
73:16

**punch (2)**
41:19;59:4

**purposes (1)**
77:11

**pursuant (2)**
4:3;85:11

**put (11)**
19:17;24:4;27:17;29:13;
35:21;36:21;38:22;39:2;
59:19,19;91:2

**putting (3)**
16:11;68:16;77:11

**pyramid (1)**
22:10

## Q

**quite (1)**
9:25

## R

**radio (7)**
41:3;68:19;73:2,5,9,9;
90:17
**raise (3)**
58:20,21,23
**raised (1)**
90:9
**rank (1)**
13:21
**ranking (1)**
14:3
**rather (1)**
5:19
**reach (1)**
84:1
**read (5)**
5:9;28:19,20,21;92:15
**real (1)**
25:1
**realized (2)**
61:23;77:22
**really (27)**
7:5;12:12;14:4;15:9,9;
18:5;25:3;26:25;27:5;
29:15,16;30:25;31:2;32:23;
37:15,16,17,17;42:9;60:16;
62:15,16;68:11;70:10;71:3;
72:18;84:10
**reason (7)**
7:8;17:11,25;23:25;
39:21,25;87:3
**reasons (3)**
37:4;39:1,15
**recall (37)**
12:13;13:18;19:15,20;
22:18;25:23;26:3,19;31:2;
32:4,6,15;33:2;35:20;36:5,
11;40:24;42:5,8,15;43:7,25;
44:25;60:8,20;68:22;71:17;
78:13;79:6,10,11;81:15;
84:12,21;85:7;89:6;92:25
**receive (2)**

83:15;92:1
**recess (2)**
57:21;82:13
**recognize (8)**
46:21,24;47:10;52:20;
53:16;64:7;65:6;74:17
**recollection (1)**
66:24
**record (7)**
8:7,11,13,16;9:2;77:3,11
**recording (1)**
32:19
**records (1)**
91:6
**recreation (1)**
48:16
**redirection (1)**
26:15
**referring (2)**
33:8;75:11
**refers (1)**
8:23
**refusal (1)**
38:13
**refused (3)**
41:9,10;75:10
**refusing (2)**
39:9;41:8
**regarding (5)**
15:8;29:2;32:16;92:16,21
**regular (2)**
37:18,21
**regularly (2)**
14:12,22
**regulations (1)**
86:15
**related (2)**
12:21,22
**relation (2)**
51:11;89:15
**relations (1)**
33:24
**relatively (1)**
55:9
**released (1)**
38:8
**relied (2)**
90:10,15
**relieve (1)**
36:2

**relieved (1)**
40:9
**religion (1)**
15:1
**rely (1)**
5:19
**remain (1)**
58:24
**remember (59)**
19:10;22:22;23:21;24:7;
29:17,20,22;32:8,12,23,24;
33:1,5;34:17,19,22,24,25;
35:1;36:3,6,13,15;38:16,17;
39:15;40:13;43:18,21;44:4,
7,16;45:3;48:23;58:10,15;
64:9,10,12,13;66:4;67:15,
17,20;68:24;69:13;75:1;
78:24;80:17,21;83:19;84:4,
14;85:13;86:14;87:13,17,
19;90:20
**remind (1)**
74:3
**reminder (1)**
85:5
**remote (1)**
4:14
**remotely (1)**
4:7
**rent (2)**
10:10,11
**repeat (2)**
36:23;80:10
**rephrase (2)**
7:4,9
**report (3)**
81:12;85:11;86:5
**REPORTER (8)**
4:5;6:19,22;8:17;46:4,5;
74:2;77:12
**reports (3)**
81:10;85:23;92:11
**represent (2)**
4:25;6:2
**reprimand (2)**
26:7,8
**reprimanded (1)**
89:11
**request (3)**
6:21;85:12;91:5
**requests (1)**

80:16
**require (1)**
31:5
**required (1)**
87:9
**requirements (2)**
20:5;21:24
**reserve (3)**
5:5,8;13:12
**Reserves (2)**
13:13,19
**respond (1)**
7:10
**responded (1)**
85:15
**response (5)**
5:18;6:16,18;28:12;90:6
**responses (2)**
6:21;80:15
**responsible (1)**
10:7
**responsiveness (1)**
5:6
**rest (2)**
38:23;42:5
**restrain (1)**
59:19
**restricted (1)**
48:7
**restrictions (1)**
48:12
**resume (1)**
19:12
**review (1)**
92:11
**reviewed (3)**
80:18;92:19,21
**revolves (1)**
25:6
**rewind (2)**
18:22;58:4
**right (147)**
5:9,16;6:20;7:2,12;9:14,
23,23;10:17;12:5,7,13;
14:21;15:22;16:15,24;
17:25;19:7;21:12,15;23:3,4,
16;24:13;27:13;33:6;34:11,
12,15;37:13,25;38:1,1;39:1,
16,18;40:8,19;41:24,25;
43:9,13;44:16,23;45:8;46:3,

14,14,24,25;47:9,12,15,18,
21;48:4;49:9,22;50:3,19,21;
51:19;52:3,12,14,16,19,24;
53:3;54:4,5,6,16,20;57:2,3;
58:1,3;59:7,7,11,16,17;
60:11,12,15;61:3,19;62:13,
14,18,19,22;63:1,4,10,16,
22,23;64:19,22,25;65:3,14,
17,20;66:7,9,16;67:4,10;
70:13,25;71:8,10;72:1,4,13,
25;73:2,7,8,17,21;74:12,13;
76:19,22;77:8,20;78:21,21;
79:16;80:22;83:4,5,7,14,17,
20;84:9;85:8;86:23;89:2,
21;90:25;93:3

**risk (1)**
22:4

**Riverdale (1)**
10:25

**Robins (1)**
12:10

**roll (1)**
59:18

**room (7)**
35:9,10,12,15,25;38:3;
51:16

**Ross (1)**
69:12

**rotate (1)**
40:4

**rotating (1)**
49:3

**rotation (2)**
38:17;49:2

**rotations (1)**
48:21

**roughly (1)**
19:10

**Rules (3)**
4:3;6:14;20:6

**runs (1)**
21:4

**Runyon (1)**
90:4

**S**

**sake (1)**
84:13

**same (9)**

8:23;11:14;17:12,21;
49:8,10;57:1;79:1,2

**Saturday (1)**
5:2

**saw (2)**
43:15;83:24

**saying (11)**
28:13;40:23;42:6;43:11;
49:19;53:8;58:8,11,16;
60:7;68:22

**scenario (1)**
34:14

**schedule (3)**
48:24;49:10;51:16

**school (14)**
11:2,4,5,8,13,16;12:14,
23;13:2;15:24;20:10;21:13;
24:1,11

**schooling (1)**
12:20

**schools (1)**
12:8

**scope (1)**
13:25

**screen (13)**
46:3,8,11;47:19,23,23,24;
52:25;54:19;58:1;64:5;
71:2,19

**second (8)**
13:4;16:24;46:15;52:22;
57:4,7;59:11;61:19

**seconds (21)**
44:12;51:4;54:5;59:12;
60:2;61:4;62:19;63:11;
64:3,23;65:3;66:1,15;67:4,
25;68:13;70:3,19;74:6;
78:22;79:20

**secure (2)**
81:18,19

**seeing (2)**
43:7;84:20

**seem (1)**
70:22

**seemed (2)**
55:8;79:14

**segment (1)**
77:19

**seizure (13)**
61:22,24;62:2;66:18,22,
23;67:5,19;70:7;71:11,14;

76:12,12

**senior (1)**
33:22

**Sense (7)**
16:8;22:3;28:6;29:11;
30:12;42:2;83:6

**S-E-N-S-E (1)**
16:6

**separate (1)**
38:23

**sergeant (3)**
13:22,24;15:16

**serious (1)**
81:5

**serve (1)**
13:9

**service (1)**
13:16

**set (1)**
37:6

**seven (6)**
61:18;66:15;67:3,24;
68:12;79:19

**shaking (1)**
6:24

**share (2)**
46:3;58:1

**sharing (1)**
71:2

**shift (2)**
35:18;66:11

**shirts (1)**
72:7

**shoot (2)**
18:21;47:25

**shot (1)**
71:19

**shoulder (12)**
41:12,17,18;42:1,7;
43:11;44:20;56:20;59:3;
72:16,17;73:1

**show (1)**
71:1

**side (7)**
54:10,19;55:20;58:25;
59:2;83:3,4

**sign (1)**
5:9

**significant (1)**
12:12

**simple (1)**
29:4

**Sindell (37)**
4:12;5:1;6:3;33:9,13;
40:19,25;53:23,24;54:23;
56:11;58:8;60:2,12;63:15,
19;66:16;67:14;70:3;71:4,
8;76:7,11;78:2,4;79:7,13;
80:24;81:15;82:3,17;83:15;
86:21;89:17,22,24;91:25

**Sindell's (8)**
36:8;38:4;43:7;70:19;
75:17,22;78:13;83:21

**sit (3)**
43:2;61:7,20

**sitting (6)**
43:1;52:6,13,13;67:7;
74:18

**situated (1)**
53:24

**situation (5)**
24:25;30:3,9;35:20;75:18

**situations (1)**
35:18

**six (12)**
13:12;16:14;18:15;60:1;
61:4;62:19;63:11;64:3,22;
65:3;66:1;78:22

**six-minute (1)**
59:12

**skills (2)**
17:13,14

**sleep (1)**
92:8

**small (1)**
20:11

**smaller (1)**
17:14

**smooth (1)**
26:25

**social (2)**
89:2,4

**soldier (1)**
15:16

**soldiers (2)**
13:25;14:4

**somebody (4)**
5:14;8:22;31:24;67:6

**someone (6)**
21:22;31:15,16;64:4,23;

Case 5:22-cv-00365-CAR    Document 18    Filed 08/15/23    Page 110 of 113
ADAM SINDELL vs.
LATONYA COACH, et al.

JACOB CLECKNER
June 24, 2023

75:10
**sometime (1)**
50:2
**Sometimes (7)**
7:5;26:14;28:21,21;
30:20;37:5;38:17
**somewhat (1)**
61:22
**somewhere (1)**
18:7
**sorry (18)**
4:9;12:2;16:8;19:16;21:2,
3;30:8;36:24;39:7;46:21;
56:25;57:6;73:15;76:17;
80:10;81:8;82:11;87:15
**sort (3)**
27:17;56:15;84:14
**sound (1)**
76:24
**Sounds (3)**
6:5;84:9;90:5
**south (1)**
18:4
**space (1)**
66:21
**speak (2)**
21:2;58:12
**speaking (2)**
35:5;92:4
**speaks (1)**
77:5
**specifically (1)**
37:6
**specifics (1)**
14:2
**speculation (1)**
50:16
**spent (3)**
24:7,18;26:1
**spoke (2)**
33:18,23
**spot (1)**
57:2
**staff (3)**
25:15;40:4;84:15
**stamp (1)**
51:4
**standing (2)**
41:24;90:23
**start (5)**

7:24;35:6;49:2,25;52:9
**started (7)**
6:4;17:5,5;19:2,11;32:22;
52:10
**starts (1)**
74:24
**state (1)**
4:6
**stated (2)**
59:13;77:17
**statement (1)**
91:23
**statements (3)**
23:6;32:20;92:15
**stating (1)**
40:15
**station (1)**
10:24
**stay (3)**
49:9;57:12,19
**stayed (1)**
12:9
**step (3)**
22:17,19;41:25
**still (25)**
9:19;12:2;13:10;24:3;
34:19;42:22;43:1,24;52:10;
53:24;56:5,9;60:2;61:11;
67:5,14;68:11,15;69:12,19;
70:4,6,20;88:1;90:22
**Stockbridge (1)**
14:18
**stomach (1)**
75:23
**stop (7)**
51:22;55:1,23;69:6,10,
11;71:2
**stopped (1)**
54:4
**story (1)**
25:3
**strenuous (2)**
16:17,19
**structure (1)**
22:10
**stuff (23)**
6:3;15:11;17:8;22:6;25:3,
4,16;26:13;27:19,21,25;
29:6,15;30:19,20,21;31:9;
34:21;35:19;37:12;39:10;

40:9;84:2
**submitted (1)**
85:10
**sudden (1)**
41:25
**summarize (2)**
77:2,17
**supervised (1)**
17:22
**supervisor (2)**
18:12,13
**supervisors (1)**
32:16
**support (1)**
91:7
**supposed (3)**
38:20;46:9;48:18
**sure (16)**
7:1;21:14;28:12;34:15,
24;45:11;62:1;63:11;65:9;
66:21;71:21;73:14;78:9;
86:25;87:1;90:3
**surface (1)**
81:20
**swearing (1)**
4:15
**switch (1)**
13:14
**switched (1)**
13:13
**Swole (2)**
27:4,5
**sworn (2)**
4:7,20
**system (1)**
24:24

**T**

**tablet (1)**
47:25
**talk (4)**
25:2;32:17,19;33:6
**talked (1)**
15:7
**talking (10)**
6:18;9:5,6,7;20:15;29:8;
44:22;75:19;76:5;83:25
**taser (1)**
20:5

**tasks (1)**
14:3
**Tech (1)**
12:10
**technical (1)**
12:7
**telling (7)**
40:18;43:10;54:12,14;
79:6,10,11
**terminology (1)**
21:6
**testified (4)**
4:20;6:11;23:5;39:16
**testimony (2)**
86:10,13
**testing (1)**
10:24
**testosterone (1)**
25:7
**texts (1)**
48:1
**thinking (5)**
12:1;56:20;81:16;83:9,10
**third (1)**
42:18
**Thirty (1)**
49:5
**though (2)**
64:12;66:5
**thought (7)**
12:3;16:8;30:3,9,11;42:6;
86:21
**threat (3)**
55:10;56:17;58:17
**threatening (1)**
45:5
**threats (1)**
56:16
**three (12)**
5:15;9:9;13:15;43:13;
44:12;52:2,3;62:7,9,9,10;
90:7
**throw (3)**
42:1,1;59:4
**tier (2)**
38:18,18
**Tiffani (1)**
9:12
**T-I-F-F-A-N-I (1)**
9:12

**timeframe (4)**
50:8,24;51:7,9
**times (8)**
15:20;26:11,25;37:4;
39:14;43:13;48:6,13
**today (2)**
7:14,22
**today's (2)**
92:7,20
**together (2)**
9:10;25:14
**told (10)**
10:14;40:20;41:8,10;
43:13;44:8,12;75:6;77:10;
90:22
**took (5)**
25:20;41:15;44:8;77:23;
87:22
**top (9)**
29:16,21;36:6;38:18;
46:18;52:5;64:4,9,10
**total (2)**
24:18,19
**towards (11)**
44:19,22;47:3;53:13,13;
55:7,9,13;56:19;59:3;63:2
**towel (1)**
31:19
**trade (1)**
17:5
**training (11)**
12:20;20:4,7;21:11,19,
20;27:23;28:3,9,13,19
**transcribe (1)**
6:22
**transcript (1)**
6:25
**transition (1)**
18:7
**transitioned (1)**
17:20
**transported (1)**
92:1
**traveling (1)**
18:3
**trays (2)**
48:24;49:15
**treatment (2)**
83:16;92:2
**tried (2)**

76:7;84:7
**triggered (1)**
71:14
**trouble (2)**
29:6;73:15
**try (8)**
15:19,20;22:2;45:23;
61:20;71:22;73:18;92:8
**trying (19)**
14:7;21:14;29:12;36:24;
56:25;58:12;59:18;60:16;
61:6,24;66:18,21;68:19;
77:16;78:10;81:17,19;
82:24;84:1
**turn (1)**
57:18
**turned (2)**
41:11;44:19
**turning (1)**
44:21
**TW (3)**
17:18;18:23;19:2
**Twenty-seven (1)**
15:4
**two (13)**
9:18;17:24;20:11;24:9;
51:14;52:19;53:9,9;62:4;
65:7,8;69:12;73:24
**two-week (2)**
20:3,7
**type (9)**
12:19;22:21;25:5,9;
29:15;31:7;56:16;58:17;
91:6
**types (5)**
12:19;15:12;26:20;91:10,
20
**typing (1)**
46:17

**U**

**unconscious (2)**
79:7,14
**under (4)**
6:6;7:16,20;23:6
**underground (3)**
17:8;18:12,13
**underneath (1)**
79:14

**underpaid (1)**
16:23
**understood (2)**
7:11;39:20
**unhappy (1)**
25:1
**Union (1)**
11:4
**unless (3)**
12:23;39:11;45:16
**unruly (1)**
21:23
**up (38)**
13:7;14:2;16:11;18:4;
21:2,14;22:17;24:21;26:15;
30:21;34:14;41:9;43:14;
44:18;45:19,23;46:17;51:7;
56:7;59:3;60:11,13,16,18;
61:6;62:18,19;64:4;68:12;
71:18,19;73:16;75:19;
77:20;80:11;81:10;83:15;
89:9
**upon (1)**
90:10
**use (15)**
5:7;20:5;22:8,12,17,19,
20;29:9,15;30:5,10;48:7,9,
14,17
**used (5)**
8:24;14:20;17:6;22:16;
49:24
**use-of-force (2)**
21:19,20
**using (2)**
21:6;48:18
**usually (7)**
14:25;26:22;45:12;48:20,
24;49:19;50:5
**utilities (2)**
17:8,22
**utility (2)**
17:20;18:13

**V**

**vaguely (5)**
23:21;34:22;43:22,23;
68:11
**vary (1)**
14:6

**venturing (1)**
17:6
**verbal (15)**
6:21;22:14,14,16;26:14;
29:10,11,14;39:6,10;43:20;
44:2;56:17,18;58:17
**veterans (2)**
33:23;37:6
**video (59)**
45:23;46:14,25;51:4,21,
25;52:10,17;53:14;54:2;
55:2;56:4,23;57:19;58:6;
59:7,24;60:9;61:1,16;63:8;
64:1,20;65:1,24;66:13;67:1,
22;68:8,25;69:8,25;70:16;
71:1,18,23,24;72:11,21;
73:12,19;74:10;75:4,14;
76:3,15,20;77:2,5,16;78:19;
79:17;80:12,15;83:25;
84:20,24;91:17;92:9
**videos (5)**
91:21,22,23;92:14,18
**view (4)**
47:4;54:20;70:14,15
**violated (1)**
32:4
**violating (1)**
32:12
**violative (1)**
87:22
**visual (1)**
64:16
**VOPs (1)**
23:22

**W**

**waist (4)**
59:9;77:23;82:4,19
**wait (1)**
6:17
**walk (1)**
43:10
**walked (8)**
40:17,19,20;41:6,8,9;
52:20;59:2
**walking (13)**
53:12;55:7,8,11;56:19;
64:4,23;65:4,8;68:1,4;69:2;
86:24

**wants (1)**
57:8

**Warner (1)**
12:9

**warning (1)**
22:14

**warnings (4)**
22:15,16;29:11,14

**watch (1)**
56:25

**way (11)**
5:21;6:18;7:4;55:24;
59:3;62:2;67:11;80:4;82:6,
6;84:10

**WAYMIRE (29)**
4:9,9,13,13;5:8,11,17;8:9,
14;21:2,4;45:19;50:11,15;
57:8,12,16,18;60:23;70:8;
77:4;85:1,15,20;87:23;
88:3;91:11;92:5;93:9

**wearing (1)**
86:10

**week (1)**
15:21

**weren't (1)**
39:5

**whatnot (1)**
27:16

**What's (6)**
10:19;14:24;15:10;39:13;
59:17;66:16

**whenever (7)**
30:2,8;35:5;43:9;53:5;
84:7;86:17

**WHEREUPON (44)**
4:2,17;8:10;51:25;52:17;
53:14;54:2;55:2;56:4,23;
57:21;58:6;59:24;60:9;
61:1,16;63:8;64:1,20;65:1,
24;66:13;67:1,22;68:8,25;
69:8,25;70:16;71:24;72:11,
21;73:19;74:10;75:4,14;
76:3,15,20;78:19;79:17;
82:9,13;93:10

**white (1)**
46:8

**whole (10)**
17:5;24:23;25:13;34:14;
38:20;39:11,12;43:4;44:13;
52:7

**who's (2)**
35:16;40:7

**whose (1)**
74:23

**wife (2)**
9:9;10:12

**wife's (1)**
9:11

**wiggle (1)**
51:16

**Williams (1)**
9:16

**W-I-L-L-I-A-M-S (1)**
9:16

**windows (2)**
63:23;65:21

**within (1)**
88:18

**witness (16)**
4:7,19;30:19;50:12;56:5;
57:11,13,17,20;60:24;70:9;
77:19;85:3;87:24;88:4;
91:16

**Wonderful (1)**
57:13

**wooden (1)**
16:9

**words (2)**
28:7;29:13

**work (15)**
10:12,14;14:14,21,25;
15:25;16:11,17;17:9;18:9;
24:17;34:18;35:1,8;38:2

**workday (2)**
35:7,22

**worked (3)**
17:21;27:13;50:23

**working (4)**
18:14;22:17;24:24;47:13

**works (1)**
10:16

**world (1)**
17:6

**worried (1)**
82:23

**worrying (1)**
81:17

**worth (1)**
17:14

**Wow (1)**
9:25

**wrapped (1)**
77:22

**write (5)**
26:15;31:19;81:3,10,12

**writing (1)**
46:17

**written (5)**
27:17;29:10;85:22;86:5;
89:9

**wrong (1)**
31:23

**wrote (3)**
85:11;86:3;91:24

---

## Y

**y'all (3)**
10:15;45:16;83:14

**year (10)**
11:11,13,14;12:15;13:18;
17:10,10;24:20;26:1;50:23

**years (7)**
9:18;13:12;17:24;24:9;
33:5;79:4;88:23

**young (2)**
12:2;26:12

---

## 1

**1 (1)**
46:1

**10 (1)**
28:7

**100 (6)**
22:22;31:12;44:5,6;
48:23;74:21

**100-percent (4)**
13:8;31:3;86:14;90:19

**10th (2)**
11:7,18

**11:00 (4)**
48:23;49:12,13;50:1

**11:09 (1)**
57:21

**11:16 (1)**
57:22

**11:52 (1)**
82:13

**11:58 (1)**

82:14

**12 (1)**
60:2

**12:00 (1)**
50:2

**12:11 (1)**
93:11

**12:15 (1)**
50:2

**12:30 (2)**
50:10,25

**12:45 (3)**
50:10;51:1,13

**15 (2)**
23:18;35:13

**18 (4)**
9:4;10:2;11:19;70:2

---

## 2

**2 (2)**
17:3;73:25

**2:00 (1)**
51:14

**2:07 (1)**
51:4

**2:07:43 (1)**
46:19

**2014 (1)**
11:19

**2016 (2)**
11:12,15

**2017 (1)**
13:20

**2020 (7)**
13:6;14:19;18:25;19:13;
25:25;33:10;46:19

**2021 (1)**
19:5

**21 (1)**
25:25

**23 (1)**
62:19

**24 (1)**
79:19

**25 (1)**
70:18

---

## 3

**30 (5)**
   49:5,23;50:7;61:4;67:3
**30th (2)**
   33:9;46:19
**33 (1)**
   63:11
**34 (1)**
   68:13
**37 (1)**
   64:3

---

**4**

---

**40 (2)**
   46:15;67:24
**43 (1)**
   51:4
**45 (2)**
   49:6,23
**49 (1)**
   64:23

---

**5**

---

**5:45 (1)**
   35:10
**5:50 (1)**
   58:5
**54 (1)**
   65:3
**56 (1)**
   54:5
**57 (1)**
   66:1

---

**6**

---

**68 (1)**
   12:3

---

**8**

---

**88 (2)**
   11:21;12:1

---

**9**

---

**98 (4)**
   11:22,23,24,25