IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| ADAM SINDELL, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | No. 5:22-CV-365 (CAR) |
| LATONYA COACH and JACOB CLECKNER; | : | |
| | : | |
| Defendants. | : | |
| | : | |

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Adam Sindell, who at all relevant times was a pretrial detainee in the Houston County Jail, brings claims under 42 U.S.C. § 1983 for excessive force, failure to intervene, and retaliation for exercising his First Amendment rights against Defendants Latonya Coach and Jacob Cleckner, who were deputies at the Houston County Jail.[1] Currently before the Court is Defendants' Motion for Summary Judgment. After careful consideration, the Court finds Defendants are entitled to qualified immunity and **GRANTS** Defendants' Motion [Doc. 13].

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must

---

[1] As explained in this Order, Plaintiff has abandoned his claims for deliberate indifference to his medical needs and his state law claims for assault and battery.

be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2]  A genuine issue of material fact only exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[3]  Thus, summary judgment must be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[4]  When ruling on a motion for summary judgment, the Court must view the facts in the light most favorable to the party opposing the motion.[5]

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[6]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of

---

[2] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[3] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[4] *See id.* at 249-52.

[5] *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

[6] *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).

material fact.[7]  This evidence must consist of more than mere conclusory allegations or legal conclusions.[8]

## BACKGROUND

The record contains video evidence. The United States Supreme Court has recognized a "wrinkle" in cases where the record contains video evidence, holding that when facts are disputed, and video evidence is present, a court should "view[ ] the facts in the light depicted by the videotape."[9] Following the Supreme Court and viewing the facts in the light most favorable to Plaintiff, the evidence reveals the following:

On June 30, 2020, Plaintiff was a pretrial detainee housed in L-Pod in the Houston County Jail (the "Jail"). At all times relevant to the events in this case,[10] Defendant Latonya Coach was the supervising officer on duty in L-Pod. At the time, L-Pod housed around 80 pretrial detainees on two tiers, referred to as the top and bottom tiers. Plaintiff's cell was on the bottom tier. The two tiers alternated times when they were allowed to come out of their cells for "rec time."[11]

---

[7] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.,* 477 U.S. at 324-26.

[8] *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

[9] *Scott v. Harris*, 550 U.S. 372, 381 (2007).

[10] The events in this case took place during the COVID pandemic.

[11] Coach Depo., pp. 61-62 [Doc. 19].

The two tiers surround a common area where the supervising officer's desk is located and where a computer kiosk is located for detainees to send emails and communications. During "rec time" the detainees could go to the common area and use the kiosk to file grievances and send emails. A video camera is mounted on the ceiling and records audio and video of the common area.

Jail officers were required to "shakedown" or check the detainees' cells three times per day for contraband and rule violations.[12] Officers had discretion in enforcing the Jail's rules and punishing the detainees, and Defendant Coach was more strict in enforcing the Jail's rules and policies than other officers.[13] When Coach conducted a cell check and found any rule violations, she required the detainee to go on "lockdown," where the detainee was required to remain in his cell and lose his "rec time."[14]

Five days before the incident in this case, on June 25, 2020, Plaintiff filed a grievance against Defendant Coach after she threw his Bible into the trash can[15] during a search of his cell because he possessed more books in his cell than Jail policy allowed.[16] In his grievance, Plaintiff complained that Coach "grabbed [his] mattress and yanked it out

---

[12] *Id.* at p. 54.
[13] *Id.* at p. 62.
[14] *Id.*
[15] Defendant Coach denies she threw away Plaintiff's Bible.
[16] June 25, 2020 Grievance [Doc. 21, p. 78 of 105].

from under [him] causing [him] to flip over onto the steel bed causing my elbow to slam into the metal" and injuring his elbow.[17] After reviewing L-Pod video evidence and interviewing Plaintiff, two other inmates, and Defendant Coach, BCSO internal affairs found Plaintiff's allegations that Coach threw away his Bible, unfairly targeted him, and used excessive force on him unfounded.[18]

On June 30, 2020, Defendant Coach again conducted cell checks of L-Pod. Plaintiff claims that during the cell check, Coach stated to the L-Pod detainees that there would be "no passing of food of any kind" or any extra food trays "because you got people that want to write grievances on me," and Plaintiff claims she pointed at his door.[19] She also stated to the other detainees: "You don't like it, go talk to Room One [Plaintiff's cell]. He's the reason that this is happening," and she pointed to Plaintiff's cell.[20]

During her check of Plaintiff's cell on the bottom tier, she again found Plaintiff possessed more books than the Jail's policy allowed.[21] Thus, as punishment for being in possession of contraband, Defendant Coach required Plaintiff to be on "lockdown" and

---

[17] *Id.*

[18] *Id.*

[19] Pl. Depo., p. 96 [Doc. 17]. Plaintiff testified that passing food is a "really big thing" in jail. "Everybody doesn't eat everything that's on the tray so there's a big market for: I'm going to trade you my eggs for your grits. Or we're going to do pancake for toast." *Id.*

[20] *Id.* at p. 97.

[21] Coach Depo., p. 59.

5

remain in his cell during his tier's scheduled "rec time."[22] Other detainees were also on

lockdown during rec time as punishment for rule violations Coach found during the cell

checks.[23]

During the bottom tier's rec time, Defendant Coach was located at the security

desk in the common area. Detainees on lockdown who remained in their cells could ring

or buzz the desk and speak to her.[24] Plaintiff buzzed and asked for some toilet paper.[25]

Coach retrieved some toilet paper from the desk and tossed it to another inmate—"the

pod worker"—to take to Plaintiff's cell.[26] When the pod worker reached Plaintiff's cell,

Coach unlocked it from the security desk, so Plaintiff could retrieve the toilet paper. But

once his cell was unlocked, Plaintiff walked out of his cell and went to the kiosk in the

common area to send a message to his fiancé.[27] Plaintiff admitted in his deposition that

when he went to the kiosk from his cell, Plaintiff knew he was "supposed to be locked

---

[22] *Id.* at p. 59.

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*; L-Pod Video, 3:18-3:35.

[27] Coach Depo, p. 59; L-Pod Video, 3:42-3:55.

down,"[28] but when his cell was unlocked, he "took the opportunity to get out of [his] cell."[29]

When Defendant Coach saw Plaintiff enter the common area, she clearly told him he was on lockdown[30] and instructed Plaintiff "a couple of times" to return to his cell.[31] Plaintiff, however, remained at the kiosk and did not return to his cell.[32] Because Plaintiff did not obey her instructions, Officer Coach put the entire pod down on lock down and instructed all detainees to return to their cells.[33] Coach stated at this time Plaintiff was "no immediate threat to anyone," and "everything was calm," but she locked down the entire pod because if Plaintiff did not return to his cell, assisting officers would be able to identify Plaintiff as the subject of her call.[34]

All detainees, except for Plaintiff, who remained at the kiosk, followed Coach's instructions and returned to their cells.[35] Although Plaintiff admits that he heard Coach

---

[28] Pl. Depo., p. 114; Plaintiff also stated that he had asked Defendant Coach earlier why he was locked down. *Id.*

[29] Pl. Depo., p. 120.

[30] L-Pod Video, 3:52-3:53.

[31] Coach Depo., p. 59.

[32] L-Pod Video, 3:52-3:53.

[33] Coach Depo., p. 59.

[34] *Id.* at pp. 59-60.

[35] L-Pod Video 3:55-4:51.

"holler[ ]" to "the entire dormitory to lock down," he testified he did not hear Coach's instructions that he lock down.[36]

Because Plaintiff failed to comply with her commands, Coach called for assistance.[37] Video footage shows that for the next 34 seconds, Defendant Coach waited at the security desk for assistance to arrive, and Plaintiff remained at the kiosk.[38]

Defendant Cleckner and Officer Boerger (collectively "the Officers") responded to Coach's call for assistance and arrived in L-Pod. As the Officers walked into the common area, Plaintiff, still at the kiosk, looked up and saw them. Defendant Cleckner told Plaintiff twice, in quick succession, to lock down.[39] According to Plaintiff, Defendant Coach told Cleckner, "We got one that needs his ass kicked," and Cleckner told Plaintiff, "I'm going to tell you one time to go to your cell."[40]

As Officers Cleckner and Boerger walked toward Plaintiff, Plaintiff walked away from the kiosk with his palms open down by his side, and the three came together in the middle of the common area between the kiosk and the stairs leading down to Plaintiff's

---

[36] Pl. Depo., pp. 115-116.

[37] Cleckner Depo., pp. 38, 75; Video 14:07:10.

[38] L-Pod Video 14:07:10-14:07:44.

[39] *Id.* at 14:07:45-49.

[40] Pl. Depo., p. 106. The video neither confirms nor refutes Plaintiff's claims. Thus, the Court accepts them as true for purposes of summary judgment.

8

cell.[41] Defendant Coach stood behind them near the security desk,[42] and Officer Cleckner pointed toward Plaintiff's cell.[43] One second later, Officer Cleckner wrapped Plaintiff's legs with his arms and began to take Plaintiff to the ground.[44] Officer Boerger placed one hand on Plaintiff's back and one hand on his shoulder to assist Plaintiff in a controlled fall.[45] Defendant Coach remained near the security desk.[46] As Defendant Cleckner lifted Plaintiff's lower body off the ground, Officer Boerger's arms were around Plaintiff's upper body to help control his head and upper body from hitting the floor.[47]

When Plaintiff hit the floor, Officer Boerger's right arm was under Plaintiff's neck,[48] but his head hit the concrete floor.[49] The Officers then began to turn Plaintiff on his stomach to place handcuffs on him, and his body went limp.[50] The Officers turned him to his stomach and handcuffed his hands behind his back.[51]  The Officers then lifted Plaintiff up and pulled him toward the stairs leading to his cell; but because Plaintiff's body

---

[41] L-Pod Video 14:07:49-14:07:51.

[42] *Id.* at 14:07:53.

[43] *Id.*

[44] L-Pod Video 14:07:54.

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id.* at 14:07:55.

[49] Pl. Depo. at p. 108.

[50] L-Pod Video 14:07:55-14:07:59.

[51] L-Pod Video 14:08-14:08:20.

remained limp, they instead attempted to place him in a chair.[52] Plaintiff then began

having what the Officers interpreted as a seizure.[53] Thus, an officer called the nurse and

other officers to assist.[54] Plaintiff remained on the floor appearing to have a seizure while

officers surrounded him to prevent him from harming himself. After stabilizing Plaintiff,

the officers placed him in a wheelchair and wheeled him to the medical unit.[55] Plaintiff

suffered bruising and cuts and also states that he suffered from an injured wrist, seizures,

a low-grade fever, and continued pain that limited to his ability to work.[56]

## ANALYSIS

Plaintiff claims Defendant Cleckner used excessive force in violation of his

Fourteenth Amendment[57] rights, Defendant Coach failed to intervene, and both

Defendants retaliated against Plaintiff in violation of his First Amendment rights.

Plaintiff also originally brought claims for deliberate indifference to his serious medical

---

[52] L-Pod Video 14:08:20-14:08:45.

[53] *Id.* at 14:08:52 *et al.*; Cleckner Depo., p. 61.

[54] Coach Depo., p. 79.

[55] L-Pod Video 14:17:42-14:18:17

[56] Pl. Depo., pp. 108, 166.

[57] Plaintiff alleges that Defendants' actions violated his right to be free from excessive force under the Fourth, Fourteenth, and Eighth Amendments. Because Plaintiff was a pretrial detainee, his excessive force claims fall under the Fourteenth Amendment. *See Piazza v. Jefferson Cnty., Ala.,* 923 F.3d 947, 951-52 (11th Cir. 2019) ("While the Fourth Amendment prevents the use of excessive force during arrests, and the Eighth Amendment serves as the primary source of protection against excessive force after conviction, it is the Fourteenth Amendment that protects those who exist in the in-between—pretrial detainees.").

needs and Georgia state law claims for assault and battery. Defendants now move for summary judgment contending Plaintiff has abandoned his deliberate indifference to serious medical needs and state law claims, and qualified immunity shields them from § 1983 liability.  The Court agrees.

## A. Abandoned Claims

In his Complaint, Plaintiff asserted claims for deliberate indifference to his serious medical needs and claims for assault and battery under Georgia state law. Defendants moved for summary judgment on all claims. Although Plaintiff responded to Defendants' arguments on his excessive force, failure to intervene claims, and First Amendment retaliation claims, Plaintiff failed to respond to Defendants arguments on the deliberate indifference to serious medical needs and the state law claims; thus, Plaintiff has abandoned those claims. "When a non-moving party fails to address particular claims in the moving party's motion for summary judgment but responds to other arguments, the non-moving party abandons these claims.[58]

---

[58] *Johns v. CSX Transp., Inc.*, 210 F. Supp. 3d 1357, 1373 (MD. Ga. 2016); *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

## B. Qualified Immunity

"[Q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known."[59] As the Supreme Court recently reiterated, "[w]hen properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law."[60] "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation."[61] Qualified immunity is immunity from suit and should be resolved as early as possible in the case.[62]

When an officer invokes qualified immunity, the initial burden is on the officer to show that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."[63] Once the officer satisfies that burden, the burden then shifts to the plaintiff to show that (1) a violation of a constitutional right occurred, and (2) that right was "clearly established" at the time of the violation.[64] The Court

---

[59] *Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (quotation marks omitted).

[60] *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015).

[61] *Lee*, 284 F.3d at 1194.

[62] *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009).

[63] *Lee*, 284 F.3d at 1194.

[64] *Pearson*, 555 U.S. at 232.

"may consider these two prongs in either order; an official is entitled to qualified immunity if the plaintiff fails to establish either."[65]

### 1. § 1983 Excessive Force Claim against Defendant Cleckner

Here, it is clear Defendant Cleckner was acting within the scope of his discretionary authority.  Therefore, the burden shifts to Plaintiff to prove Cleckner's use of force was unreasonable and excessive and violated his clearly established Fourteenth Amendment right to be free from excessive force. Although the Court finds in taking Plaintiff to the ground, Cleckner may have arguably used force disproportionate to the need, he did not violate Plaintiff's clearly established rights, and therefore he is entitled to qualified immunity.

"Claims alleging excessive force by pretrial detainees are governed by the Fourteenth Amendment's 'objective reasonableness' standard which resemble[s] the test that governs excessive-force claims brought by arrestees under the Fourth Amendment."[66] A pretrial detainee must show "that the force purposely or knowingly used against him was objectively unreasonable."[67] "If an officer used objectively unreasonable force, he or she violated a detainee's Fourteenth Amendment rights"

---

[65] *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 951 (11th Cir. 2019) (citing *Jacoby v. Baldwin Cnty.*, 835 F.3d 1338, 1344 (11th Cir. 2016)).

[66] *Patel v. Lanier Cnty. Ga.*, 969 F.3d 1174, 1182 (11th Cir. 2020); *see also Myrick v. Fulton Cnty., Ga.*, 69 F. 4th 1277, 1300 (11th Cir. 2023) (citing *Crocker v. Beatty*, 995 F.3d 1232, 1246 (11th Cir. 2021)).

[67] *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

thereby satisfying the first prong of the qualified immunity analysis.[68]

Objective reasonableness turns on the "facts and circumstances of each particular case."[69] In making this determination, the Court must presume that Plaintiff's version of the events is true,[70] but "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[71] In *Kingsley v. Hendrickson*, the Supreme Court set forth a non-exhaustive list of factors the Court should consider: "[T]the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting."[72]

The Court also needs to consider the "legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional

---

[68] *Myrick*, 69 F.4th at 1301.
[69] *Id.* (internal quotation marks and citation omitted).
[70] *Hope v. Pelzer*, 536 U.S. 730, 736 (2002).
[71] *Mercado*, 407 F.3d at 1157.
[72] *Myrick*, 69 F.4th at 1301 (quoting *Kingsley*, 576 U.S. at 397).

security."[73] This Court is mindful that "[o]fficers facing disturbances are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving."[74]

Taking each of these considerations into account and viewing the facts in the light most favorable to Plaintiff, the first, fourth, fifth, and sixth factors arguably weigh in Plaintiff's favor. To be sure, Plaintiff was in the common area in direct violation of Defendant Coach's lockdown order; he blatantly disobeyed Coach's subsequent orders to return to his cell; his injuries were not extensive; and the officers made attempts to limit the amount of force used—a takedown is considered by the Jail as a "soft hands" use of force,[75] Officer Boerger placed his hands behind Plaintiff to control his fall and limit injuries, and the Officers immediately called for medical assistance when Plaintiff appeared to be having a seizure.[76] But the Court is not convinced Cleckner's use of the takedown was proportional to the need, that Plaintiff presented a sufficiently severe security threat, or that the Officers perceived Plaintiff to be a sufficient security threat. When Plaintiff saw Defendant Cleckner and Officer Boerger enter L-Pod, he immediately began walking toward them with his palms open. Plaintiff was not resisting, and he was the only inmate in the common area with three officers. Cleckner

---

[73] *Kingsley*, 576 U.S. at 397 (internal quotation marks and citation omitted).
[74] *Id.* at 399 (quoting *Graham v. Connor*, 490 U.S. 386, 387 (1989)).
[75] Internal Affairs Report of Investigation, p. 21 [Doc. 21, p. 45 of 105].
[76] *See Fennell v. Gilstap*, 559 F.3d 1212, 1220 (11th Cir. 2009).

took Plaintiff to the ground in less than 10 seconds from the time he entered L-Pod and only one second after Cleckner and Boerger came in close contact with Plaintiff. Thus, the Court cannot find as a matter of law that Cleckner's conduct did not violate Plaintiff's Fourteenth Amendment rights.

But Cleckner's takedown of Plaintiff did not violate clearly established law, and therefore Defendant Cleckner is entitled to qualified immunity. "For a constitutional right to be clearly established the contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates the law."[77] "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[78]

A plaintiff may demonstrate the law clearly establishes that a particular amount of force is excessive in one of three ways.[79] First, a plaintiff can point to a materially factually similar case from the U.S. Supreme Court, the Eleventh Circuit, or the State Supreme Court where the events occurred. Second, a plaintiff may "show that a broader, clearly established principle [from prior case law] should control the novel

---

[77] *Bates v. Harvery*, 518 F.3d 133 (11th Cir. 2008).
[78] *Saucier v. Katz*, 533 U.S. 194, 202 (2001).
[79] *Patel v. City of Madison*, 959 F.3d 1330, 1343 (11th Cir. 2020).

facts of this situation."[80] Finally, a plaintiff may show that "the official's conduct lies so obviously at the very core of what the [Fourteenth] Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw."[81] Under the "obvious clarity" test, qualified immunity is only overcome "if the standards set forth in relevant precedent 'inevitably lead every reasonable officer in [the defendant's] position to conclude that the force was unlawful.'"[82] The Court's ultimate concern is "that any officer must have had fair notice, at the time he engaged in his actions, that his challenged conduct amounted to excessive force."[83]

Plaintiff fails to identify, and this Court's research fails to reveal, any case law from the Georgia Supreme Court, the Eleventh Circuit Court of Appeals, or the United States Supreme Court which put Defendant Cleckner on notice that his conduct was unlawful. Indeed, no research reveals any law from these courts finding that an officer's takedown of a pretrial detainee to the ground has ever amounted to excessive force. Certainly, this is not a case in which Cleckner's conduct was "so egregious that a

---

[80] *Id.* (quoting *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005)).

[81] *Id.* (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000)).

[82] *Id.* (quoting *Priester*, 208 F.3d at 926-27).

[83] *Id.*

constitutional right was clearly violated, even in the total absence of case law."[84] Thus, Defendant Cleckner is entitled to qualified immunity.

### 2. Failure to Intervene Claim against Defendant Coach

Plaintiff claims Defendant Coach failed to intervene and stop Defendant Cleckner from using excessive force. Even if an officer personally did not use excessive force, an officer who is present at the scene can be alternatively liable for failing to take "reasonable steps to protect the victim of another officer's use of excessive force."[85] But "an observing officer must have both the opportunity to intervene and be in a position to intervene and yet fail to do so."[86] "Instances of force that occur within seconds do not place officers in a realistic position to intervene."[87]

Here, the entire incident lasted only a few seconds. Ten seconds elapsed from the time Officers Cleckner and Boerger entered L-Pod until Cleckner took Plaintiff to the ground, and only one second elapsed after the Officers came in close contact with Plaintiff before the takedown. Officer Coach remained by the security desk and had neither an opportunity nor a position to intervene. Thus, even assuming Officer Cleckner

---

[84] *Proper v. Martin*, 989 F.3d 1242, 1251 (11th Cir. 2021).

[85] *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) (quoting *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007)).

[86] *Johnson v. White*, 725 F. App'x 868, 878 (11th Cir. 2018) (citing *Hadley*, 526 F.3d at 1331).

[87] *Id.* (citing *Hadley*, 526 F.3d at 1331 (finding no evidence from which a reasonable jury could find that an officer could have anticipated and stopped another officer from punching the plaintiff once in the stomach))

used excessive force, Officer Coach is entitled to qualified immunity on Plaintiff's failure to intervene claim.

### 3. First Amendment Retaliation Claims

Finally, Defendants seek summary judgment on Plaintiff's First Amendment retaliation claim against them. Plaintiff contends Defendant Cleckner's use of force and Defendant Coach's failure to intervene were in retaliation for communicating with his fiancé by email and filing a complaint about Officer Coach throwing away his Bible during the search of his cell on June 25, 2020.[88]

---

[88] For the first time in his response to Defendants' Motion for Summary Judgment, Plaintiff raises additional First Amendment retaliation claims that Defendant Coach <u>placed him on lockdown</u> in retaliation for filing the June 25, 2020 grievance against her, ignoring Plaintiff on the intercom when he attempted to inquire why he was placed on lockdown, and telling the entire dormitory they would not be able to pass extra food trays because Plaintiff filed a grievance against her. Plaintiff alleged in his Complaint that "<u>Defendants' violent actions</u>," not that he was placed on lockdown, "were solely in response to protected speech by Plaintiff, a violation of his First Amendment rights."[88] Plaintiff responded to interrogatories that Defendant Cleckner used excessive force, and Defendant Coach "further created [ ] conditions that aggravated Plaintiff's injuries" . . . "in an attempt to stifle and suppress Plaintiff's right to reasonable objections and consideration of Plaintiff's need to maintain communications with those in the community who support Plaintiff, and Plaintiff's complaint that he was set up to have more books than the number authorized in order to suffer punishment."[88] Indeed, in Plaintiff's Response to Defendants' Statement of Material Facts, Plaintiff states that his "First Amendment claim rests on the fact that Defendant Coach threw away Plaintiff's [B]ible, as well as Defendants trying to prevent Plaintiff from calling his family in order to ask for help against the unlawful treatment of Plaintiff while he was in pretrial incarceration." Plaintiff may not "raise additional claims for the first time in a response brief as this deprives the opposing party of the proper notice of the claim as well as the opportunity to develop a defense." *Robinson v. Houston Cty.*, No. 5:09-cv-156 (CAR), 2010 WL 2464901, *3 (June 14, 2010) (citing *Gilmour v.*

The First Amendment "protects not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right."[89] "A prisoner's right to communicate is protected by the First Amendment, which balances the prisoner's interests against prison security and administrative concerns."[90] And "[i]t is an established principle of constitutional law that an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement."[91]

"To establish a First Amendment retaliation claim, a plaintiff must show that (1) [his] speech was constitutionally protected; (2) [he] suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech; and (3) there was a causal connection between the adverse conduct and the protected speech."[92] "In order to establish a causal connection, the plaintiff must show that the defendant

---

*Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("[P]laintiff may not amend her complaint through argument in a brief opposing summary judgment.")). Thus, the additional claims are improper, and the Court will not address them.

[89] *Echols v. Lawton*, 913 F.3d 1313, 1320 (11th Cir. 2019).

[90] *Thornton v. Warren*, Case No. 1:20-cv-869-TWT-RDC, 2021 WL 2188688, *6 (N.D. Ga. May 7, 2021) (citing *Turner v. Safley*, 482 U.S. 78, 84-93 (1987); *see also Pope v. Hightower*, 101 F.3d 1382, 1384 (11th Cir. 1996) (applying *Turner*, 482 U.S. at 89-91, factors to determine reasonableness of restrictions on prisoner's First Amendment right to telephone access).

[91] *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008) (citing *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003)).

[92] *Castle v. Appalachian Tech. College*, 631 F.3d 1194, 1197 (11th Cir. 2011) (citing *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005)).

20

was subjectively motivated to take the adverse action because of the protected speech."[93]

Plaintiff cannot establish that his unauthorized communication with his fiancé was constitutionally protected speech. "[A]n inmate's First Amendment right to free speech is not protected if affording protection would be inconsistent with the inmate's 'status as a prisoner or with the legitimate penological objectives of the corrections system'"[94] "[I]f a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct,' and cannot proceed beyond step one."[95] It is undisputed Plaintiff knew he was not allowed out of his cell to communicate with his fiancé, and he violated Defendant Coach's order that he remain locked down. Moreover, regardless of whether Plaintiff heard Defendant Coach's instructions, he violated multiple direct orders to return to his cell and continued to remain at the kiosk to email his fiancé. Thus, any First Amendment retaliation claim based on his communication with his fiancé fails because it was not protected conduct.

Although Plaintiff's June 25, 2020 grievance against Defendant Coach is constitutionally protected speech, Plaintiff cannot maintain a First Amendment retaliation claim against Defendant Cleckner because Plaintiff fails to establish a causal

---

[93] *Id.* (citing *Smith v. Mosley*, 532 F.3d 1270, 1277 (11th Cir. 2008)).

[94] *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2018) (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).

[95] *Thaddeus-X v. Blatter*, 175 F.3d 378, 395 (11th Cir. 1999).

connection between Defendant Cleckner's use of force and his protected speech, and Defendant Coach is entitled to qualified immunity.

The record is devoid of evidence that Defendant Cleckner was subjectively motivated to take any adverse action against Plaintiff because of his grievance. Indeed, no evidence shows Cleckner knew anything about Plaintiff's grievance concerning Defendant Coach throwing away his Bible. The record shows that Cleckner simply responded to a call for help and acted in response to that call. Thus, Cleckner is entitled to summary judgment on Plaintiff's First Amendment retaliation claim.[96]

Accepting Plaintiff's testimony as true, as this Court must on summary judgment, a reasonable jury could find Defendant Coach was subjectively motivated to take adverse action against him because of the grievance he filed against her. Plaintiff testified that during her search of Plaintiff's cell, Defendant Coach told the L-Pod detainees they would not be allowed certain food privileges because Plaintiff filed a grievance against her, and when Defendant Cleckner and Officer Boerger arrived in L-Pod, she told them that Plaintiff "needs his ass kicked."

---

[96] *See, e.g., Nieves v. Bartlett*, 587 U.S. 391, 408 (2019) (affirming summary judgment where officer could not be liable for retaliation where no evidence showed officer knew about the acts for which the other officer allegedly retaliated); *Farrow v. West*, 320 F.3d 1235, 1278-49 (11th Cir. 2003) (affirming summary judgment on retaliation claim where evidence established alleged retaliator had no knowledge of inmate's protected speech).

But in a First Amendment retaliation case, a defendant is entitled to qualified immunity if "the record indisputably establishes that the defendant in fact was motivated, at least in part by lawful considerations."[97] So, if "the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful and unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in plaintiff's favor, the defendant is entitled to immunity."[98] It is undisputed that Plaintiff exited his cell knowing Defendant Coach had placed him on lockdown, and he violated her direct orders to return to his cell. Because no preexisting law dictates that this case be resolved in Plaintiff's favor, Defendant Coach is entitled to qualified immunity on Plaintiff's First Amendment retaliation claim.

## CONCLUSION

Based on the foregoing, Plaintiff has abandoned his § 1983 deliberate indifference to serious medical needs and state law assault and battery claims, and Defendants are entitled to qualified immunity on Plaintiff's § 1983 excessive force, failure to intervene, and First Amendment retaliation claims. Thus, Defendants' Motion for Summary Judgment [Doc. 13] is **GRANTED**.

---

[97] *Stanley v. City of Dalton*, 219 F.3d 1280, 1296 (11th Cir. 2000).
[98] *Foy v. Holston*, 94 F.3d 1528, 1535 (11th Cir. 1996).

**SO ORDERED,** this 26th day of September, 2024.

S/ C. Ashley Royal
C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT COURT